# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:    CV-00485-MHT


AUTHERINE CROSKEY,

       Plaintiff,

VS.


BIG LOTS STORES, INC.,

       Defendant.

      * * * * * * * * *


S T I P U L A T I O N


IT IS STIPULATED AND AGREED by and
between the parties, through their respective
counsel, that the deposition of AUTHERINE
CROSKEY may be taken before Kelly Gray, CSR., at
the law offices of Carpenter, Ingram &
Mosholder, LLP, 303 Sterling Centre, 4121
Carmichael Road, Montgomery, Alabama 36106, on

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 24

1    A        Yeah, about five.

2    Q        If you'll look back at Exhibit 2, which

3    is your responses to Big Lots' Interrogatories.

4    And look specifically at your response to

5    Interrogatory Number 1.

6    A        Uh-huh.

7    Q        Does this response accurately list all

8    the places you've lived in the last ten years?

9    A        Yes.

10   Q        And are the dates you provided correct?

11   A        Yes.

12   Q        And, Ms. Croskey, for the record, what is

13   your race?

14   A        Black.

15   Q        And you are female, correct?

16   A        Yes.

17   Q        And you testified that you're currently

18   married?

19   A        Uh-huh.

20   Q        And what is your spouse's name?

21   A        Erick, E-R-I-C-K.

22   Q        Croskey?

23   A        Uh-huh; yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 77

1    A        Yes.

2    Q        Okay.  And do you like working at

3    Wal-Mart?

4    A        Uh-huh.

5    Q        Do you prefer it to Big Lots?

6    A        Do I prefer Big Lots?

7    Q        Do you prefer working at Wal-Mart to

8    working at Big Lots?

9    A        I liked Big Lots.

10   Q        You liked working at Big Lots?

11   A        Uh-huh.

12   Q        Okay.  Do you like working at Wal-Mart

13   more?

14   A        Yeah, because of the money.

15   Q        Because you make more money?

16   A        They give us 40 cent raises, and Big Lots

17   only gave 25 cent raises.

18   Q        So you like working at Wal-Mart more than

19   working at Big Lots, because you make more

20   money?

21   A        Yes.

22   Q        But otherwise, you liked working at Big

23   Lots?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 78

1    A        Yeah.

2    Q        Have there been any changes in your job

3    title or your responsibilities since you started

4    working at Wal-Mart?

5    A        I was asked to be a CSS, but I haven't

6    accepted it, because it wouldn't be in the time

7    frame that I would need to be with my grandbaby.

8    Q        All right.  So is that a promotion?

9    A        Uh-huh.

10   Q        Yes?

11   A        Yes.

12   Q        And CSS is Customer Service Specialist,

13   perhaps?

14   A        Yes.

15   Q        Is that what that stands for?

16   A        Yes.

17   Q        When were you offered that position?

18   A        About a month ago.

19   Q        And you testified that's a promotion?

20   A        Yes.

21   Q        And do you know how much more money you

22   would be earning?

23   A        No.  I'm not going to guess on that, no.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 89

1    than Wal-Mart, since your separation from Big

2    Lots; is that right?

3    A        Right.

4    Q        And you have not been self-employed

5    during that time period?

6    A        No.

7    Q        So again, you have only worked at

8    Wal-Mart since you separated from Big Lots,

9    correct?

10   A        Yes.

11   Q        Let's talk about your employment history

12   with Big Lots.

13   A        Okay.

14   Q        You were hired by Big Lots on March 30,

15   1997; is that correct?

16   A        I can't say whether -- if you have a

17   document with that date, yes.

18   Q        Well, let's put it this way, do you have

19   any reason to disagree with the statement that

20   you were hired by Big Lots on March 30th, 1997?

21   A        No.

22   Q        And you were hired as a part-time

23   cashier/recovery associate; is that correct?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 90

1    A       Yes.

2    Q       And you were hired to work in Big Lots

3    Store Number 818 in Montgomery, Alabama; is that

4    correct?

5    A       Yes.

6    Q       And you worked at Store Number 818

7    throughout your employment with Big Lots; isn't

8    that true?

9    A       Yes.

10   Q       With whom did you interview when you

11   applied with Big Lots?

12   A       I can't remember his name.  It was a man.

13   Q       Do you know who was involved in the

14   decision to hire you?

15   A       No.

16   Q       Okay.  You also received an Associate's

17   Handbook when you were hired at Big Lots; isn't

18   that right?

19   A       Yes.

20   Q       And you recall signing a paper

21   acknowledging you had received the Associate's

22   Handbook and reviewed the contents?

23   A       Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 91

1    REPORTER'S NOTE:  (At this point, instrument was

2    marked for identification by the Reporter as

3    Defendant's Exhibit Number 9, after which, the

4    deposition continued, as follows:)

5

6    Q       (continued by Mr. Smith)  Ms. Croskey,

7    I've just handed you what has been marked as

8    Exhibit 9.  Do you recognize this document,

9    which is Big Lots' Equal Employment Opportunity

10   application contained in the Associate's

11   Handbook?

12   A       Yes.

13   Q       And the first line states that, "No

14   person shall be discriminated against in

15   employment because of" -- among other things --

16   "race, color or sex;" isn't that correct?

17   A       Uh-huh.

18   Q       And you were aware during your employment

19   that Big Lots' policy prohibits discrimination

20   based upon, among other things, race, color and

21   sex; is that right?

22   A       Right.

23   Q       And the sixth paragraph states that, "Any

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 92

1    formal or informal allegation that this policy

2    has been violated should be referred immediately

3    to Human Resources;" is that right?

4    A        Right.

5

6    REPORTER'S NOTE:  (At this point, instrument was

7    marked for identification by the Reporter as

8    Defendant's Exhibit Number 10, after which, the

9    deposition continued, as follows:)

10

11    Q        (continued by Mr. Smith)  And, Ms.

12    Croskey, do you also recognize this document,

13    which has been marked as Exhibit 10?  And this

14    is Big Lots' Harassment-Free Environment policy

15    also in the Associate's Handbook; is that right?

16    A        Yes.

17    Q        And you were familiar with this policy

18    during your employment?

19    A        Yes.

20    Q        And the policy states that, "Big Lots

21    strictly prohibits harassment and/or

22    discrimination based on" -- among other things--

23    "race, color and sex;" is that right?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 93

1    A      Yes.

2    Q      And the paragraph beginning with the word

3    "likewise," which is one, two, three -- the

4    fourth paragraph down, states that, "Any

5    associate who believes he/she has been the

6    subject of harassment is responsible for

7    promptly reporting the alleged act to Human

8    Resources or his/her immediate supervisor;" is

9    that correct?

10   A      Yes.

11   Q      And you were familiar with this policy

12   during your employment?

13   A      Yes.

14   Q      And the last sentence of the fifth

15   paragraph states that, "Likewise, retaliation

16   against anyone reporting acts of harassment will

17   not be tolerated;" is that correct?

18   A      That's right.

19

20   REPORTER'S NOTE:  (At this point, instrument was

21   marked for identification by the Reporter as

22   Defendant's Exhibit Number 11, after which, the

23   deposition continued, as follows:)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 94

1    Q        (continued by Mr. Smith)  Ms. Croskey,

2    I've just handed you Exhibit 11, which is a copy

3    of Big Lots' Open Door policy, right?

4    A        Right.

5    Q        And you recall this policy from the

6    Associate's Handbook you received, don't you?

7    A        Uh-huh.

8    Q        And the second sentence of that policy

9    states that, "Any associate with a question or

10   problem is entitled to use the policy and may

11   contact anyone in the organization;" isn't that

12   correct?

13   A        Correct.

14   Q        And it goes on to state that, "An

15   associate may take his or her question or

16   concern to the immediate supervisor or manager,

17   to the next level manager, or the Human

18   Resources Department;" isn't that correct?

19   A        Correct.

20   Q        And the policy also provides that

21   associates may make anonymous complaints by

22   calling the Get Real Hotline, which is a toll

23   free complaint number; isn't that correct?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 95

1    A        Correct.

2    Q        And you were familiar with this policy

3    during your employment?

4    A        Yes.

5    Q        And you recall that the 1-800 complaint

6    number was posted in the break room, correct?

7    A        Yes.

8    Q        And the last paragraph of the policy

9    states that, "Any attempt to thwart or retaliate

10   against an associate for exercising his/her open

11   door rights will be considered a serious

12   violation of company policy and may result in

13   disciplinary action up to and including

14   termination;" is that correct?

15   A        Correct.

16

17   REPORTER'S NOTE:  (At this point, instrument was

18   marked for identification by the Reporter as

19   Defendant's Exhibit Number 12, after which, the

20   deposition continued, as follows:)

21

22   Q        (continued by Mr. Smith)  Ms. Croskey,

23   I've just handed you what's been marked as

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 96

1    Exhibit 12, and this is a copy of Big Lots'

2    Standards of Conduct policy; is that right?

3    A        Right.

4    Q        And this was also in the Associate's

5    Handbook during your employment, correct?

6    A        Yes.

7    Q        And the first page states that,

8    "Violations of company policy, including the

9    Harassment-Free Environment policy, will not be

10   tolerated;" is that correct?

11   A        That's right.

12   Q        And the second page, last paragraph,

13   states that, "Associates are expected to comply

14   with this policy and report violations

15   immediately;" is that correct?

16   A        Yes.

17   Q        And you were familiar with this policy

18   during your employment, correct?

19   A        Yes.

20   Q        Do you recall that your initial rate of

21   pay at Big Lots was $5.30 an hour?

22   A        When I first started there?

23   Q        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 97

1    A    Yeah.

2    Q    And you regularly received merit-based

3    raises throughout your employment at Big Lots,

4    didn't you?

5    A    Yes.

6    Q    And these increases in pay were at least

7    every six or twelve months, correct?

8    A    Yes.

9    Q    And was Billy Pridgen an assistant

10   manager at Store Number 818 during much of your

11   employment?

12   A    Yes.

13   Q    And are you aware that he held that

14   position at the store since February of 1998?

15   A    Yes.

16   Q    And are you aware that he was often

17   involved in the decision to give you pay

18   increases?

19   A    I don't know.  I guess.  I don't know.

20   Q    If his name appears on the Big Lots'

21   Action Request forms regarding your raises,

22   would you have any reason to question Pridgen's

23   involvement in the decisions to give you pay

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1    Q        (continued by Mr. Smith)  Ms. Croskey,

2    Exhibit 16 is yet another Action Request Form

3    from Big Lots, and this one is dated March 31st,

4    2001.  Do you recognize this document?

5    A        Yes.

6    Q        It indicates you were promoted from a

7    part-time cashier to a full-time stocker

8    effective March 31st, 2001; is that correct?

9    A        Yes.

10   Q        And the document is signed by you and

11   James Williams; is that correct?

12   A        Yes.

13   Q        And Mr. Williams was an assistant manager

14   at Store Number 818?

15   A        Yes.

16   Q        Do you know who was involved in the

17   decision to promote you to this full-time

18   position?

19   A        No.

20   Q        Isn't it true that throughout your

21   employment at Big Lots, you received overall

22   ratings on your performance appraisals of

23   acceptable or meets expectations or above

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 103

1    acceptable.

2    A        Yes.

3

4    REPORTER'S NOTE:  (At this point, instrument was

5    marked for identification by the Reporter as

6    Defendant's Exhibit Number 17, after which, the

7    deposition continued, as follows:)

8

9    Q        (continued by Mr. Smith)  Ms. Croskey,

10   Exhibit 17 is a Performance Appraisal for you

11   from Big Lots.  Do you recognize this document?

12   A        Yes.

13   Q        And this Performance Appraisal was signed

14   on June 14, 2002 by you, Billy Pridgen and E.

15   Torbert; is that correct?

16   A        Yes.

17   Q        And Billy Pridgen completed this

18   appraisal for you; is that your understanding?

19   A        I don't know who does it.  I thought the

20   manager does it.  I don't know.

21   Q        You don't know?  You don't know whether

22   Billy Pridgen was involved?

23   A        Yes.  I don't know.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 106

1    Q        (continued by Mr. Smith)  Ms. Croskey,

2    Exhibit 19 is a Performance Appraisal for you

3    dated August 30, 2004; is that correct?

4    A        Yes.

5    Q        And do you recognize this document?

6    A        Yes.

7    Q        And this Performance Appraisal was signed

8    by Billy Pridgen on August 30, 2004?

9    A        Yes.

10   Q        Do you know whether Jerry Culpepper was

11   involved in preparing this evaluation?

12   A        I don't know.

13   Q        Jerry Culpepper was then the store

14   manager for Store Number 818 in August 2004; is

15   that correct?

16   A        Yes.

17   Q        And he became the store manager at Store

18   Number 818 on or about July 12, 2004; is that

19   correct?

20   A        Like I say, I don't know the dates.  I

21   don't know.  I can't really give you a positive

22   answer on --

23   Q        Do you have any reason to disagree with

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 107

1    that date?

2    A        No, I don't.

3    Q        And your overall rating was six points?

4    A        Yes.

5    Q        And according to the ratings at the

6    bottom of the page, the score gave you an

7    overall rating of acceptable; is that true?

8    A        Yes.

9    Q        And you received above acceptable ratings

10   in two categories?  Look at Exhibit 19.

11   A        Okay.  Yes, it's acceptable.

12   Q        But the 2 stands for above acceptable; is

13   that right?

14   A        Oh, okay.  Yes.

15   Q        So you received above acceptable in two

16   categories?

17   A        Yes.

18   Q        Okay.  And were you pleased with this

19   evaluation?

20   A        Yes.

21

22   REPORTER'S NOTE:  (At this point, instrument was

23   marked for identification by the Reporter as

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 109

1    appraisal for you?

2    A       Yes.  It's their signature, but I don't

3    know who -- I just know their signature is on

4    here.

5    Q       You don't know who prepared this --

6    A       I don't know who makes the decision.

7    Q       But this document was signed by Billy

8    Pridgen and Jerry Culpepper?

9    A       Yes.

10   Q       And they both signed it on 7/25/05?

11   A       Yes.

12   Q       All right.

13   A       Yes.

14   Q       And by signing it, they approved it.  It

15   says "approval signatures;" is that right?

16   A       Yes.

17   Q       So it's your understanding they approved

18   this review for you?

19   A       Yes.

20   Q       And isn't it true that you always

21   received consistently positive evaluations

22   during your employment at Big Lots?

23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 110

1    Q       And isn't it true that Billy Pridgen and

2    Jerry Culpepper gave you positive evaluations?

3    A       They -- yes.

4    Q       And throughout your employment at Big

5    Lots, did you perform your job duties well?

6    A       Yes.

7    Q       And you were able to perform your job

8    well while you were at Big Lots?

9    A       Yes.  I loved my job, yes.

10   Q       You loved your job?

11   A       Yes.

12   Q       And your claims in this lawsuit don't

13   have anything to do with your evaluations, do

14   they?

15   A       No.

16   Q       Isn't it true that at the time of your

17   separation from Big Lots, you had not received

18   any written progressive counselings or any other

19   form of reprimand or discipline since 2003?

20   A       Yes.

21   Q       And isn't it true that when employees at

22   Store Number 818 were disciplined, they were

23   issued a Progressive Counseling Form, a written

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 115

1    A    Yes.

2    Q    And if you don't understand something,

3    then do ask me so I can clarify it.

4    A    Okay.

5    Q    So when I use the term "pre-date," I

6    meant that Jerry Culpepper and Mike Williams

7    didn't even work at Big Lots when you received

8    those disciplines; is that right?

9    A    Yes.

10    Q    In this lawsuit, you allege you were

11    subjected to a hostile work environment, because

12    of your race and sex; is that correct?

13    A    Yes.

14    Q    And these are the only claims you're

15    alleging in this lawsuit, right?

16    A    Yes.

17    Q    And you've brought your claims under

18    Title 7; is that right?

19    A    If that's what -- yes.

20    Q    That's the statute.

21    A    Okay.

22

23    REPORTER'S NOTE:  (At this point, instrument was

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 118

1    you filed it?

2    A       Yes.

3    Q       And this is your signature verifying that

4    everything is true and accurate on the second

5    page of the Complaint; is that right?

6    A       Yes.

7

8    REPORTER'S NOTE:  (At this point, instrument was

9    marked for identification by the Reporter as

10   Defendant's Exhibit Number 23, after which, the

11   deposition continued, as follows:)

12

13   Q       (continued by Mr. Smith)  Ms. Croskey,

14   I've just handed you a Charge of Discrimination

15   filed with the EEOC, which has been marked as

16   Exhibit 23.  Do you recognize this document?

17   A       Yes.

18   Q       And is this a copy of your Charge of

19   Discrimination that you filed against Big Lots

20   with the EEOC on June 23rd of 2005?

21   A       Yes.

22   Q       And this is charge number 130200505216;

23   is that right?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 119

1    A        Yes.

2    Q        And you produced a copy of this document

3    in your response to Big Lots' request for

4    production; is that right?

5    A        Yes.

6    Q        And did you review this charge before it

7    was filed?

8    A        Yes.

9    Q        And is that your signature at the bottom

10   of the page?

11   A        Yes.

12   Q        And you signed the document on June 16,

13   2005?

14   A        Yes.

15   Q        And you understood this was sworn

16   testimony, correct?

17   A        Yes.

18   Q        Is everything in the charge truthful and

19   accurate?

20   A        Yes.

21   Q        And you've included the relevant facts?

22   A        Yes.

23   Q        And in the box indicating the date the

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 120

1    alleged discrimination took place, you noted

2    March 28th through 30, 2005; is that correct?

3    A       Yes.

4    Q       And those are the dates you allege the

5    discrimination took place, correct?

6    A       Yes.

7    Q       And in the Cause of Discrimination box --

8    A       Okay.

9    Q       -- you checked race and sex; isn't that

10   correct?

11   A       Yes.

12   Q       And those are the two things you believe

13   your discrimination was based on, your race and

14   your sex; is that right?

15   A       Yes.

16   Q       And attached to the EEOC charge are

17   Exhibits A and B to the charge; is that right?

18   A       Yes.

19   Q       And did you draft Exhibit A?

20   A       Yes.

21   Q       You wrote it?

22   A       No.  I wrote down -- I wrote down what he

23   told -- what happened to me.  I told him what

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 121

1    happened, and he wrote this up.

2    Q        Okay.  So your lawyer, Gary Atchison --

3    A        Yes.

4    Q        -- he actually prepared the document; is

5    that right?

6    A        Yes, he did.

7    Q        And he was representing you at the time?

8    A        Yes.

9    Q        And is the information contained in

10   Exhibit A complete with respect to the specific

11   facts underlying your EEOC charge?

12   A        Yes.

13   Q        And did you file your charge because you

14   were complaining about the pictures Mike

15   Williams made?

16   A        And other --

17   Q        And other things?

18   A        Yeah.

19   Q        Mike Williams was then an associate

20   manager at Store Number 818; is that correct?

21   A        Yes.

22   Q        And is his full name Gerald Michael

23   Williams; is that right?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 122

1    A       Yes.

2    Q       And with respect to the pictures, what

3    specifically are you alleging Mike Williams did?

4    A       I was working in the toy department, and

5    I was on the wall and I was hanging toys up

6    on --

7    Q       Are you referring to the pictures?

8    A       I'm referring to the screw.

9    Q       I'm asking you about the pictures.

10   A       Oh, what -- what do you want -- oh, what

11   I hate about these pictures (indicating)?

12   Q       Well, tell me specifically what you think

13   Mike Williams did with respect to these

14   pictures.

15   A       He put me on a dollar bill, $100.00 bill,

16   and he put bogus -- I'm just as bogus as this --

17   as this note.  That's downgrading.  I gave him

18   my -- I took a picture for it to go on the card,

19   and he put me on these (indicating).

20   Q       Like a name bandage; is that what you

21   mean when you say "a card?"

22   A       Yes.

23   Q       Okay.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 123

1    A       And he put me on a $100.00 bill, and then

2    put "bogus."  And then he put me on this picture

3    looking like clowns.  That was hurting.  And

4    then he turned around and put me on a picture

5    with Jerry, sitting in his lap, with another

6    woman's body.

7    Q       Okay.

8    A       And with my arms around him.  I've never

9    been hurt like that.  I've never seen nothing

10   like this in all the years and every where I've

11   been.  I never thought something like this --

12   Q       Okay.  Are the pictures about which

13   you're complaining attached as Exhibit B to your

14   EEOC charge?

15   A       Yes.

16   Q       And on this first page of Exhibit B,

17   that's not you, is it?

18   A       No.  Where?  No, it's not (indicating).

19   Q       And I'm referring to this photograph that

20   says, "Where are we going, hun?"  That's not you

21   there in that picture, is it?

22   A       No.

23   Q       Is it your understanding that Mike

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 124

1    Williams made all the pictures attached as

2    Exhibit B to your EEOC charge?

3    A      Yes.

4    Q      Why do you think that?

5    A      Do I know that he made these?

6    Q      Yes.

7    A      Because he brought them to work, and he

8    told me -- he told us that he did this on his

9    computer.

10   Q      So he said he did it?

11   A      Yes.

12   Q      Okay.  Now, who are the two individuals

13   in this picture on the first page of your

14   Exhibit B?

15   A      Jerry Culpepper and Linda Sankey.

16   Q      And Linda Sankey is a black female?

17   A      Yes.

18   Q      And the other picture -- person in the

19   picture is Jerry Culpepper, the store manager;

20   is that right?

21   A      Yes.

22   Q      And he's a white male, correct?

23   A      Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 127

1    the office then, to staple -- to put the

2    stamp --

3    Q       Did you see Mike Williams put that up

4    there?

5    A       No.

6    Q       Okay.  You don't have any personal

7    knowledge as to whether Mike Williams was really

8    the person that hung up the picture, do you?

9    A       No, just -- Linda told me to come and

10   look at it; he had pinned it up on the wall.

11   Q       But you don't personally know whether

12   Mike Williams actually hung that picture?

13   A       No.

14   Q       And you're referring to just this picture

15   dated 3/29/05 that includes only Linda Sankey,

16   correct?

17   A       Yes.

18   Q       Because you're not in this picture, you

19   weren't affected personally by this picture,

20   were you?

21   A       No.

22   Q       On the second page of your Exhibit B

23   includes pictures of various individuals on play

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 128

1    or fake $100.00 bills; is that correct?

2    A       Yes.

3    Q       Okay.  And were these individuals all Big

4    Lots' employees?

5    A       Yes.

6    Q       Now, are you pictured on any of these

7    play $100.00 bills?

8    A       Yes, I'm the first one.

9    Q       All right.  So as we're looking at them,

10   they're on the left.  There are one, two, three,

11   four, five on the left side of the page; is that

12   right?

13   A       Yes.

14   Q       And you're saying that's you in the first

15   picture; is that right?

16   A       I'm the first picture on the dollar, and

17   I'm in Jerry's lap.

18   Q       Okay.  I'm asking you about the $100.00

19   bill.

20   A       Yes.

21   Q       Now, tell me who the employees are on

22   these play bills.

23   A       Barbara, Linda, Lola --

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 129

1    Q        Hold on.  You're in the first one.  Who's
2    in the second one?
3    A        Barbara.
4    Q        Barbara who?  Martin?
5    A        Yes.
6    Q        Okay.  Next?
7    A        Linda Sankey.
8    Q        Uh-huh.
9    A        Lola Abner.
10   Q        Lola Abner is in the fourth one down; is
11   that right?
12   A        Yes.
13   Q        And who's in the fifth one down?
14   A        Nicole Reed.
15   Q        Are you aware that pictures of all
16   employees who worked in the store at the time --
17   and by "the store" I'm meaning Store Number
18   818 -- were put on play $100.00 bills by
19   Williams?
20   A        No.
21   Q        You're not aware of that?
22   A        No.
23   Q        Do you have any reason to disagree with

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 130

1    that statement?

2    A       I don't have a reason to disagree.

3    Q       Okay.

4    A       I just know --

5    Q       Do you -- do you know whether Williams

6    put pictures of all the employees on play

7    $100.00 bills regardless of their race or their

8    gender?

9    A       I don't know.

10   Q       Do you know whether white employees were

11   also included on these play $100.00 bill

12   pictures?

13   A       There's only three in there, the

14   managers.  And the only manager that was on --

15   it wasn't on no fake $100.00 bill.  It was just

16   the black ladies.  The only woman that's in

17   there --

18   Q       Okay.  I'm asking you whether you know

19   whether white employees were also included on

20   play $100.00 bills.

21   A       No.

22   Q       You don't know?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 131

1    Q       Do you know whether male employees were
2    also included on play $100.00 bills?
3    A       No, I don't know.
4    Q       And again, we're talking about the
5    pictures on the play $100.00 bills.  The
6    pictures that -- or the $100.00 bills that don't
7    include you didn't affect you personally, did
8    they, because you weren't in them?
9    A       In the $100.00 bills?  I'm in there.
10   Q       You're in one of them.
11   A       Yeah.
12   Q       What I'm saying, the other four didn't
13   affect you personally, did they, because you
14   weren't a part of those pictures?
15   A       I was concerned about mine.
16   Q       The only -- the only play $100.00 bill
17   that affected you was the one that had your
18   picture on it; is that right?
19   A       Yes.
20   Q       And did you find -- so the only play
21   $100.00 bill that you found objectionable was
22   the one that had your picture; is that right?
23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 132

1    Q       Why did you find that objectionable?

2    A       He put me on a $100.00 bill, and he said

3    I'm just as bogus as this note that's written in

4    small print all around the $100.00 bill, and

5    he's got, "Bogus cash; fake."  That made me --

6    Q       It was play money, correct?

7    A       It was real money.  The colored pictures

8    will show you it's real money.

9    Q       Well, but the whole point was, it was

10   someone's picture imposed on what is play money;

11   it wasn't real money that you could spend.

12   A       It was fake money that was done on paper.

13   Q       Okay.  But the whole point, he was making

14   play money; is that right?

15   A       It's not play money.  It's real money.

16   He just -- he just redid the words.

17   Q       He didn't make real money.  He just was

18   making play money, correct --

19   A       Yes.

20   Q       -- like you use for a Monopoly game or

21   something like that?

22   A       Okay.  Yes.

23   Q       Do you see what I'm saying?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 133

1    A       Yes.

2    Q       So that's the type of thing it was; it

3    was play money like you would use in a board

4    game or something is what he was creating,

5    correct?

6    A       I guess.

7    Q       These pictures and the text on the play

8    $100.00 bills don't have anything to do with the

9    employees' race or gender, do they?

10   A       I think they do.

11   Q       Okay.  Do they refer to the individual's

12   race or gender?

13   A       On the pictures, on the money, yes,

14   because it's all black ladies.

15   Q       Okay.  Other than the fact that they're

16   black individuals, these dollar bills don't say

17   anything about their race or gender, do they?

18   A       No, but --

19   Q       And the language doesn't say anything

20   about their race or gender, does it?  Answer my

21   question.

22   A       No.

23   Q       It does not?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 134

1    A        The language?  Yes, it does.  He called
2    me fake.
3    Q        Okay.  That doesn't have anything to do
4    with your race or gender, does it?
5    A        No.
6    Q        Okay.  And the term "bogus" doesn't have
7    anything to do with your race or gender, does
8    it?
9    A        No.
10   Q        Okay.  So nothing written on these play
11   $100.00 bills has anything to do with your race
12   or gender, does it?
13   A        No.
14   Q        So you just didn't like the fact that
15   your picture was used on one of these.  But
16   otherwise, it didn't have anything to do with
17   your race or gender, did it?
18   A        No, sir.  Yes; you're right.
19   Q        Now, are you depicted in any of the other
20   pictures on Exhibit B?
21   A        Yes.
22   Q        Which one?  This one in the top right
23   corner?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 135

1    A    Yeah, as a clown.

2    Q    And I'm sorry, where are you?

3    A    On the top right here (indicating).

4    Q    Okay.  So you're in this first picture --

5    or the first $100.00 play bill --

6    A    Uh-huh.

7    Q    -- listed, right?

8    A    Yes.

9    Q    And then are you saying that's also you

10   to the right of that --

11   A    Yes.

12   Q    -- in the clown picture?

13   A    Yes.

14   Q    And is that the only other picture you're

15   in?

16   A    No.  I'm sitting in his lap with my

17   arm --

18   Q    So you're also in the top right picture;

19   is that right?

20   A    Yes.

21   Q    In the hat?

22   A    Yes.

23   Q    Okay.  Now, are you sure those are your

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 137

1    A       They was dressed up as clowns in the
2    movie.
3    Q       What movie?
4    A       The picture, See No Evil, Hear No Evil,
5    they was dressed up like --
6    Q       Have you ever seen that?
7    A       Yes.
8    Q       You don't know that that has anything to
9    do with this picture, do you?
10   A       I can't say that.  I can say what I look
11   like.
12   Q       But you find it objectionable, because
13   you don't like the fact that you're pictured in
14   a clown outfit; is that right?
15   A       Yes.
16   Q       All right.  So that's what you find
17   objectionable about this second picture?
18   A       Yes.  Done by a manager, member of
19   management, yes.  I don't think --
20   Q       Okay.  But what you find objectionable
21   about the picture itself is just the fact that
22   you're wearing a clown outfit; is that right?
23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 138

1    Q        Okay.  Now, let's talk about the next
2    picture, which is the top right corner; is that
3    right?
4    A        Yes.
5    Q        All right.  Now, that picture also
6    includes a white male employee; is that right?
7    A        Yes.
8    Q        And who is that?
9    A        Jerry Culpepper.
10   Q        All right.  So his face has been imposed
11   on someone else's body as well, correct?
12   A        Yes.
13   Q        And he's depicted in someone else's
14   clothing, just as you are; is that right?
15   A        Yes.
16   Q        So kind of the same thing has been done
17   to both of you in this picture; is that right?
18   A        Yes.
19   Q        And, in fact, you're saying -- the body
20   you're imposed on, your face is imposed on,
21   you're calling Jerry Culpepper, the white male,
22   a sap, aren't you?
23   A        I'm calling him a sap?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 139

1    Q      Yeah.  I mean, it looks like that's what

2    you're supposed to be thinking in the caption.

3    Do you see the caption?

4    A      Yeah.

5    Q      Okay.

6    A      Yeah.

7    Q      So it could be that he might even find

8    this picture more objectionable than you; is

9    that possible?

10   A      I don't know.  I know he was mad that day

11   when I called.

12   Q      Jerry Culpepper was?

13   A      Yes.

14   Q      All right.  So -- but you see how -- I

15   mean, you can see it would be possible that he

16   could even find this more objectionable than

17   you; is that right, Jerry Culpepper could?

18   A      Well, yes.

19   Q      Okay.  So what you find objectionable

20   about this is that your face has been imposed on

21   somebody else's body and the clothing you're

22   wearing; is that correct?

23   A      Yes.  And I was sitting in his lap.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 146

1    Q       You're here to respond to my questions.

2    A       Yes, sir.

3    Q       And I asked you what you found

4    objectionable about that picture in the top

5    right corner.

6    A       Yes.

7    Q       Is that all?

8    A       That's it.

9    Q       And you were not affected by any of the

10   other pictures that you're not in; is that

11   correct?

12   A       No.

13   Q       Is that correct?

14   A       Yes.

15   Q       All right.

16   A       No, it's not.

17   Q       Okay.  Let me try it again to make sure

18   this is clear.  The only pictures on this page

19   that affected you personally were the ones that

20   you were in; is that right?

21   A       Yes.

22   Q       The others didn't affect you personally?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 147

1    Q    And so is it your testimony that Mike

2    Williams had pictures of you -- or a picture of

3    your face to go on a name badge, and that he

4    imposed it into this play $100.00 bill, onto

5    this body wearing a clown outfit --

6    A    Yes.

7    Q    -- and then in this other picture with

8    you -- I'll just identify it with a cartoon

9    caption; is that right?

10   A    Yes.

11   Q    Now, do you know -- obviously again,

12   Jerry Culpepper is also in this other picture

13   with you on the top right corner, correct?

14   A    Yes.

15   Q    Do you know whether Mike Williams made

16   the same or similar pictures of other male

17   employees?

18   A    No.

19   Q    Do you know whether Mike Williams made

20   pictures of any male employees in a clown

21   outfit?

22   A    No.

23   Q    Do you know whether Mike Williams made

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 148

1    the same pictures or similar pictures, as those

2    on this second page of your exhibit, of other

3    white employees?

4    A       No.

5    Q       Isn't it true that the majority of hourly

6    employees at Store Number 818 -- or indeed all

7    the employees at Store 818 at this time were

8    black females?

9    A       Yes.

10   Q       All right.  And there are other pictures

11   on this page that include a while male, as well;

12   is that right?

13   A       Yes.

14   Q       And is that Jerry Culpepper --

15   A       Yes.

16   Q       -- in each of these pictures?

17   A       Yes.

18   Q       So this is the store manager that Mike

19   Williams put in these other pictures, correct?

20   A       Yes.

21   Q       And he is shown in silly clothing and

22   making silly comments just like all the other

23   individuals in the pictures on this page; is

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 149

1    that correct?

2    A       Yes.

3    Q       So is it your testimony that three of the

4    twelve pictures on page 2 of Exhibit B include

5    you?

6    A       Yes.

7    Q       And page 2 has the date 3/30/05 written

8    on the bottom of the page.  Did you write this?

9    A       No.

10   Q       Did Linda Sankey?

11   A       Yes.

12   Q       Do you know when?

13   A       No.

14   Q       Okay.  And did you tell me -- back to the

15   first page of Exhibit B.  Who showed you this

16   picture?

17   A       Linda.

18   Q       Linda Sankey did?

19   A       Yes.

20   Q       Now, had she taken it off the wall at

21   that point?

22   A       She snatched it off the wall.  He tried

23   to get it, and she snatched it.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 150

1    Q    Okay.  I'm asking you what you observed.

2    Were you there?

3    A    No.

4    Q    Okay.  So you weren't there.

5    A    I was on the floor working.

6    Q    So you never saw this posted anywhere?

7    A    No.

8    Q    All right.

9    A    She said it was posted on the wall, and

10   she snatched it --

11   Q    This is what Linda Sankey told you?

12   A    Yeah.  He tried to --

13   Q    But you don't have any personal

14   knowledge?

15   A    No.  He tried to get it.

16   Q    I want you to testify only about what you

17   have personal knowledge of, unless I ask you

18   about something else, okay?

19   A    Okay.

20   Q    So you never saw this posted?

21   A    No.

22   Q    And Linda Sankey was the one who showed

23   it to you?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 151

1    A      Yes.

2    Q      And you don't have personal knowledge as

3    to how she got this, do you?

4    A      No.

5    Q      All right.  Now, back to the second page

6    of Exhibit B that we were just discussing.  When

7    did you first see this page?

8    A      That morning.

9    Q      What morning?

10   A      The 30th.

11   Q      All right.  Did Linda Sankey show you

12   this one, too?

13   A      Yes.

14   Q      And did she have it in her possession at

15   that time?

16   A      Yes.

17   Q      Okay.  And is that the only time you saw

18   it, is when Linda Sankey gave it to you?

19   A      Yes.

20   Q      Do you have any personal knowledge as to

21   how Linda Sankey got it?

22   A      Off the wall.

23   Q      That's what she told you?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 152

1    A       Yes.

2    Q       But you didn't see it on the wall?

3    A       No.

4    Q       And you didn't see her take it down from

5    the wall?

6    A       No.

7    Q       None of the captions in the pictures on

8    the second page -- and by "caption," I'm

9    referring to the language or the writing on

10   them -- none of those have anything to do with

11   race or gender, do they?

12   A       Yes.

13   Q       What?

14   A       This right here seems like I'm a

15   prostitute; like I'm working for money.

16   Q       Listen to my question.  Why do you -- I'm

17   asking whether any of the words on any of this

18   relate to your race or gender.

19   A       No, it don't.

20   Q       They do not, do they?

21   A       No.

22   Q       None of them on this page?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 153

1    Q      And indeed, no words on this page -- and
2    again I'm referring to the second page of
3    Exhibit B -- have anything to do with any of the
4    employees' race or gender, do they?
5    A      That don't have anything to do with mine.
6    I don't know about their gender, but I know -- I
7    don't know.
8    Q      But the pictures that you testified you
9    were affected by on this page, that you
10   personally found objectionable and they
11   personally affected you, they don't have
12   anything to do with your race or gender, do
13   they?
14   A      No.  I take that back.  My race, it does,
15   but my gender, it doesn't.
16   Q      All right.  So the pictures that you
17   allege Mike Williams made don't have anything to
18   do with your gender; is that what you said?
19   A      That's what I'm saying.
20   Q      Nothing to do with your gender, but
21   you're saying they do have something to do with
22   your race; is that correct?
23   A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 154

1    Q        And why?

2    A        Because it seems as though he's

3    downgrading the blacks, to me.

4    Q        That's your personal opinion?

5    A        That's my personal opinion.

6    Q        That's your speculation?

7    A        That's my speculation.

8    Q        But you testified he's got Jerry

9    Culpepper in these pictures, as well, correct?

10   A        Yes.

11   Q        And Jerry Culpepper is a white male,

12   correct?

13   A        Yes.

14   Q        And does he appear to be downgrading

15   Jerry Culpepper, also?

16   A        When Jerry Culpepper -- yes, because when

17   he saw these pictures, he was mad.

18   Q        I'm just asking whether he appears to --

19   based on what you're looking at in these

20   pictures, it also looks like he's downgrading,

21   to use your term, Jerry Culpepper as well,

22   correct?

23   A        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 155

1    Q    And Jerry Culpepper is white?

2    A    Yes.

3    Q    All right.  But again, the language, the

4    words on this don't have anything to do with

5    your race, do they?

6    A    No.

7    Q    All right.  And the pictures on page 3 of

8    Exhibit B appear to be name badges for certain

9    employees.  Specifically Ms. Martin, Lola Abner,

10   Nicole Taylor and you; is that correct?

11   A    Yes.

12   Q    And isn't it true that Mike Williams put

13   the pictures of all store employees on the name

14   badges?

15   A    I don't know.

16   Q    You don't find anything objectionable or

17   discriminatory about the pictures on these name

18   badges, do you?

19   A    Yes, I do.

20   Q    And why is that?

21   A    Because he used my Social Security

22   number.

23   Q    Okay.  I'm asking whether you found

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 157

1    A       Three numbers are missing.

2    Q       Okay.  Listen to my question, if you

3    would.  This is not your complete Social

4    Security number, is it?

5    A       No.

6    Q       And you don't have any reason to think

7    that this has anything to -- the use of your

8    partial Social Security number doesn't have

9    anything to do with your race or gender, does

10   it?

11   A       No.

12   Q       Okay.  And you don't have any personal

13   knowledge as to why Mike Williams used the

14   employees' pictures on the play money and the

15   other pictures about which you're complaining?

16   And I'm referring to the pictures, you know, in

17   Exhibit B that we're discussing.

18   A       No.

19   Q       So you don't know why he did those, do

20   you?

21   A       No.

22   Q       And you don't know whether he just

23   thought it would be funny, do you?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 158

1    A       I don't know what he was thinking.

2    Q       Could it be that he just had an odd sense
3    of humor different from your own?

4    A       No.

5    Q       You don't know whether his sense of humor
6    is different from your own?

7    A       It's different from mine.

8    Q       Right.  You may not find this funny, but
9    you don't know whether he did, correct?

10   A       Yes.

11   Q       And you don't have any personal knowledge
12   as to whether race or gender had anything to do
13   with Williams making these pictures, do you?

14   A       No.

15   Q       Do you know whether the store manager or
16   any higher level manager had given Williams
17   permission to make any of these pictures?

18   A       No.

19   Q       Do you know whether the store manager or
20   any other high level manager had prior knowledge
21   of these pictures that Williams made?

22   A       No.  Oh, the store manager did.

23   Q       Prior knowledge, before they were made.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 165

1    real.  I'm just a down home -- I'm from the old
2    school.  I don't like that.
3        Q       Okay.  So you just don't like that.  You
4    don't like the word "bogus," right?
5        A       I don't like fake.
6        Q       It's not funny to you.
7        A       I don't like anything fake.  I don't want
8    nothing fake.  I'm not fake.  Don't put me up
9    under something calling bogus and fake.  That
10   hurts.
11       Q       All right.
12       A       It hurts.
13       Q       And you didn't talk -- you didn't
14   complain to Williams personally about these
15   pictures, did you?
16       A       No.
17       Q       And you personally didn't complain to
18   anyone else about these pictures?
19       A       Yes, I did.
20       Q       To whom?
21       A       I called Human -- I called Asset
22   Protection, and I told them what it was on.
23   Then Jerry --

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 166

1    Q        Called who?

2    A        Asset Protection.

3    Q        Okay.

4    A        And then they got in touch --

5    Q        But you didn't go to Jerry Culpepper --

6    A        Jerry was out of town.

7    Q        Okay.  Go on.

8    A        And Jerry came back in town.  They told

9    him to get down to the store.

10   Q        When you called Asset -- you personally

11   called Asset Protection?

12   A        Uh-huh.

13   Q        Is that like loss prevention?

14   A        Yeah.

15   Q        What did you say when you called them?

16   A        I told them that Mike had put us on some

17   pictures in the store, and some clowns and fake

18   money, and he said that he would get in touch

19   with Jerry and Jerry would get back -- be back

20   in town so they -- Jerry said they told him to

21   come back immediately.

22   Q        All right.  Now, is that all you said

23   when you talked to somebody in the Asset

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1    Protection?

2    A        I had called Human Resources, also.

3    Q        You called Human Resources, also?

4    A        Yes, I did.

5    Q        On the same day?

6    A        Yes.

7    Q        What day was this?

8    A        That date, the 30th.

9    Q        Who did you speak with in Human

10   Resources?

11   A        I tried to speak to -- oh, I spoke

12   with -- I can't think of the man's name.  I

13   don't remember his name.

14   Q        Okay.  Do you remember the name of the

15   person you spoke to in Asset Protection?

16   A        Yes.  It was a man.  He left -- I don't

17   know his name.  I don't remember his name.

18   Q        All right.  What did you say when you

19   spoke to someone in Human Resources?

20   A        I don't know if it was Mark or --

21   Q        What did you say when you spoke to

22   somebody in Human Resources?

23   A        I told him he had put pictures of me and

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 174

1    A      He was really mad.

2    Q      Did he think they were unprofessional?

3    A      Yes.

4    Q      All right.  And then what happened next?

5    A      I was -- the next day, he called me in

6    the office.  They -- he had talked to the DM.

7    Q      Who was that?

8    A      Jim.  I don't know his last name.

9    Q      Jim?  And by DM, you mean the District

10   Manager?

11   A      Yes.

12   Q      Okay; all right.  And then what happened?

13   So the next day you --

14   A      I was called in the office.

15   Q      Jerry Culpepper called you in the office?

16   A      Yes.

17   Q      And the District Manager was there?

18   A      Yes.  Billy and him was in the office

19   then.  The District Manager talked to me that

20   day, also.

21   Q      Who's Billy?

22   A      Pridget.

23   Q      Okay.  So Jerry and Billy Pridget?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 175

1    A    Was in this office.

2    Q    And then what happened in the office?

3    A    He said what they --

4    Q    Did they apologize?

5    A    Yes.  They apologized to me, and they

6    said they would get Mike in to apologize, and

7    they said they wrote him up.

8    Q    Uh-huh.

9    A    And said, "This won't happen again."  And

10   he asked me did I want his apology.  I told him

11   I didn't want Mike's apology.

12   Q    Okay.  So they said it wouldn't happen

13   again, and they apologized?

14   A    They did; they did.

15   Q    That's what I'm asking.

16   A    Uh-huh.

17   Q    Okay.  And did you -- do you remember

18   anything else you said about the pictures at

19   that point?

20   A    Nothing else.

21   Q    Okay.  And these pictures hadn't been up

22   or anything; they had already been taken down at

23   this point?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 178

1    would call me in the office to write a statement

2    or something, write something down.  They didn't

3    volunteer anything like that.  They said they

4    was handling it, management did.

5    Q        Yeah.  All right.  So again my question

6    was, you didn't write down any complaint in

7    writing, did you?

8    A        No.

9    Q        Okay.  Are you aware that Big Lots

10   determined Mike Williams had violated company

11   policy, specifically the Standards of Conduct,

12   by making the pictures?

13   A        Yes.

14   Q        Are you aware that Mike Williams was

15   disciplined after the pictures -- or about the

16   pictures, rather, on April 5th, 2005?

17   A        I don't know.

18   Q        All right.

19   A        I don't know.  He was still employed.  I

20   don't know.  I don't know what they did to him.

21   Q        You don't know whether he was

22   disciplined?

23   A        No, I don't know.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 179

1    Q      You have no reason to disagree with that?

2    A      I don't know.

3    Q      But you said Jerry Culpepper told you he

4    was going to?

5    A      Yes.  So I don't know whether he did or

6    not.

7    Q      And you're aware that Williams'

8    employment with Big Lots ended shortly

9    thereafter, correct?

10   A      He was looking for a job before.

11   Q      My question was, you're aware that

12   Williams' employment with Big Lots ended shortly

13   after this incident, correct?

14   A      Yes.

15   Q      And are you aware that Williams'

16   separation from Big Lots was effective April

17   11th, 2005?

18   A      No.

19   Q      Do you have any reason to disagree with

20   that date?

21   A      No.

22   Q      And isn't it true that as soon as Big

23   Lots learned about the pictures, it investigated

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 180

1    the incident?

2    A       Yes.

3    Q       And isn't it true that after Big Lots'

4    timely investigation and its discipline of

5    Williams, there were no more such pictures?

6    A       Yes.

7    Q       And don't you agree that Big Lots

8    corrected any problems with Mike Williams and

9    these pictures by disciplining him?

10   A       No; no.

11   Q       There were no more pictures after --

12   A       There were no more pictures, but --

13   Q       All right.  So this stopped the pictures,

14   correct?

15   A       That stopped the pictures.

16   Q       So the actions that Big Lots took towards

17   Mike Williams ended the pictures about which

18   you're complaining about, correct?

19   A       Yes.

20   Q       So Big Lots took effective action,

21   correct?

22   A       Yes.

23   Q       And you were pleased with the way Big

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 182

1    Q      But after Big Lots found out and did its

2    investigations and investigated and disciplined

3    him, there were no more pictures, correct?

4    A      Right.

5    Q      All right.  So that problem with Mike

6    Williams was corrected by what Big Lots did,

7    correct?

8    A      Yes.

9    Q      Okay.  You personally would have liked to

10   have seen him fired, right?

11   A      Yes.

12   Q      But that's just your personal opinion?

13   A      Yes.

14   Q      And you're not personally familiar with

15   the circumstances surrounding his separation

16   from Big Lots, are you?

17   A      No.

18   Q      Are you aware that Mike Williams first

19   became employed by Big Lots at Store Number 818

20   on December 20th, 2004?

21   A      I don't know the date.

22   Q      Okay.  So you testified that this EEOC

23   charge was based on these pictures that Mike

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 183

1    Williams made; those that we just testified

2    about, right?

3    A        Yes.

4    Q        And also some other incidents; is that

5    right?

6    A        Yes.

7    Q        In addition to those pictures, correct?

8    A        Yes.

9    Q        And these other incidents or comments

10   that you're referring to, those are the ones

11   that you specifically identified in the second

12   charge you filed with the EEOC; is that right?

13   A        Yes.

14   Q        Okay.  So the last paragraph -- let's

15   look back at -- the last paragraph of Exhibit A

16   to your EEOC charge states, "That management at

17   Big Lots 818, furthermore during the last 180

18   days has made many comments and statements of a

19   racially and sexually harassing nature."  There

20   you're referring to other comments that you

21   specifically identified in your second EEOC

22   charge; is that right?

23   A        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 184

1

2      REPORTER'S NOTE:  (At this point, instrument was

3      marked for identification by the Reporter as

4      Defendant's Exhibit Number 24, after which, the

5      deposition continued, as follows:)

6

7      Q       (continued by Mr. Smith)  Okay.  You've

8      just been handed a document that's been marked

9      as Exhibit 24, which is a Dismissal and Notice

10     of Rights from the EEOC; is that right?

11     A       Yes.

12     Q       And is this a copy of the Dismissal and

13     Notice of Rights you received from the EEOC with

14     respect to your EEOC charge number

15     130-2005-05216?

16     A       Yes.

17     Q       And you produced a copy with your

18     discovery responses, didn't you?

19     A       Yes.

20     Q       And the document indicates it was mailed

21     on June 29th, 2005; is that right?

22     A       Yes.

23     Q       And you received the document on or about

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 185

1    that date, correct?

2    A      Yes.

3    Q      And the box that's checked that states,

4    "The facts alleged in the charge fail to state a

5    claim under any of the statutes enforced by the

6    EEOC;" is that right?

7    A      Yes.

8    Q      And under "Notice of Rights, I guess the

9    last sentence of the first paragraph states,

10   "Your lawsuit must be filed within ninety days

11   of receipt of this Notice;" is that correct?

12   A      Yes.

13

14   REPORTER'S NOTE:   (At this point, instrument was

15   marked for identification by the Reporter as

16   Defendant's Exhibit Number 25, after which, the

17   deposition continued, as follows:)

18

19   Q      (continued by Mr. Smith)  You've just

20   been handed a letter to you from the EEOC, which

21   has been marked as Exhibit 25.  Do you recognize

22   this letter?

23   A      Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 186

1    Q       This is a letter to you dated 6/29/05

2    from Allen Gosa, G-O-S-A, with the EEOC,

3    correct?

4    A       Yes.

5    Q       And you produced a copy in response to

6    Big Lots' request for production, correct?

7    A       Yes.

8    Q       In it the EEOC states that your charge

9    has been dismissed.  From the facts presented,

10   the EEOC did not conclude that the photographs

11   and illustrations constitute a racially or

12   sexually hostile work environment; is that

13   correct?

14   A       Yes.

15   Q       And the last paragraph states that,

16   "Should you decide to pursue the claim, you must

17   do so within ninety days from the date you

18   receive the Dismissal and Notice of Rights;" is

19   that correct?

20   A       Yes.

21   Q       And in the second paragraph, Mr. Gosa

22   states that the EEOC concluded that the

23   photographs and illustrations you presented as

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 191

1    A       No.

2    Q       But then you went on and you returned to

3    work and performed your work duties at that

4    point, right?

5    A       I did that, and then I called -- made

6    those calls.

7    Q       Okay.  Well, that wasn't the same day,

8    was it?  You testified that you made the calls

9    the next day.

10   A       No, I made those calls that afternoon on

11   those pictures.

12   Q       Okay.  The pictures were on two different

13   days you testified.

14   A       I made the call on 1/30; the one on 1/30.

15   That's when I made --

16   Q       3/30.

17   A       Well, 3/30.

18   Q       I was asking you about 3/29?

19   A       Oh, no, I didn't call on that one.

20   Q       Okay.  And after you saw the picture on

21   3/29, you went on back to work, correct?

22   A       Yes.

23   Q       Okay.  And then on 3/30, after you saw

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 192

1    the pictures that Linda Sankey showed you, you

2    then went on back to work, correct, and

3    performed your job?

4    A       And made a call.

5    Q       At some point later?

6    A       Yes.

7    Q       Okay.  But you performed your work duties

8    on both of these days?

9    A       Yes.

10   Q       You were at work and working those days,

11   correct?

12   A       Yes.

13   Q       And performed all your job duties those

14   days?

15   A       Yes.

16

17   REPORTER'S NOTE:  (At this point, instrument was

18   marked for identification by the Reporter as

19   Defendant's Exhibit Number 26, after which, the

20   deposition continued, as follows:)

21

22   Q       (continued by Mr. Smith)  Ms. Croskey,

23   you've just been handed what has been marked as

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 193

1    Exhibit 26.  Do you recognize this document?

2    A        Yes.

3    Q        And this is a copy of the second charge

4    of discrimination you filed against Big Lots

5    with the EEOC; is that correct?

6    A        Yes.

7    Q        And you also attached a copy of this

8    charge as an exhibit to your Complaint in your

9    interrogatory responses, correct?

10   A        Yes.

11   Q        And this is charge number 130200506801,

12   correct?

13   A        Yes.

14   Q        And you filed it with the EEOC on

15   September 16th, 2005, correct?

16   A        September 12th.

17   Q        That's when you signed it, but it was

18   filed on the 16th; is that correct?

19   A        Oh, yeah.

20   Q        16th of September, correct?

21   A        Yeah.

22   Q        Did someone prepare this for you?

23   A        Gary Atchison.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 194

1    Q      Did you review the charge before it was
2    submitted to the EEOC?
3    A      Yes.
4    Q      And is this your signature at the bottom
5    of the page?
6    A      Yes.
7    Q      And you signed the charge on September
8    12th, 2005?
9    A      Yes.
10   Q      And you understood this was sworn
11   testimony, correct?
12   A      Yes.
13   Q      Is everything in the charge truthful and
14   accurate?
15   A      Yes.
16   Q      Okay.  And you filed a second EEOC
17   charge, because the EEOC had dismissed the first
18   charge; is that right?
19   A      Yes, to go along with this -- with the
20   pictures.
21   Q      Right.  But the EEOC had dismissed your
22   first charge, right?
23   A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 195

1    Q      And that's why you filed this second

2    charge, correct?

3    A      This one and the pictures.  I redid it

4    with the pictures.

5    Q      And the reason you did that is because

6    the EEOC had dismissed the first charge,

7    correct?

8    A      Yes.

9    Q      And this charge is also based on alleged

10   conduct that took place between March 28th

11   through March 30th of 2005; is that correct?

12   A      Yes.

13   Q      And this second charge -- this second

14   EEOC charge is based on the same allegations of

15   harassment and discrimination included in your

16   first EEOC charge, correct?

17   A      Yes.

18   Q      In other words, the same incidents that

19   you're complaining about in the second EEOC

20   charge are the ones that you based your first

21   EEOC charge on; is that correct?

22   A      Yes.

23   Q      And this charge also alleges race and sex

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 196

1    harassment, correct?

2    A        Yes.

3    Q        And under cause of discrimination, you

4    checked race and sex; isn't that correct?

5    A        Yes.

6    Q        And attached to the EEOC charge is

7    Exhibit A to the charge; is that right?

8    A        Yes.

9    Q        And Exhibit A contains all the

10   allegations on which you base this EEOC charge,

11   correct?

12   A        Yes.

13   Q        And are these pages attached as an

14   exhibit the only documents and information you

15   recall providing to the EEOC in support of your

16   second EEOC charge?

17   A        Yes.

18   Q        And did you draft Exhibit A?

19   A        What did you say now?

20   Q        Did you draft Exhibit A?

21   A        Did I draft --

22   Q        Did you prepared it?

23   A        No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 197

1    Q      Who did?

2    A      Gary Atchison.

3    Q      And in this charge you also complain

4    about the same Mike Williams' pictures you

5    complained about in your first EEOC charge,

6    right?

7    A      Yes.

8    Q      And this conduct by Williams occurred

9    between March 28th and March 30th, 2005; is that

10   correct?

11   A      Yes.

12   Q      And you testified that Mike Williams was

13   an associate store manager, correct?

14   A      Yes.

15   Q      And Jerry Culpepper was the store manager

16   at that time, and he was your direct supervisor,

17   correct?

18   A      Yes.

19   Q      And in Exhibit A, you allege that Mike

20   Williams made a comment about a metal screw on

21   or about March 14th, 2005; is that correct?

22   A      Yes.

23   Q      And this incident occurred before you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 198

1    filed your first EEOC charge on June 23rd, 2005,

2    correct?

3    A       Yes.

4    Q       And this is one of the incidents in which

5    you based your June 23rd EEOC charge, correct?

6    A       Yes.

7    Q       All right.  Tell me what you can recall

8    about Mike Williams' statement about the metal

9    screw.

10   A       I was working on the toy wall, and he was

11   coming across the back, and he called me, and I

12   was still hanging stuff, and I turned.  When I

13   did -- he called my name again, and then when I

14   turned around, he asked me did I want to screw,

15   and I said, "No, I don't need no screw over here

16   on this wall."  And he's like, "Do you want a

17   screw?"  And then I caught on to what he was

18   saying, and then he laughed.  I said, "Oh,

19   you're asking me do I want to screw?"  So that's

20   when I walked up to the front, went to Jerry

21   Culpepper --

22   Q       Hold on.  Is there anything else about

23   what he said, that you can recall, Mike

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 200

1    Q       Okay.

2    A       There's no screws that go on a peg wall.

3    Q       Okay.  And that's all that you can recall

4    about what he said or you said?

5    A       Yes.

6    Q       Were there any other employees around at

7    the time?

8    A       No, I was on the back wall by myself.

9    Q       So there were no witnesses?

10   A       No.

11   Q       So you said Williams said, quote, do you

12   want a screw, end quote?

13   A       Yes.

14   Q       While holding a metal screw?

15   A       Yes.

16   Q       Do you have any personal knowledge as to

17   why Williams made this alleged statement?

18   A       I don't know.

19   Q       Do you think he was simply trying to be

20   funny?

21   A       No.  I was standing up on something

22   like --

23   Q       I'm asking you -- my question was, do you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 201

1    think he was trying to be funny?

2    A       No.

3    Q       You don't know, though?

4    A       I don't know.

5    Q       You don't know whether he was trying to

6    be funny?

7    A       I don't know.

8    Q       And he was holding a metal screw?

9    A       Yeah.

10   Q       And you said he laughed?

11   A       Yeah.

12   Q       Did you know whether this was part of his

13   sense of humor?

14   A       No, it wasn't.

15   Q       I'm asking whether you know whether it

16   was part of his sense of humor.  I'm not asking

17   whether you thought it was funny.  I'm asking

18   whether you know whether it was part of his

19   sense of humor.

20   A       He don't have a sense of humor.  I mean,

21   he asked me do I want a screw.

22   Q       Okay.  Listen to my question.  Do you

23   know whether that was part of his sense of

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 205

1    A       Yes.

2    Q       Just your personal opinion?

3    A       Yes.

4    Q       All right.

5    A       I know when my husband wants something, I

6    know.  So he was asking me in that kind of way,

7    and that hurts.

8    Q       You don't have any personal knowledge as

9    to why Williams made the comment, do you?

10   A       No.

11   Q       Williams didn't make any reference to

12   your race or sex when he made that comment, did

13   he?

14   A       I don't know.

15   Q       You don't know?

16   A       No.

17   Q       You don't recall?

18   A       My sex, he did.

19   Q       I'm asking whether he made any reference

20   to your race or sex?

21   A       No.

22   Q       Do you know whether Williams ever made

23   the same comment to white employees?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 206

1    A        No.

2    Q        You don't know?  Go ahead.

3    A        No.

4    Q        Do you know whether he ever made the same

5    comment to male employees?

6    A        No.

7    Q        You don't think that comment had anything

8    to do with your race, do you?

9    A        No.

10   Q        Do you think his comment had anything to

11   do with your sex?

12   A        Yes.

13   Q        And why?

14   A        He was looking at me asking me did I want

15   a screw.

16   Q        Do you want a screw.  And he was holding

17   a metal screw, correct?

18   A        Yes.

19   Q        Okay.  Is there any other reason you

20   think that might have had something to do with

21   your sex?

22   A        Yes.

23   Q        What?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 210

1    Q    Do you understand what I'm saying?

2    A    Yes.

3    Q    Just listen to my questions.

4    A    Uh-huh.

5    Q    So the reason you believe this comment

6    had something to do with your sex is because you

7    personally are equating the term "screw" with

8    the term "sex;" is that right?

9    A    Yes.

10   Q    But again, you don't know whether he was

11   just trying to be funny, do you?

12   A    He was looking serious.

13   Q    Do you know whether he was just trying to

14   be funny?

15   A    No.

16   Q    Okay.  So then you just walked away; is

17   that right?

18   A    Yes.

19   Q    And then what did you do?

20   A    Went to the service desk where Jerry was.

21   Q    And is that Jerry Culpepper, the store

22   manager?

23   A    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 211

1    Q        Okay.  And what did you tell Jerry?

2    A        I told Jerry I needed to talk to him.

3    Q        Okay.

4    A        And he came up to the -- to the

5    service -- he came closer to me, and I told him

6    what Mike said.

7    Q        So you repeated the comment about "do you

8    want a screw" that Mike Williams had said to

9    you?

10   A        Yes.

11   Q        And you said that to Jerry?

12   A        Yes.

13   Q        Did you say anything else to Jerry?

14   A        He said he was coming to the back.

15   Q        All right.  Did you say anything else to

16   Jerry?

17   A        No; no.

18   Q        So all you did was repeat what Mike

19   Williams had said to you?

20   A        Yes; yes.

21   Q        Okay.  And then Jerry Culpepper said he

22   was going to come to the back; is that right?

23   A        He's going to come -- yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 212

1    Q      And that's where you were working?

2    A      Yes, I was.

3    Q      Okay.  And then what happened?

4    A      We was in the center of the aisle, and I

5    was talking to Jerry, and then Mike came over to

6    the conversation, and then --

7    Q      All right.  So Jerry came back to talk to

8    you, as he said he would, correct?

9    A      Yes.  And then Mike came over in the

10   conversation, and then he got on another --

11   Q      Did you say anything else to Jerry at

12   that point?

13   A      No.

14   Q      Jerry had just walked back there?

15   A      Yes.

16   Q      Okay.  And then what happened?

17   A      And he came over to the conver -- came

18   over there and --

19   Q      Mike Williams did?

20   A      Yes.

21   Q      And then what happened?

22   A      He started talking about Jerry Beads.

23   Q      Who did?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 213

1    A      Not even talking about what -- he just
2    started talking --
3    Q      Who started talking about Jerry Beads?
4    A      Mike.
5    Q      Okay.  As far as you know at that point,
6    Mike didn't know why Jerry Culpepper was back
7    there, right?
8    A      No.
9    Q      He didn't know, correct?
10   A      No.  I don't think he knew.
11   Q      Okay.
12   A      He saw me walking up there, so he just --
13   Q      But he didn't know why Jerry Culpepper
14   was back there, right?
15   A      No.
16   Q      And presumably Jerry Culpepper had gone
17   back there to talk to Mike Williams about
18   anything he had said to you --
19   A      Yes.
20   Q      -- that made you feel uncomfortable,
21   correct?
22   A      Yes.
23   Q      So this was the same date, on or about

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 214

1    March 14th, 2005, correct?

2    A        Yes.

3    Q        In the same few minutes?

4    A        Yes.

5    Q        Just a few minutes after the comment

6    regarding the metal screw, correct?

7    A        Yes.

8    Q        And so this comment about the beads also

9    allegedly occurred prior to you filing the first

10   EEOC charge on June 23rd, 2005, correct?

11   A        That was right when he came back to

12   the -- came to the back, correct.

13   Q        It happened before you filed your first

14   charge, correct?

15   A        It was the same day all that happened,

16   yes.

17   Q        So they were -- both of these incidents

18   occurred before you filed the first EEOC charge?

19   A        Yes; yes.

20   Q        And this was also one of the incidents in

21   which you based your June 23rd EEOC charge,

22   correct?

23   A        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 215

1    Q        Okay.  So Jerry has come back there

2    presumably to talk to Mike about the comment

3    that you had told Jerry about, correct?

4    A        Uh-huh.

5    Q        And Jerry has not yet said anything, and

6    Mike comes over --

7    A        Yes.

8    Q        -- correct?  And then what happened?

9    A        He started talking about Jerry Beads.

10   Q        Okay.  And this is Mike?

11   A        Yes.

12   Q        Now, tell me what he said --

13   A        He said --

14   Q        -- as best you can recall.

15   A        I was standing there with Jerry, and he

16   said, "You want some Jerry Beads?  And Jerry

17   said --

18   Q        Hold on.  I only asked you to tell me

19   what Mike said.

20   A        "Jerry Beads."

21   Q        Offering, "Do you want some Jerry Beads?"

22   A        Yes.

23   Q        All right.  So that's everything that

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 220

1    A       No.

2    Q       And the reason you think it's connected

3    to the Jerry Springer show is because you watch

4    that show; is that right?

5    A       Yes.

6    Q       And Williams did not reference your race

7    or sex when he made the comment, did he?

8    A       What do you mean by sex?

9    Q       Your gender.

10   A       What do you mean by -- explain gender to

11   me, what you're saying about gender.

12   Q       Well, he didn't mention your race or sex,

13   did he?

14   A       What do you mean by sex and gender?

15   Explain it to me.

16   Q       I don't know how to explain that any more

17   clearly.

18   A       No.

19   Q       So the answer to my question is no, he

20   did not reference your race or sex when he made

21   the comment; is that correct?

22   A       No.

23   Q       Is that correct?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 221

1    A        Yes.

2    Q        Do you know if Mike Williams had ever

3    seen the Jerry Springer show?

4    A        He said he did.

5    Q        When?

6    A        When he was explaining to Jerry what they

7    were.

8    Q        Well, that's not what you -- you've not

9    said anything about him saying that he watched

10   the Jerry Springer show.

11   A        He said it.  I said it.  Every time I got

12   ready to say it, you said, "No."  He said it to

13   Jerry; he explained to Jerry what is Jerry

14   Beads, because Jerry didn't know what it was.

15   Q        Yes.  But you've still not said that he

16   said he had ever seen the Jerry Springer show.

17   A        Oh, he said he had seen it.

18   Q        What did he say exactly?

19   A        He said he seen when the ladies show

20   their breasts.  He said that to Jerry.

21   Q        That's all he said?

22   A        And I walked off, because --

23   Q        And that's all he said?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 223

1    this was, correct?

2    A       No.

3    Q       Is that right?

4    A       He didn't know what it was.

5    Q       He didn't know what it was.  Do you know

6    whether Williams knew whether you had ever

7    watched the Jerry Springer show or knew what

8    Jerry Beads were?

9    A       No.

10   Q       And you don't know why Williams made this

11   comment, do you?

12   A       No.

13   Q       He could have been joking, correct?

14   A       I don't know.

15   Q       Do you know whether Williams ever made

16   the statement to white employees?

17   A       No.

18   Q       Do you know whether Williams ever made

19   this statement to male employees?

20   A       No.

21   Q       You don't think this comment had anything

22   to do with your race, do you?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 224

1    Q      Do you think this comment had something
2    to do with your sex?
3    A      Yes.
4    Q      And why do you think that?
5    A      Because I'm a woman, and he wanted to see
6    beads.  He was telling Jerry what Jerry Beads
7    are.
8    Q      Is it just your personal belief or
9    speculation that it had something to do with
10   your sex?
11   A      Personal belief.
12   Q      After Mike allegedly told Jerry what
13   Jerry Beads were, you said you just walked away?
14   A      Yes, I left while he was standing there
15   talking to him, because he wasn't even talking
16   to him about what he said to me.  So I just
17   walked off while they were talking about Jerry
18   Beads.
19   Q      So when he explained what Jerry Beads
20   were, he wasn't talking to you, was he?
21   A      He asked me did I want any Jerry Beads.
22   Q      Okay.  But after that, when he explained
23   what they were, he was talking to Jerry

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 225

1    Culpepper?

2    A        No.  He was the talking to Jerry

3    Culpepper.

4    Q        Not you?

5    A        No.

6    Q        And at that point, you just walked away?

7    A        Yeah, mad.

8    Q        But you didn't say anything else to them

9    about it?

10   A        No.

11   Q        All right.  So you never complained about

12   the Jerry Beads statement?

13   A        No.  I told my lawyer and he told me to

14   just note all this.

15   Q        But you never complained to anyone at Big

16   Lots, right?

17   A        I should have done it, but no.

18   Q        So the answer is, no, you didn't complain

19   to anyone at Big Lots?

20   A        No.

21   Q        Okay.  And Jerry Culpepper continued to

22   talk to Mike Williams; is that correct?

23   A        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 226

1    Q      Do you know what he -- you weren't part

2    of that conversation, were you?

3    A      No.

4    Q      And so you don't know what he said to

5    him; what Jerry Culpepper said to Mike Williams,

6    do you?

7    A      No.

8    Q      You don't know whether he said that was

9    inappropriate statements, do you?

10    A      No.

11    Q      You don't know whether he reprimanded

12    Mike Williams, do you?

13    A      No.

14    Q      But Mike Williams thereafter never made

15    similar comments to you, did he?

16    A      No.

17    Q      So if Jerry Culpepper had talked to him

18    about these comments and asked him not to make

19    such comments in the future, that would have

20    worked, correct?

21    A      Yes.

22    Q      Because after this incident, you didn't

23    have any more comments like that from Mike

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 227

1    Williams, correct; is that right?

2    A        I stayed away from him.

3    Q        Okay.  But my question was, after this

4    incident --

5    A        No.

6    Q        -- there were no further --

7    A        No, I ain't talked to him.

8    Q        Okay.  After this incident, there were

9    not any similar incidents with Mike, were there?

10   A        No.

11   Q        All right.  And you also alleged that

12   Mike Williams made a comment about another

13   woman's butt in early March of 2005; is that

14   correct?

15   A        Yes.

16   Q        And this comment likely pre-dated the

17   comment about the metal screw and the comment

18   about the Jerry Beads, correct?

19   A        Yes.

20   Q        And if this incident occurred in March

21   2005 as you testified, it occurred before you

22   filed your first EEOC charge on June 23rd, 2005,

23   correct?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 228

1    A        Yes.

2    Q        And this was one of the incidents in

3    which you based your June 23rd EEOC charge,

4    correct?

5    A        Yes.

6    Q        All right.  Tell me what you recall about

7    Williams' comment.

8    A        About what?

9    Q        About his comment.

10   A        To whom?

11   Q        About the other woman.

12   A        She was in the -- I had seasonal wall at

13   Big Lots.  I used to do the seasonal, and she

14   was over in the lawn and garden part, and she

15   was bending over getting some pots, and he

16   watched that woman, and he said those words

17   about her butt, he had never seen a white woman

18   with a big butt.  He watched that lady all the

19   way through the store.  That's when I started

20   really noticing him, really looking at him.

21   Q        Okay.  Is that all that you can recall

22   about the incident?

23   A        Yeah.  He looked at her; he watched her.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 229

1    He came out and watched her all the way up the

2    hall.   Even when she paid and went out to the

3    car.   I just watched him.

4    Q        Were there any witnesses?

5    A        I don't know.   I was looking at him.

6    Q        Okay.   And who was the woman to whom he

7    was referring; a customer?

8    A        A customer.

9    Q        And you overheard him make that statement

10   while he was standing near you?

11   A        Yes.

12   Q        Williams was not referring to you, was

13   he?

14   A        No.

15   Q        And he was not referring to your anatomy,

16   was he?

17   A        No.

18   Q        And because he wasn't referring to you

19   personally, you weren't personally affected by

20   this alleged comment, were you?

21   A        None other than him -- realizing that

22   he's really a weirdo.

23   Q        Okay.   My question was, because Williams

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 230

1    was not referring to you personally, you really

2    weren't personally affected by the alleged

3    comment, were you?

4    A        No.

5    Q        Do you have personal knowledge as to why

6    Williams made this alleged statement?

7    A        No.

8    Q        Do you know whether he was just trying to

9    be funny?

10   A        No.

11   Q        And Williams didn't make any reference to

12   your race or sex when he made this comment, did

13   he?

14   A        No.

15   Q        And this comment had nothing to do with

16   your race, did it?

17   A        No.

18   Q        And this comment had nothing to do with

19   your sex, did it?

20   A        No.

21   Q        And you didn't complain to anyone about

22   this incident, did you?

23   A        No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 231

1    Q       All right.  And these three comments that

2    you alleged were made by Mike Williams, these

3    were all isolated incidents, correct?

4    A       It didn't do no good with Jerry being --

5    Q       What I'm asking is, these were all

6    isolated incidents, right?

7    A       Yeah.  Me and him was the only ones

8    working on one side of the store.

9    Q       And you've told me about the three

10   comments you allege Mike Williams made, that you

11   raised in your EEOC charge, correct?

12   A       Yes.

13   Q       Okay.  Did you allege that in mid May

14   2005 Billy Pridgen once stated something about

15   sugar?

16   A       Yes.

17   Q       And that was in mid May 2005?

18   A       Yes.

19   Q       And this incident also occurred before

20   you filed your first EEOC charge on June 23rd,

21   2005, correct?

22   A       Yes.

23   Q       And this was one of the incidents in

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 232

1    which you based your June 23rd EEOC charge,

2    correct?

3    A        Yes.

4    Q        Okay.  Tell me what you can recall about

5    Pridgen's alleged comment.

6    A        I was at the time getting ready to clock

7    out.  Deborah and Linda had already clocked out.

8    They came in early, so they clocked out five

9    minutes before I did; five minutes early.  And I

10   was there at the time clock waiting for the time

11   to get straight up.  Billy came down the

12   hallway, and I was up against the wall, and he

13   put his arms --

14   Q        You were up against the wall waiting for

15   the time clock?

16   A        Yes; yes.

17   Q        You were just waiting for the time to

18   leave?

19   A        Waiting for the time to get up; that one

20   more minute to get up there.

21   Q        Okay.

22   A        He came down the hallway, and put his

23   arms around me like that (indicating).  And I

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 233

1    told him to move, and he was trying to kiss me.

2    Q        You mean like he put his arms on the

3    wall?

4    A        Yes.

5    Q        When you say "put it around," you mean he

6    put his arm on the wall?

7    A        Yes, around me.

8    Q        But on the wall?

9    A        On the wall.

10   Q        But not on you personally?

11   A        Not on me personally, but his body was on

12   me, because he's a big person.

13   Q        All right.

14   A        His body touched my body.

15   Q        Because of his weight?

16   A        Yes.

17   Q        But you don't know that he was

18   intentionally meaning to touch you with his

19   body?

20   A        He was trying to kiss me with his face.

21   He had his arms around me.  I was on the wall,

22   and I'm telling him to move --

23   Q        Hold on a minute.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 234

1    A    He was doing like that (indicating).

2    Q    Okay.  He didn't kiss you, did he?

3    A    No, because I was telling him to move.

4    Q    So he didn't kiss you?

5    A    But he was kissing at my face.

6    Q    And his arms were on the wall?

7    A    Yes.

8    Q    Not on you, correct?

9    A    Yes.  His body was touching mine.

10   Q    All right.

11   A    If my husband had came around that

12   corner --

13   Q    We're not talking about your husband

14   right now.  I'm talking about this incident.

15   Your husband was present?

16   A    He was picking me up.

17   Q    Okay.  Have you told me everything you

18   can remember about that incident?

19   A    Yes.

20   Q    Were there any witnesses?

21   A    No.

22   Q    What time of day was it?

23   A    3:00.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 235

1    Q    And you were near the time clock?

2    A    Yes.

3    Q    Just waiting for time to clock out?

4    A    Yes.

5    Q    And what was Pridgen doing back there?

6    A    He was coming down the hallway.

7    Q    Do you know why?

8    A    No.  The office is right there.  I guess
9    he was going in the office.

10   Q    Going toward the office, and you just
11   happened to be there?

12   A    Yes.

13   Q    And this incident, how long would you say
14   it lasted, a couple of seconds?

15   A    Yes.

16   Q    And then what happened, he just moved
17   away and you clocked out and went home?

18   A    Yes, because I was trying to get out from
19   under him.

20   Q    I'm sorry?

21   A    I was trying to get out from down there.

22   Q    Okay.  So then he just moved?

23   A    After I pushed him and went on out of the

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 238

1    A    Yes.

2    Q    Okay.  And you said he didn't actually

3    kiss you; is that right?

4    A    No.

5    Q    That is right?

6    A    He didn't kiss me.

7    Q    Okay.  Do you have any personal knowledge

8    as to why Pridgen made this alleged statement or

9    acted in this way?

10   A    No.

11   Q    Do you think he was just trying to be

12   funny?

13   A    No.

14   Q    Do you think it's possible?

15   A    Yes.

16   Q    Do you think it's possible he was just

17   teasing around with you?

18   A    No.

19   Q    I'm saying, do you think it's possible?

20   A    He was doing it.  Yes, he was trying to

21   kiss me.

22   Q    Okay.  Do you think he was just teasing?

23   A    He wasn't teasing.  No, he wasn't

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 240

1    A       I don't know.

2    Q       You don't know?

3    A       I don't know about his humor.

4    Q       So you don't know?

5    A       Not about his humor.

6    Q       Okay.  And you don't have any personal

7    knowledge as to why Pridgen made the comment or

8    acted this way, or what he actually meant by it,

9    do you?

10   A       No.

11   Q       And Pridgen didn't actually make any

12   reference to your race or sex during this

13   incident, did he?

14   A       No.

15   Q       You don't think this conduct had anything

16   to do with your race, do you?

17   A       I don't know.  Maybe he wanted to kiss a

18   black woman.  I don't know.

19   Q       But you don't know?

20   A       I don't know.

21   Q       All right.  You just don't know why he

22   did that?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 241

1    Q        Do you know whether Pridgen ever made the

2    same comment or acted in the same manner with

3    white employees or male employees?

4    A        No.

5    Q        And you didn't complain to anyone about

6    this, did you?

7    A        No.  My lawyer.

8    Q        Okay.  But no one at Big Lots?

9    A        No.  And my husband.

10   Q        Okay.  But no one at Big Lots?

11   A        No.

12   Q        You also allege that in late May 2005

13   Billy Pridgen rubbed against you; is that

14   correct?

15   A        Yes.

16   Q        And this incident also occurred before

17   you filed your first EEOC charge on June 23rd,

18   2005, correct?

19   A        Yes.

20   Q        And this was also one of the incidents in

21   which you based your June 23rd EEOC charge,

22   correct?

23   A        Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 242

1    Q       All right.  Tell me what you recall about
2    the incident.
3    A       We was unloading a truck one day.  It was
4    on a Tuesday or Thursday.  He was on the same
5    side that I was, and the boxes was coming down,
6    some heavy boxes, and he was like, "I'll get
7    these right here."  And that's when I was
8    standing right there.  The conveyer belt is
9    right here (indicating).  I was standing right
10   here, and he was like moving like --
11   Q       Okay.  Now, you're going to have to
12   verbalize what you're talking about, because the
13   Court Reporter can't -- even though I may be
14   able to see what you're showing me, he can't get
15   it on the record.  Okay?  So tell me again.  You
16   were --
17   A       On the conveyer belt that the
18   merchandise --
19   Q       So the merchandise comes down on a
20   conveyer belt?
21   A       Uh-huh.
22   Q       Okay.
23   A       And Billy wanted to get around me.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 243

1    Q        To get some boxes off the conveyer belt?

2    A        And I was trying to move for him to get

3    the boxes.

4    Q        Okay.

5    A        He's just going to come right past me and

6    rub his body up against me.

7    Q        Okay; all right.  And so the both of you

8    were next to the conveyor belt at this point?

9    A        My face was -- and our butts was behind.

10   That's what he rubbed against.

11   Q        I'm sorry.  Now, what was?

12   A        My butt is where he came --

13   Q        You were facing forward towards the

14   conveyor belt?

15   A        Yes.

16   Q        And he was walking around behind you to

17   get boxes off the conveyor belt; is that right?

18   A        Yes.

19   Q        Okay.  And in doing so, he rubbed against

20   you?

21   A        Rubbing against me holding my -- like

22   this (indicating), and that's when I moved with

23   his body touching me on my --

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 244

1    Q      His body touched you as he went around
2    you to get boxes off the conveyor belt?
3    A      Yes, holding my -- holding me, but I was
4    trying to move and let him by.  He could have
5    said, "Excuse me."  I would have let him by.
6    Q      Okay.  Now, what did you just say?
7    A      I was letting him -- I was trying to let
8    him get by.
9    Q      That is a tight space there, isn't it?
10   A      Yeah.
11   Q      All right.  So you were trying to move a
12   little out of the way, and he was trying to get
13   around you to get the boxes off the conveyor
14   belt, and in so doing, he rubbed against the
15   back of you; is that correct?
16   A      Yeah.  Like I'm standing here with his
17   hands right here trying to get -- holding me,
18   but wasn't moving fast.  He was trying to --
19   Q      What do you mean holding you?  What are
20   you talking about now?
21   A      If I'm standing --
22   Q      Did he put his hands on you?
23   A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 245

1   Q      While he was trying to get by you?

2   A      Yes.  And he wasn't moving fast.  He was

3   moving slow.

4   Q      In your opinion?

5   A      Yeah.

6   Q      All right.

7   A      His body was touching my behind.

8   Q      Okay.  While he was trying to get around

9   you?

10  A      Yes.

11  Q      Do you know why -- he put his hand on

12  your shoulder, did you say?

13  A      I don't know.

14  Q      Did he or did he not?

15  A      He did.  I don't know why he did it,

16  but --

17  Q      You don't know why he did it.  Do you

18  know if he was trying to like just kind of let

19  you know he was trying to get around you?

20  A      He didn't have to let me know.  I was

21  trying to move.

22  Q      Do you know if he was trying to move you

23  a little bit?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 246

1    A      No.  He wasn't moving me.  He was moving
2    slow --
3    Q      Do you know why he did it?  You said no?
4    A      Yes.  He was trying to rub my butt.
5    That's what he was doing.
6    Q      Okay.  I'm asking you what you know --
7    A      Yes.
8    Q      -- based on your personal knowledge, not
9    what you speculate about.
10   A      Okay.
11   Q      All right?  You don't know why he touched
12   your shoulders as he was walking by, do you?
13   A      No.
14   Q      All right.  But you said that he's a
15   large person?
16   A      Yes.
17   Q      And do you know how much he weighs?
18   A      No.
19   Q      How much did you weigh at the time?
20   A      The same size I am now.
21   Q      What size is that?
22   A      246.
23   Q      And you don't know how much he weighed?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 247

1    A    No.

2    Q    Do you know how -- was there a wall

3    behind -- you know, kind of a conveyor belt, and

4    then a space, and then a wall?

5    A    There's a wall right there.

6    Q    Okay.  Do you know how much space there

7    was; how many feet between the wall and the

8    conveyor belt?

9    A    A lot of it.

10   Q    Do you know how many?

11   A    It was enough for me to move out of his

12   way; to let me move instead of trying to rub

13   into me to let him get by.  He could have let me

14   move.  I was moving.

15   Q    So in answer to my question, you don't

16   know how many feet, do you?

17   A    No.

18   Q    Now, have you told me everything you

19   remember about that incident?

20   A    Yes.

21   Q    Okay.  Were there any witnesses to that?

22   A    They was all at the end.  I don't know if

23   they seen him --

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 248

1    Q    Do you know if there were any witnesses?

2    A    No.

3    Q    What time of day was that?

4    A    It was in the morning.

5    Q    And you were both working on unloading

6    boxes from the conveyor belt, right?

7    A    Yes.

8    Q    And when I say "both," I mean you and

9    Billy Pridgen, right?

10   A    Uh-huh.

11   Q    And did this incident take place over the

12   course of a few seconds?

13   A    Yes.

14   Q    And then following this incident, you

15   continued on with your job -- your work duties?

16   A    Yes.

17   Q    Do you have personal knowledge as to

18   whether Pridgen's conduct was accidental rather

19   than intentional?

20   A    Intentional.

21   Q    I'm talking about personal knowledge.

22   A    This is my personal knowledge.

23   Q    Your personal opinion?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 249

1    A        Yes.

2    Q        Do you know whether he was trying to be

3    funny or teasing you?

4    A        No.

5    Q        Do you know whether he thought it was an

6    accidental situation?

7    A        No, because when he -- when he was trying

8    to get by, he said something -- I said -- he

9    said, "I'm going to fall on top of you."  And he

10   said, "If you fall backwards, I'm going to fall

11   on top of you."  I was trying to move away from

12   him.  He said, "If you fall backwards, I'm going

13   to fall on top of you."

14   Q        Well, that doesn't even make any sense.

15   A        Fall on top of me?

16   Q        When you fall backwards?

17   A        Yeah, he's going to fall on top of me.

18   Q        All right.  Anything else?

19   A        That was it.

20   Q        You don't know what he meant by that?

21   A        No.

22   Q        Okay.  So again I was asking you, you

23   don't know whether he thought that incident was

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 250

1    accidental, do you?

2    A       No.

3    Q       And Pridgen didn't make any reference to

4    your race or sex when he bumped into you, did

5    he?

6    A       What do you mean?

7    Q       He didn't make any reference to your race

8    or sex when he bumped into you, did he?

9    A       No.

10   Q       And you don't know whether this incident

11   had anything to do with your race, do you?

12   A       No.

13   Q       And you don't know whether it had

14   anything to do with your sex, do you?

15   A       No.

16   Q       Do you know whether Pridgen ever acted in

17   the same manner with white employees or male

18   employees?

19   A       No.

20   Q       And you didn't complain regarding this

21   incident to anyone at Big Lots, did you?

22   A       My lawyer.

23   Q       Okay.  Listen to my question, please.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 251

1    A       No.

2    Q       You didn't complain to anyone at Big

3    Lots, did you?

4    A       No.

5    Q       Was there another incident involving

6    Billy Pridgen in which you based your EEOC

7    charge?

8    A       Yes.

9    Q       And was this an incident that allegedly

10   occurred in mid June 2005?

11   A       Yes.

12   Q       And this incident also occurred before

13   you filed your first EEOC charge on June 23rd,

14   2005, correct?

15   A       Yes.

16   Q       And this is one of the incidents in which

17   you based your June 23rd EEOC charge, correct?

18   A       Yes.

19   Q       Okay.  If you would, tell me what you

20   recall about the incident.

21   A       This was another one with the truck, and

22   we was taking our fifteen minute break, and he

23   sent Deborah Mitchell up to the front to get

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 252

1    some sodas for everybody.  So I was sitting on a

2    box that was up against the wall, and --

3    Q      Let me stop you just for a second.  Now,

4    is that something that he would sometimes do,

5    was to offer to buy drinks for folks when they

6    were working unloading the truck?

7    A      They write them off.  They write the

8    drinks off for the people that are unloading the

9    truck.

10   Q      That's kind of a perk of working there,

11   right?

12   A      Uh-huh.

13   Q      So that's a nice thing that they do?

14   A      Yes.  Since it wasn't but us ladies back

15   there unloading, he tried to give us something

16   to have that was cold.

17   Q      To be nice?

18   A      Yes.

19   Q      Okay.  So go on.  I'm sorry.

20   A      And I was on the box in the corner, and I

21   was -- to tell you the truth, I really had dozed

22   off, because I really was tired, and I was up on

23   the box waiting, you know, for Deborah to get

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 253

1    back with the drinks on my fifteen minutes.

2    Then I felt somebody blowing their breath in a

3    circular motion in my face, and that's when I

4    looked up.  I said, "Billy, what are you doing?"

5    I pushed him back off of me.  "What are you

6    doing?"  "That's the way my wife likes it when I

7    wake her up in the morning.  She likes me to

8    blow my breath in her face."  And then Deborah

9    came, and I said, "Deborah, why didn't you wake

10   me up?  Billy is over here blowing his breath in

11   my face."  She said, "I didn't know he was over

12   there doing that."

13   Q       Okay.  Is that all you recall?

14   A       That was it.  He was over me like this

15   blowing his breath in my face in a circular

16   motion (indicating).

17   Q       Trying to wake you up?

18   A       Yeah.

19   Q       All right.

20   A       I don't know what he was doing, but I

21   know he ain't got to blow his breath in my face.

22   Q       But you were asleep; you had dozed off?

23   A       Yeah.  I wasn't asleep.  I was relaxing

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 255

1    A       Uh-huh.

2    Q       -- in the back area?

3    A       We didn't go in the break room.  We just

4    stayed back there and took our fifteen minutes.

5    Q       I see what you're saying.  So you were

6    getting a break at the time?

7    A       Yes.

8    Q       And Pridgen had been working with you at

9    the time?

10   A       Yes.

11   Q       And did this take -- this incident take

12   place over the course of a few seconds, as well?

13   A       Yes.

14   Q       And then following this incident, I

15   assume your break was over and you just returned

16   to work; is that right?

17   A       Yes.  We also have cameras.  We had

18   cameras in the store.

19   Q       You had cameras in the store?

20   A       Yes.

21   Q       Okay.  Why are you telling me that?

22   A       Because those dates, the camera was on in

23   the hallway, and the camera was on in the back

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 257

1    to how long any film or video coverage is
2    maintained?
3    A    No.
4    Q    Do you know whether the cameras are even,
5    in fact, actually recording or saving the
6    pictures, unless someone has, you know, pushed a
7    button or done something else to make them
8    operate like in the case of a theft or
9    something?
10   A    No.
11   Q    Okay.  You don't have any personal
12   knowledge as to why Pridgen acted this way?
13   A    No.
14   Q    Or what he meant by it, do you?
15   A    No.
16   Q    He didn't actually make any reference to
17   your race or sex during this incident?
18   A    No.
19   Q    Do you know whether Pridgen ever acted in
20   the same manner with white employees?
21   A    No.  It was all blacks over there.
22   Q    Well, I'm asking, you don't know whether
23   he ever acted in the same manner with white

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 258

1    employees, do you?

2    A       No, I don't.

3    Q       You don't know whether he ever acted in

4    the same manner with male employees, do you?

5    A       No.

6    Q       You don't know whether this had anything

7    to do with your race?

8    A       No.

9    Q       You don't know whether it had anything to

10   do with your sex?

11   A       No.

12   Q       And you didn't complain to anyone --

13   A       No.

14   Q       -- at Big Lots?

15   A       Not at Big Lots.

16   Q       You worked with Billy Pridgen throughout

17   your employment at Big Lots, didn't you?

18   A       Yes.

19   Q       And the three incidents you allege

20   regarding Pridgen are isolated incidents, aren't

21   they?

22   A       Except for the cameras.  There's four.

23   Q       Okay.  And we've already covered the

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 260

1    mean by isolated.

2    A       Okay.

3    Q       You understand what I mean now?

4    A       Uh-huh.

5    Q       So these incidents that you allege

6    regarding Pridgen are isolated incidents; isn't

7    that correct?

8    A       Yes.

9    Q       And the incident involving Pridgen that

10   you've just testified about, those were

11   unrelated to the incidents you testified about

12   with respect to Mike Williams, correct?

13   A       Yes.

14   Q       In other words, they didn't have anything

15   to do with each other, did they?

16   A       No.

17   Q       Are you aware that numerous former

18   employees of Store Number 818, who worked there

19   during your employment, have all denied

20   witnessing any racial or sexual harassment at

21   Store Number 818?

22   A       No.

23   Q       And you've told me now about all the

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 261

1    conduct in which you base your second EEOC

2    charge, correct?

3    A        What?

4    Q        You've told me about all the conduct in

5    which you based your second EEOC charge,

6    correct?

7    A        Yes.

8

9    REPORTER'S NOTE:    (At this point, instrument was

10   marked for identification by the Reporter as

11   Defendant's Exhibit Number 27, after which, the

12   deposition continued, as follows:)

13

14   Q        (continued by Mr. Smith)  Ms. Croskey, do

15   you recognize what has been marked as Exhibit

16   27?

17   A        Yes.

18   Q        And this is a copy of the Dismissal and

19   Notice of Rights you received from the EEOC with

20   respect to your second EEOC charge, charge

21   number 130200506801, correct?

22   A        Yes.

23   Q        And you attached this document to your

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 262

1    Complaint as an exhibit, and also produced a

2    copy in response to Big Lots' interrogatories,

3    didn't you?

4    A       Yes.

5    Q       And the document indicates it was mailed

6    on May 5th, 2006, correct?

7    A       Yes.

8    Q       And according to your Complaint, you

9    received the document on May 5th, 2006, correct?

10   A       Yes.

11   Q       And the box that's checked states that,

12   "Based on the EEOC's investigation, it is unable

13   to conclude that the information obtained

14   establishes a violation of the statutes;" is

15   that correct?

16   A       Yes.

17   Q       And you only filed the two EEOC charges,

18   the two we've discussed today, correct?

19   A       Yes.

20   Q       And you never revised or amended these

21   two EEOC charges, did you?

22   A       No.

23   Q       And the alleged conduct on which you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

Page 263

1    based your two EEOC charges was alleged race and

2    sex harassment, correct?

3    A        Yes.

4    Q        And we've discussed all the incidents on

5    which you based your EEOC charges, correct?

6    A        Yes.

7    Q        And you've told me about any complaints

8    you made regarding any alleged misconduct at Big

9    Lots, correct?

10   A        Yes.

11   Q        Your employment with Big Lots ended

12   effective December 24th, 2005; is that correct?

13   A        Yes.

14   Q        And you were terminated because Store

15   Number 818 where you worked was closed

16   permanently, correct?

17   A        Yes.

18   Q        And you're aware that all hourly

19   employees at Store Number 818 were terminated

20   because the store closed, aren't you?

21   A        Yes.

22   Q        And this was over twenty individuals who

23   were terminated because the store was closed,

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 264

1    correct?

2    A      Yes.

3    Q      And do you recall signing an Action

4    Request Form acknowledging that your termination

5    was because Store Number 818 was closing?

6    A      Yes.

7    Q      And your termination resulting from the

8    store closing is not part of your claims in this

9    lawsuit; isn't that correct?

10   A      Yes.

11   Q      And you're not claiming your termination

12   from Big Lots was because of your race or sex,

13   are you?

14   A      No.

15   Q      And you don't have any personal knowledge

16   as to who made the decision to close Store

17   Number 818, do you?

18   A      No.

19   Q      And you don't have any personal knowledge

20   as to who made the decision to terminate your

21   employment effective December 24th, 2005, do

22   you?

23   A      No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 265

1    Q      And you're not aware of any hourly store

2    employees who were transferred to another Big

3    Lots' location when Store Number 818 closed, are

4    you?

5    A      No.

6    Q      Okay.  So again, your claims in this

7    lawsuit have nothing to do with your

8    termination, do they?

9    A      No.

10   Q      And your claims in this lawsuit don't

11   have anything to do with not being transferred

12   to another Big Lots store, do they?

13   A      No.

14   Q      All right.  According to your Complaint,

15   which we have marked previously as Exhibit 22,

16   and according to paragraph 4 of that Complaint

17   on page 1, the acts you're complaining of in

18   this lawsuit are hostile environment based on

19   your race and/or sex; is that correct?

20   A      Yes.

21   Q      And these are the only claims you're

22   alleging in this lawsuit, correct?

23   A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 266

1    Q      And according to paragraph 8, the alleged

2    discrimination occurred on or about March 28th

3    through the 30th, 2005; is that correct?

4    A      Yes.

5    Q      Are your claims in this lawsuit based on

6    the pictures of employees made by Mike Williams

7    that we've discussed previously?

8    A      Yes.

9    Q      And for clarification, you're not

10   alleging retaliation in this lawsuit, are you?

11   A      No.

12   Q      And no one ever told you you were being

13   terminated because of your race or sex, did

14   they?

15   A      No.

16   Q      And no one ever told you you were being

17   terminated because of any complaints you had

18   made or anything like that, did they?

19   A      No.

20   Q      Have we now discussed all the facts that

21   support the claims you've made in this lawsuit?

22   A      Yes.

23   Q      And you're not aware of any other facts

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 286

1    you to be transfused, two units of packed RBCs

2    for the chest pain; is that correct?

3    A       Yeah.

4    Q       "So with the patient clinically improved

5    after the transfusion, I" -- meaning the

6    doctor -- "decided to discharge her home;" is

7    that correct?

8    A       Yes.

9    Q       And then you were discharged to home in

10   good condition, correct?

11   A       Yes.

12   Q       So again, you don't know what the medical

13   cause was for this visit, do you?

14   A       No.

15   Q       You don't know whether it had anything to

16   do with Big Lots, do you?

17   A       No.

18   Q       Okay.  So I'm going to ask you again, can

19   you identify any treatment by any doctors or

20   healthcare providers for any medical or

21   psychiatric condition allegedly caused by Big

22   Lots?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 288

1    Q     And that had nothing to do with Big Lots,

2    did it?

3    A     No.

4    Q     And also in March 2002, you were treated

5    at the same hospital due to your face, lips and

6    tongue swelling, and then it was determined that

7    that was probably an allergic reaction to food

8    or drink, as well, correct?

9    A     Correct.

10   Q     Okay.  And so again, you can't identify

11   any medical treatment that you have received

12   resulting from the alleged harassment or hostile

13   work environment at Big Lots, can you?

14   A     No.

15   Q     Will you look back at Exhibit 22 for me?

16   Actually, that's not the right one.  How about

17   Exhibit 2?  Interrogatory Number 8, which is in

18   Exhibit 1, just asks you to state the name and

19   dosage of any medications that have been

20   prescribed to you in the last ten years; and for

21   each medication, to provide the name and address

22   of the medical provider who provided such

23   medication, the reason such medication was

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

**Equal Employment Opportunity**                    **Last update: August 2005**

No person shall be discriminated against in employment because of race, color, religion, sex, sexual orientation, age, national origin, mental or physical disability or marital status.

This policy applies to all terms and conditions of employment including, but not limited to hiring, training, promotion, transfer, demotion, compensation, benefits, and termination.

The Executive Vice President is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of equal employment opportunity.

Each manager is responsible for initiating and administering this policy within his/her store/department.

Every associate is expected to adhere to the guidelines set forth in this policy in both practice and spirit.

Any formal or informal allegation that this policy has been violated should be referred immediately to Human Resources.

**Employing Persons with Disabilities**

Qualified individuals with disabilities are to be treated in a nondiscriminatory manner in the pre-employment process and in all terms, conditions, and privileges of employment.

All medical-related information is to be maintained in a confidential manner in separate, confidential files.

Applicants and associates with disabilities are to be provided reasonable accommodation, except where making an accommodation would create an undue hardship on the Company.

All requests for reasonable accommodation from qualified applicants and associates with disabilities are to be referred to the appropriate Human Resources manager. The Company will make a good faith effort to assist individuals seeking accommodations.

In determining the feasibility of the requested accommodation, the Company will consider the preference of the individual to be accommodated and, if there are two or more effective accommodations, will choose the least expensive or most practical accommodation that will provide equal opportunity for the applicant or associate.

Accommodation is generally initiated by a request from an applicant or associate. Situations may arise where an associate, who is known to have a disability, may be having difficulty performing the essential functions of his/her job and therefore, may need accommodation. The associate's supervisor should discuss the matter with the appropriate Human Resources manager. The Human Resources manager will advise the associate's supervisor on how to initiate a discussion with the associate.

Violations of this policy may result in disciplinary action, up to and including termination of employment. (See Confidential Information, Harrassment-Free Environment, Open Door)



DEFENDANT'S
EXHIBIT

9

**Harassment-Free Environment**            **Last update: August 2005**

Big Lots strictly prohibits harassment and/or discrimination based on race, color, religion, sex, sexual preference, age, national origin, mental or physical disability or marital status.

Each supervisor or manager is responsible for maintaining a work environment that is free of harassment both sexual and otherwise. This includes communication of this policy to all associates and assuring that they are not subjected to insulting, degrading or exploitative behavior as defined above.

Big Lots also strictly prohibits sexual harassment. Sexual harassment includes any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

- Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment.
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive

  work environment.

Likewise, all associates are responsible for adhering to these guidelines and are prohibited from engaging in discriminatory or harassing behavior. Any associate who believes he/she has been the subject of harassment is responsible for promptly reporting the alleged act to Human Resources or his/her immediate supervisor.

All reports of harassment will be promptly investigated under the direction of Human Resources. All investigations of alleged harassment will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved. Any associate who is found to have engaged in discriminatory or harassing conduct will be subject to appropriate disciplinary action, up to and including termination. Likewise retaliation against anyone reporting acts of harassment will not be tolerated.

This policy is intended to be in compliance with all Federal laws, specifically Title VII of the Civil Rights Act of 1964, and all State and Local laws dealing with unlawful discrimination and/or harassment. (See Equal Employment Opportunity, Open Door, Standards of Conduct)

DEFENDANT'S
EXHIBIT

10

**Open Door**                                    **Last update: August 2005**

Big Lots believes in dealing directly with all associates and further believes that all associates have a right to express their opinions, concerns, and to ask any questions they may have relating to their job or the Company. Any associate with a question or problem is entitled to use the Open Door Policy and may contact anyone in the organization.

Take the question or concern to your immediate supervisor or manager.

OR

If you have a question and do not wish to discuss the matter with your direct manager or supervisor, go to the next level manager.

OR

If you have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department:

- <u>Store Associates</u>: Contact the Regional Human Resources Manager.
- <u>Distribution Associates</u>: Contact the Distribution and Transportation Services Human Resources Manager.
- <u>General Office Associates</u>: Contact the General Office Human Resources Manager.

Associates wishing to make anonymous complaints or ask a question may call the Get Real Hotline at 1-866-834-REAL (1-866-834-7325).

All members of management are expected to maintain the integrity and communicate the spirit of the Open Door Policy.

Any attempt to thwart or retaliate against an associate for exercising his/her Open Door rights will be considered a serious violation of Company policy and may result in disciplinary action, up to and including termination of employment. (See <u>Harrassment-Free Environment</u>, <u>No Solicitation</u>, <u>Standards of Conduct</u>, <u>Union-Free Environment</u>)



DEFENDANT'S
EXHIBIT

11

**Standards of Conduct**                    **Last update: August 2005**

Associates are expected to conduct themselves in a way that is conducive to an ethical business environment. Violations of company policy, public policy, or local, state, and federal laws will not be tolerated. Conduct is expected to reflect our Company's values at all times.

The following behaviors are unacceptable deviations from the Company Standards of Conduct:

- Violation of the Harassment-Free Environment Policy.
- Physical assault or attempted assault on another associate or customer.
- Engaging in conversation, gestures or behaviors that are considered lewd, offensive, abusive, and profane or threatening to associates and/or customers.
- Inappropriate fraternization, including having an intimate relationship with another associate whom you supervise, either directly or indirectly, or over whom you exert some influence or control by nature of your responsibility.
- Violation of the Drug-Free Workplace Policy, including but not limited to consuming intoxicating beverages or use of illegal drugs during scheduled work time; or reporting to work under the influence of intoxicating beverages or illegal drugs.
- Smoking in a company facility or company vehicle and/or use of chewing tobacco or similar products (See Smoke Free Policy).
- Conduct which results in a substantial risk of harm to a customer or another associate, or damage to Company property.
- Possession of weapons, including but not limited to, knives, firearms, explosives, or other instruments that may cause harm to others, intoxicating beverages, or illegal drugs on Company property, including parking lots, or while conducting Company business.
- Conviction of a criminal offense for a crime against the Company or related to the type of responsibilities performed for the Company.
- Dishonest activities such as, theft, selling merchandise at a price lower than that which is marked on the goods without authorization, consumption or use of merchandise that has not been previously purchased by the associate or approved by management.
- Violation of minor labor laws for those associates under eighteen (18) years of age. *NOTE: Associates less than eighteen (18) years of age are not permitted to load, unload or otherwise operate the cardboard baler. These associates are also not permitted to operate any type of power equipment.* (See Employment of Minors Policy).
- Violation of the No Solicitation Policy.
- Unauthorized use of Company property, facilities or resources (See Information Security and Electronic Communications Policy).
- Unauthorized divulgence of personnel records or Company business (See Confidential Information Policy).
- Insubordination by refusing to complete work as assigned by a manager. In the event of conflicting instructions, the associate should follow the directions of the manager-on-duty and later request clarification.
- Unsatisfactory work performance including disregard of established safety practices and rules.
- Failure to cooperate with Company investigations or inspections.
- Excessive absenteeism or tardiness (See Attendance Policy).
- Working before or after scheduled time without specific authorization from management.
- Job abandonment, which includes two (2) consecutive days absence from scheduled work without calling into management (See Call-in Procedure Policy) or walking off the job without notifying management. These occurrences are

DEFENDANT'S
EXHIBIT

12

considered voluntary terminations (See Termination of Employment Policy).

- Falsification of documents or records including but not limited to, employment application, expense reports, price change documents, timecards, permitting another associate to clock in or out for you, production reports, payroll management documents, etc.

- Misuse of the associate discount privilege by permitting someone not eligible to purchase items with the associate discount or by returning merchandise for a full refund when purchased with the associate discount (See Associate Discount Policy).

- Associates are not permitted to hold or hide merchandise for purchase at a later time. Associates may not purchase merchandise unless it is available for sale to the general public.

- The writing of bad checks to the Company.

- The following violations are store specific:

  o Any violation of established shopping regulations including processing unauthorized markdowns and/or ringing sales or handling any other transaction (i.e., returns, cashing checks, etc.) of your own or any immediate relative.

  o Improper use of "paid outs".

  o Cashing checks.

  o Use or unauthorized removal of store funds, or other Company resources, for personal use.

  o Unexplained single incident variance of $50 or greater where till integrity has been maintained.

  o Single till variance of $5 or more, and/or variances of $15 or more in a 30-day period.

  o Failure of store associates to perform established procedures, including but not limited to, the following:

    ■ Completing daily bank deposits.

    ■ Securing funds properly.

    ■ Maintaining accountability for all funds transactions.

    ■ Conducting "cash pickups" when cash totals in excess of $1500 in drop box and till.

    ■ Ensuring that Register operator "till drops" are made when cash exceeds $100 of paper currency in till.

    ■ Ensuring all doors are locked and alarms set as required.

    ■ Ensuring all safety exits are accessible.

    ■ Securing safe, as required including maintaining confidential safe combination.

    ■ Maintaining key control.

    ■ Ensuring that store security cameras are operating daily and tapes maintained as required.

    ■ Allowing only authorized associates in controlled areas (i.e., stock room, cash office, etc.).

  o Violation of any other Company rules/regulations or any other action/activity that is deemed to be detrimental to the orderly operation of our Company.

Associates are expected to comply with this Policy and report violations immediately. In all of the above instances, the severity of an individual violation may warrant immediate termination. However, only those persons with the approval to terminate can make this determination (See Termination of Employment Policy).