# EXHIBIT 8

LEXSEE 2006 U.S. DIST. LEXIS 21184


Positive
As of: Mar 14, 2007

**MOHAMED HYATH, Plaintiff, v. CITY OF DECATUR, W.S. RICHARDS, individually and in his official capacity as Lieutenant, T.G. KAROLYI, individually and in his official capacity as Corporal, and M.H. HENSEL, individually and in his official capacity as Corporal, Defendants.**

CIVIL ACTION NO. 1:04-CV-1135-JEC

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

*2006 U.S. Dist. LEXIS 21184*

**March 28, 2006, Decided**
**March 28, 2006, Filed**

**COUNSEL:** [*1] For Mohamed Hyath, Plaintiff: Amanda A. Farahany, Benjamin F. Barrett, Jr., Barrett & Farahany, LLP, Atlanta, GA.

For City of Decatur, Defendant: Weyman Thompson Johnson, Jr., William Cory Barker, Paul Hastings Janofsky & Walker, Atlanta, GA.

For W. S. Richards, individually and in his official capacity as Lieutenant, T. G. Karolyi, individually and in his official capacity as Corporal, M. H. Hensel, individually and in his official capacity as Corporal, Defendants: Fred L. Cavalli, Office of Fred L. Cavalli, Decatur, GA.

**JUDGES:** JULIE E. CARNES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JULIE E. CARNES

**OPINION:**

### ORDER & OPINION

This case is presently before the Court on defendant Richards' Motion for Summary Judgment [29], defendant Hensel's Motion for Summary Judgment [30], defendant Karolyi's Motion for Summary Judgment [31], defendant City of Decatur's Motion for Summary Judgment [33], defendant City of Decatur's Motion for Sanctions [40], plaintiff's Motion for Summary Judgment [44], and defendant City of Decatur's Motion to Strike [69]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant [*2] Richards' Motion for Summary Judgment [29] should be **GRANTED**, defendant Hensel's Motion for Summary Judgment [30] should be **GRANTED**, defendant Karolyi's Motion for Summary Judgment [31] should be **GRANTED**, defendant City of Decatur's Motion for Summary Judgment [33] should be **GRANTED**, defendant City of Decatur's Motion for Sanctions [40] should be **DENIED** as moot, plaintiff's Motion for Summary Judgment [44] should be **DENIED**, and defendant City of Decatur's Motion to Strike [69] should be **DENIED**.

### BACKGROUND

This is an employment discrimination case. Plaintiff is a practicing Muslim, of Mauritian origin. (Compl. [1] at P 4.) Defendant City of Decatur ("Decatur" or "the City") hired plaintiff as a police recruit in April, 2002. (Def.'s Statement of Material Facts ("DSMF") [33] at P 1.) n1 Plaintiff spent the first 10 weeks of his employment in a training course at the North Central Police Academy in Austell, Georgia. (*Id.* at P 2.) Following his graduation from the police academy, plaintiff joined the Decatur police department as a probationary officer in the patrol division. (*Id.* at P 4.)

> n1 The Court draws the facts from the undisputed facts in Defendant's Statement of Material Facts ("DSMF") [33], Plaintiff's Statement of

Material Facts ("PSMF")[46], and Plaintiff's Response to Defendant's Statement of Material Facts [46]. The majority of the facts underlying plaintiff's Complaint are undisputed.

[*3]

Plaintiff alleges that as soon as he joined the police department, he became the object of "constant taunting and harassment" based on his ethnicity and religion. (Plaintiff's Statement of Material Facts ("PSMF") [46] at P 12.) Plaintiff's fellow officers were aware that he was a practicing Muslim and, because of his ethnicity, perceived him to be from the Middle East. (Pl.'s Mot. for Summ. J. [44] at 19.) Plaintiff contends that, as a result of his religion and ethnicity, officers in the police department frequently referred to him by the nickname "Taliban" or "Al Queada." (Id. at 17.) In addition, plaintiff claims that officers teased him about Muslim dress and dietary restrictions, asking plaintiff why he did not eat pork or suggesting that he order the "pork sandwich or hot dog" for lunch. (Id. at 2, 21.) In the same vein, plaintiff alleges that defendant Karolyi, who was plaintiff's field training officer and often rode with him in the patrol car, asked plaintiff on several occasions whether women they encountered in traditional Muslim dress were plaintiff's "wife" or "mother." (Id. at 2.)

In addition to these general comments, plaintiff asserts two specific [*4] incidents of alleged racial harassment by his co-worker, defendant Hensel, and his shift commander and supervisor, defendant Richards. (PSMF [46] at PP 13-18.) The first incident involved plaintiff's training in the use of oleoresin capsicum, more commonly known as "OC" or "pepper spray." (Id. at P 13.) As part of their training, all new police recruits are exposed to pepper spray for three to five seconds. (Id.) Exposure to pepper spray causes an unpleasant reaction, and members of the police department typically gather to watch the new recruits undergo the training. (Id.) Plaintiff received pepper spray training in July, 2002. (DSMF [33] at P 6.) Approximately 25 people were present at the training, including defendant Hensel, a Decatur police officer. (Id. at P 8.) Plaintiff alleges that after he was exposed to the pepper spray, defendant Hensel stated, "That's what you get for bombing us you damn Taliban." (Id. at P 9.)

The second incident involved an altered FBI poster. (DSMF [33] at P 13.) The Decatur police department occasionally receives FBI "Seeking Information" posters requesting information about suspected criminals. (Pl.'s Mot. for Summ. J. [44] [*5] at 17.) In August, 2002, the department received a "Seeking Information" poster concerning A.S. Al-Rasheed, a Saudi Arabian suspected of being involved in the September 11, 2001 hijacking. (Id.; Richards Aff. [29] at P 15.) Defendant Richards used his computer to superimpose plaintiff's photograph onto the FBI poster, so that the poster depicted plaintiff as a suspected Islamic terrorist. (Id.) Richards showed the poster to plaintiff, and then left it in the roll call room for other officers to see. (Pl.'s Mot. for Summ. J. [44] at 18-19.)

Although the City maintains an anti-harassment policy, n2 plaintiff did not complain about any of these incidents when they occurred. n3 (DSMF [33] at P 23.) Neither did plaintiff tell defendants Hensel, Karolyi, or Richards that he found their comments offensive, or ask defendants to stop making the comments. (Id. at P 21.)

n2 The policy includes a grievance procedure, which is described in the City's Personnel Rules and Regulations manual. (DSMF [33] at P 27.) Pursuant to the policy, an employee may present a grievance to his or her supervisor within five working days after the employee knew, or in the exercise of due diligence should have known, of the conduct or acts upon which the grievance is based. (Id. at P 24.) If the grievance is not resolved by the supervisor, the employee may present it to the head of his department within five working days after the supervisor's response is given or is due. (Id.) If the grievance is still not resolved, the employee may present it to the City Manager within five working days after the department head's decision is rendered or due. (Id. at P 25.)

[*6]

n3 Plaintiff concedes that he received a copy of the policy along with his offer of employment, and that the City reviewed the policy with plaintiff at an orientation session. (DSMF [33] at P 23.)

Plaintiff first complained about the alleged harassment when he contacted Assistant Chief of Police David Junger by telephone on September 11 or 12, 2002, and requested a meeting to discuss his allegations. (DSMF [33] at P 28.) Pursuant to plaintiff's request, Junger scheduled a meeting for September 13, 2002. (Id.) In addition to plaintiff and Junger, Director of Public Safety Sherrard White and Assistant Chief of Police William Clark attended the meeting. (Id. at P 30.) During the meeting, plaintiff informed White, Junger, and Clark about the alleged harassment. According to plaintiff, Clark stated that he believed the comments were not intended maliciously, but were a form of inappropriate joking. (Id. at P 31.) White added that he took plaintiff's complaints seriously, and that the City would investigate

the alleged conduct. (*Id.* at P 32.) White further assured plaintiff that if [*7] his allegations were true, the City would discipline the individuals involved. (*Id.* at P 33.) Upon plaintiff's request, White agreed to allow plaintiff to take a paid leave of absence during the investigation. (*Id.* at P 34.)

Following his meeting with plaintiff, White appointed Lieutenant David Hipple to conduct an internal investigation into plaintiff's allegations. (DSMF [33] at P 36.) Hipple subsequently met with plaintiff to discuss his complaint. (*Id.* at P 37.) Hipple then interviewed defendants Hensel, Richards, and Karolyi, as well as Officer Sibley, who worked with plaintiff on a regular basis. (*Id.* at P 39.)

On September 19, 2002, while Hipple's investigation was ongoing, plaintiff's wife sent a letter to Peggy Merriss, the City Manager, indicating plaintiff's desire to resign from the police department. (DSMF [33] at P 41.) The following day, Merriss responded in writing, assuring plaintiff's wife that "the City of Decatur takes the conduct reported by Officer Hyath very seriously." (*Id.* at P 42.) Merriss further stated that "Officer Hyath is a valued member of the City of Decatur Police Department, and we would like him to continue employment" with [*8] the City. (*Id.*) Merriss reassured plaintiff's wife that "[e]very effort is being made to address [plaintiff's] complaint." (*Id.*)

In late September, 2002, Clark informed plaintiff that Lieutenant Hipple had completed his investigation and that discipline of the offending officers was pending. n4 (DSMF [33] at P 43.) Shortly thereafter, plaintiff submitted his letter of resignation to Clark and Junger. (*Id.* at P 44.) Plaintiff claims that he resigned because he feared retaliation for having raised a harassment complaint. (*Id.* at P 46.) However, plaintiff never experienced any harassment or retaliation after his meeting with White, Clark, and Junger on September 13th. (*Id.* at P 35.) Neither is plaintiff aware of any other officers who have experienced retaliation for making complaints against the City or fellow officers. (*Id.* at P 46.) Plaintiff also concedes that, prior to resigning, he had a telephone conversation with defendant Richards, who indicated that he had no ill feelings for plaintiff and encouraged plaintiff to return to work. (*Id.* at P 47.)

n4 The City ultimately disciplined Hensel and Richards by issuing written letters of reprimand to both officers. (DSMF [33] at P 45.) Karolyi was not disciplined, apparently because plaintiff did not identify Karolyi as one of the offending individuals in his initial conversation with Lieutenant Hipple or in his previous meeting with White. (*Id.* at P 38.)

[*9]
After plaintiff resigned, he filed for unemployment benefits. (Compl. [1] at" P 26.) The Department of Labor determined that plaintiff had resigned from the police department for good cause, and granted benefits. (*Id.* at P 27.) On appeal, the Dekalb County Superior Court affirmed the decision, also finding that plaintiff resigned for good cause. (*Id.* at P 28.)

Plaintiff subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was subjected to a hostile work environment. (Hyath Dep. at Ex. 14.) Although the EEOC never issued a notice of right to sue, plaintiff filed this lawsuit on April 26, 2004. n5 (Compl. [1].) In his Complaint, plaintiff alleges that he was subjected to a hostile work environment on the basis of his ethnicity and religion. (*Id.* at P 30.) Plaintiff seeks relief against the City, and against the individual defendants in their individual and official capacities, pursuant to *42 U.S.C. §§ 1981* and *1983*. Plaintiff also asserts various state law theories of recovery, including negligent supervision and retention, and intentional infliction of [*10] emotional distress. (*Id.* at PP 47-61.)

n5 Plaintiff initially indicated that he intended to amend his Complaint when he received his Notice of Right to Sue. (Compl. [1] at P 10.) Presumably, plaintiff intended this amendment to address a claim under Title VII, *42 U.S.C. § 2000e-2, et seq.* However, plaintiff never amended his Complaint and never produced a Notice of Right to Sue from the EEOC. Accordingly, the Court addresses only plaintiff's claims for relief under *§ 1981* and *§ 1983*.

All of the parties have filed motions for summary judgment, which are presently before the Court. The City has also filed a motion to strike untimely exhibits submitted by plaintiff, and a motion for sanctions to address alleged discovery abuses.

DISCUSSION

I. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [*11] issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" *FED. R. CIV. P. 56(c)*. A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106*

Case 2:06-cv-00485-MHT-CSC   Document 34-9   Filed 03/16/2007   Page 5 of 16

Page 4
2006 U.S. Dist. LEXIS 21184, *

*S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id. at 249-50*.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, *Rule 56 of the Federal Rules of Civil Procedure* mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. [*12] *Id. at 322-23* (quoting *FED. R. CIV. P. 56(c)*).

The movant bears the initial responsibility of asserting the basis for his motion. *Id. at 323*. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " showing' -- that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id. at 325*. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating " specific facts showing that there is a genuine issue for trial.'" *Id. at 324*. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, . *Samples (v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)*, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson, 477 U.S. at 247-48 (1986)*. [*13]

## II. Defendant City's Motion for Summary Judgment

Plaintiff asserts claims against the City under *§ 1981* and *§ 1983* for creating and maintaining a hostile work environment. (Compl. [1] at PP 35-46.) *Section 1983* "provides the exclusive federal damages remedy for the violation of rights guaranteed by *§ 1981* when the claim is pressed against a state actor." *Busby v. City of Orlando, 931 F.2d 764, 771 (11th Cir. 1991)*. Thus, the Court will not separately consider plaintiff's claim under *§ 1981*, which "effectively merge[s] into [his] *section 1983* claim." (*Id. See also, Webster v. Fulton County, 283 F.3d 1254, 1256 (11th Cir. 2002)* (noting that *§ 1981* is only enforceable against a state actor through *§ 1983*) and *Godby v. Montgomery County Bd. of Educ., 996 F.Supp. 1390, 1411 (M.D. Ala. 1998)* ("Where the defendants to a suit are state actors, *§ 1981* claims merge into *§ 1983* claims."). In order to hold the City liable under *§ 1983*, plaintiff must demonstrate that the City: 1) deprived him of a constitutional right, 2) under color of state law. *Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995)* [*14] (citing *Gomez v. Toledo, 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980))*. In addition, plaintiff must show that the constitutional deprivation occurred pursuant to a policy or custom of the City. *Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (11th Cir. 2001)*.

The City contends that it is entitled to summary judgment because plaintiff cannot demonstrate harassment sufficiently severe and pervasive to rise to the level of a constitutional deprivation. (Def. City's Mot. for Summ. J. [33] at 6-10.) The Court agrees. In addition, the Court finds no evidence to suggest that any policy or custom of the City caused the alleged constitutional deprivation. For both reasons, the City is entitled to summary judgment on plaintiff's *§ 1983* claim.

### A. Plaintiff has not suffered a constitutional deprivation.

Plaintiff alleges that the City deprived him of his constitutional right to equal protection of the law, as guaranteed by the *Equal Protection Clause of the Fourteenth Amendment*. (Compl. [1] at P 38.) Specifically, plaintiff contends that he has a constitutional right, under the *Equal Protection Clause*, to be free from a hostile work environment. (*Id.*) According to [*15] plaintiff, the City deprived him of that right by creating and condoning a work environment in which he was subjected to harassment as a result of his religion and his perceived Middle Eastern ethnicity. (*Id.*)

The Eleventh Circuit has recognized a constitutional right, arising under the *Equal Protection Clause*, to be free from unlawful discrimination in public employment. See *Busby, 931 F.2d at 775, 777*. See also, *Cross v. State Dep't of Mental Health, 49 F.3d 1490, 1507 (11th Cir. 1995)* (discussing *§ 1983* sexual harassment claim). This includes the right to be free from a hostile work environment. *Cross, 49 F.3d at 1507*. As the court explained in *Busby* and *Cross*, the elements of a hostile work environment claim under the *Equal Protection Clause* are generally the same as the elements of a similar claim under Title VII, *42 U.S.C. 2000e-2, et seq. Busby, 931 F.2d at 777*; *Cross, 49 F.3d at 1508*. See also, *Snider v. Jefferson State Community College, 344 F.3d 1325, 1328 n. 4 (11th Cir. 2003)* ("We have written that [w]hen *section 1983* [*16] is used as a parallel remedy for violation of Title VII . . . the elements of the two causes of action are the same.'") (quoting *Hardin v. Stynchcomb, 691 F.2d 1364, 1369 (11th Cir. 1982))*.

Thus, in order to establish that the City deprived plaintiff of his constitutional right to equal protection by maintaining a hostile work environment, plaintiff must

show that: 1) he belongs to a protected group; 2) he was subjected to unwelcome harassment; 3) the harassment was based on his race or ethnicity; and 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). See also, *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000). For purposes of this motion, the City concedes that plaintiff has met his burden on the first three factors. The focus of the Court's inquiry is thus on the fourth factor.

To prevail on the fourth factor, plaintiff must offer proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter [*17] the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal citations and quotation marks omitted); *Gupta*, 212 F.3d at 583. Moreover, plaintiff must produce evidence that the harassment is "both subjectively and objectively severe and pervasive." *Johnson v. Booker T. Washington Broad. Svc. Inc.*, 234 F.3d 501, 509 (11th Cir. 2000). That is, plaintiff must establish "not only that he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would [so] perceive the environment." *Gupta*, 212 F.3d at 583. To determine whether harassment is objectively severe and pervasive, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247-48 (11th Cir. 2004). [*18] Plaintiff alleges the following facts in support of his hostile work environment claim:

> (1) Officers frequently referred to him by the nickname "Taliban" or "Al Queada";
>
> (2) Officers insulted Muslim dietary restrictions by asking him if he was going to have "the pork sandwich or the hot dog" for lunch;
>
> (3) Defendant Karolyi, when he encountered women in traditional Muslim dress while riding in the patrol car with plaintiff, asked plaintiff if the women were "his wife" or "his mother";
>
> (4) On one occasion, while plaintiff was undergoing "pepper spray" training, defendant Hensel yelled, "That's what you get for bombing us, you damn Taliban!"; and
>
> (5) On another occasion, defendant Richards superimposed plaintiff's face onto an FBI "Seeking Information" poster to depict plaintiff as an Islamic terrorist suspected of being associated with the September 11, 2001 hijackers.

(PSMF [46] at PP 1-17; Pl.'s Resp. to Def.'s Statement of Material Facts [46] at P 20.)

As an initial matter, the Court notes that plaintiff's allegations consist almost entirely of offensive statements. A hostile work environment generally does not arise from the "mere utterance of an . . . epithet [*19] which engenders offensive feelings in an employee." *Harris*, 510 U.S. at 21. To create a hostile work environment, racial slurs must be " so commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" *Edwards*, 49 F.3d at 1521 (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). Assuming that plaintiff's fellow officers made the statements that plaintiff attributes to them, the statements do not indicate an atmosphere "charged with racial hostility." *Id*. (See PSMF [46] at PP 1-17.) Indeed, Lieutenant Hipple's investigation revealed that, though the statements were inappropriate, the officers expressed no hostility or ill-will towards plaintiff. (DSMF [33] at P 40.) Plaintiff also acknowledges that, while he was offended by the statements, they occurred in the context of pervasive "nicknames, joking and teasing" within the police department, as opposed to an atmosphere "charged with racial hostility." (PSMF [46] at PP 5-6; Hyath Dep. at 163.)

Moreover, applying the relevant factors, the statements plaintiff alleges do not rise to the level of severe and [*20] pervasive harassment. While some of the statements were frequent, none were particularly severe. See *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (concluding that statements referring to Turkish plaintiff as "turkey" and teasing him about his Turkish food, although frequent, were not sufficiently severe to support a hostile work environment claim). Further, plaintiff concedes that the statements did not affect his job performance. (Hyath Dep. at 176.) Finally, there is no evidence that the statements were made in an intimidating manner, or accompanied by physical threats. Compare *Miller v. Kenworth of Dothan*, 277 F.3d 1269 (11th Cir. 2002) (finding sufficient evidence that racial epithets were severe where plaintiff's foreman called him "Spic" "wetback" and "Mexican motherfucker" in an intimidating manner while arguing with plaintiff or berating him for his job performance).

The only allegation that involves more than an offensive statement is plaintiff's complaint about the altered FBI poster. (PSMF [46] at PP 13-17.) The poster incident, however, is in the same vein as the offensive statements. While inappropriate and offensive [*21] to plaintiff, there is no evidence that the poster was accompanied by threats or intimidation, or presented in a malicious or hostile manner. (*See* PSMF [46] at PP 13-18; DSMF [33] at PP 13-14.) Richards has testified, and plaintiff does not dispute, that he presented the poster to plaintiff in a teasing, as opposed to a hostile manner, in an environment in which teasing among officers was routine. (Richards Aff. [29] at P 16; Hyath Dep. at 163.) *See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* (instructing courts to consider the social context to distinguish between innocuous behavior and severe and pervasive harassment). n6 Moreover, as with the offensive statements, plaintiff concedes that the poster incident did not interfere with his job performance. (Hyath Dep. at 176.) Thus, like the offensive statements, the poster incident does not rise to the level of severe and pervasive racial harassment. *See Baker v. Alabama Dep't of Public Safety, 296 F.Supp. 2d 1299, 1309 (M.D. Ala. 2003)* (finding that computer image depicting plaintiff as an Arab terrorist was not sufficiently severe to create a hostile work environment). [*22]

  n6 In his Affidavit, Richards explains that he intended the poster as a joke. (Richards Aff. [29] at P 15.) Hyath similarly refers to the "teasing" or "joking" culture within the police department. (Hyath Dep. at 163, 241-42.)

Particularly considering the social context surrounding plaintiff's alleged harassment, his reliance on *Miller* is misplaced. The plaintiff in *Miller*, a Mexican-American, presented evidence not only that his coworkers and foreman referred to him by derogatory names, including "Julio," "Chico," "taco," "wetback," "spic," and "Mexican motherfucker", but also that his coworkers and foreman used these names in an intimidating manner, shouting racial epithets at plaintiff while arguing with him or berating him for his job performance. *Miller, 277 F.3d at 1273*. Finding a question of fact as to whether plaintiff could show severe and pervasive racial harassment, the court emphasized that plaintiff had presented evidence of intimidation, as opposed to merely relying [*23] on "offensive utterances." *Id. at 1277*.

As discussed, there is no similar evidence in this case of threatening or intimidating behavior. On the contrary, plaintiff does not dispute that although he found the officers' comments offensive, they were made in a teasing, as opposed to a hostile manner, in an environment in which teasing among officers was routine. (Hyath Dep. at 163, 241-42; Richards Aff. [29] at P 15; Hensel Aff. [30] at PP 8, 10-11.) *See Gupta, 212 F.3d at 584* (emphasizing that "ordinary socializing in the workplace should not be mistaken for discriminatory conditions of employment'"), and (*Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* (noting that "simple teasing" does not constitute severe and pervasive harassment).

There is another important distinction between this case and *Miller*. In *Miller*, the plaintiff's foreman continued to refer to him as "wetback," "spic," and "Mexican motherfucker," even though plaintiff had complained about the name-calling, and management had discussed the complaint with plaintiff's foreman and co-workers. *Miller, 277 F.3d at 1274*. In this case, [*24] on the contrary, plaintiff did not complain to anyone, including the offending officers, until he requested a meeting with Assistant Chief of Police Junger. (Hyath Dep. at 154-55). Plaintiff concedes that he did not experience any harassment after his initial complaint. (*Id.* at 190, 214.) Thus, while the verbal harassment in *Miller* continued despite the plaintiff's objections, in this case the offensive conduct ceased immediately upon plaintiff's complaint. (*Id.*) This distinction is significant, because the *Miller* Court based its holding, in part, on the proposition that, "it is repeated incidents of verbal harassment that continue despite the employee's objections that are indicative of a hostile work environment.'" *Miller, 277 F.3d at 1276* (quoting *Shanoff v. Illinois Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001)*).

In fact, plaintiff's allegations in this case are more like those in *Smith v. Beverly Health and Rehab. Servs., Inc., 978 F. Supp. 1116 (N.D. Ga. 1997)* (Hull, J.). The plaintiff in *Smith*, a black nursing assistant, asserted a Title VII hostile work environment claim based on several racially [*25] charged statements, including his supervisor's comments that: 1) "all that mooly can do is make coffee and bring it to me"; 2) "these goddamn Georgia niggers think they own Georgia"; and 3) "where I come from niggers knew their place." n7 *Smith, 978 F.Supp. at 1121-22*. Citing well-settled Eleventh Circuit law concerning "offensive utterances," Judge Hull concluded that plaintiff's allegations did not rise to the level of severe and pervasive racial harassment. *Id. at 1120, 1122* (citing *Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995)*).

  n7 The plaintiff in *Smith* also alleged that his employer had placed a post-it note on a patient's chart directing that no black males care for the patient, per the patient's request. *Smith, 978 F.Supp. at 1121-22*.

As in *Smith*, plaintiff's allegations in this case primarily involve "offensive utterances." Indeed, the statements plaintiff alleges are arguably less offensive than the [*26] statements in *Smith*. The Court agrees with Judge Hull's reasoning, and concludes that the alleged statements, like those in *Smith*, do not constitute severe and pervasive racial harassment. *Smith, 978 F. Supp. at 1122. See also, Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 2005 WL 1926420 *3 (11th Cir. 2005)* (holding that racial symbols and slurs, including the presence of rebel flags and the letters "KKK" in the workplace, in addition to several other comments referring to plaintiff as "nigger" and "boy", did not constitute "sufficiently severe or pervasive" harassment to alter the conditions of plaintiff's employment.) n8

> n8 *Barrow* is an unpublished decision, and is thus persuasive, but not binding, authority pursuant to *Eleventh Circuit Rule 36-2*.

Applying an objective standard, and considering all the relevant factors, the incidents that plaintiff alleges are insufficiently severe or pervasive to establish actionable racial harassment. n9 Thus, plaintiff cannot show [*27] that the City violated his constitutional right to equal protection. As plaintiff cannot demonstrate a constitutional deprivation, as required to impose liability against the City under *§ 1983*, the City is entitled to summary judgment on plaintiff's hostile work environment claim.

> n9 Plaintiff also contends that he was constructively discharged as a result of his alleged harassment. (Compl. [1] at P 38.) "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)*. Specifically, to prevail on a claim for constructive discharge, plaintiff must demonstrate working conditions that "were so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Id.* (citing *Poole, 129 F.3d 551 at 553*). Because plaintiff cannot establish sufficiently severe and pervasive harassment to create a hostile work environment, the City is also entitled to summary judgment on his claim for constructive discharge.

Moreover, immediately after plaintiff complained, the defendant investigated and took corrective action to insure that plaintiff's fellow workers not make the ethnic remarks that plaintiff found to be offensive. There is no reason to believe that these comments would have been repeated, had plaintiff returned to work. Thus, no reasonable person would have felt compelled to resign.

[*28]

**B. The alleged harassment did not occur pursuant to a City custom or policy.**

In addition, plaintiff cannot establish a basis for holding the City liable for his alleged harassment. There is no *respondeat superior* liability under *§ 1983*. *Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (11th Cir. 2001)* (citing *Monell v. Dept. of Social Servs., 436 U.S. 658, 663, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))*. Thus, a municipality is only liable under *§ 1983* for constitutional deprivations that are caused by a governmental policy or custom. *Id.* Moreover, "[i]t is not sufficient for a [municipality's] policy to be tangentially related to a constitutional deprivation." *Cuesta v. School Board of Miami-Dade County, 285 F.3d 962, 967 (11th Cir. 2002)*. Instead, "[t]he official policy or custom must be the moving force of the constitutional violation in order to establish liability . . . under *§ 1983*.'" *Id.* (citing *Gilmere v. City of Atlanta, 737 F.2d 894, 901 (11th Cir. 1984))*. Accordingly, in order to prevail on his claim against the City, plaintiff must show that a City policy or custom was the "moving force" behind his alleged racial [*29] harassment.

Plaintiff presents no evidence of any City custom or policy of racial harassment. Indeed, plaintiff appears to rely on a *respondeat superior* theory, asserting that, "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with the immediate or successively higher authority over the employee." (Pl.'s Mot. for Summ. J. [44] at 25.) While this may be a correct statement of the law under Title VII, plaintiff has not asserted a Title VII claim. (*See generally*, Compl. [1].) Plaintiff's claims arise, instead, under *§ 1983*. As noted above, the law is clearly established that there is no vicarious liability against a municipality under *§ 1983*. Instead, to recover from the City under *§ 1983*, plaintiff must demonstrate that he was deprived of a constitutional right pursuant to a City policy or custom. *Griffin, 261 F.3d at 1307*.

There are three ways to show a governmental policy or custom: 1) an express policy; 2) a widespread practice that is so permanent and well-settled as to constitute a custom; or 3) the act or decision of a municipal official with final policy-making [*30] authority. *Cuesta, 285 F.3d at 966-968*. Plaintiff has presented, and the Court can find, no evidence in the record to suggest a City policy or custom of racial harassment under any of the above formulations.

Case 2:06-cv-00485-MHT-CSC    Document 34-9    Filed 03/16/2007    Page 9 of 16

Page 8
2006 U.S. Dist. LEXIS 21184, *

It is undisputed that the City's express policy forbids racial discrimination and harassment. Plaintiff concedes that the City maintains an equal opportunity employment policy, which includes a grievance procedure to address harassment. (DSMF [33] at PP 23-24.) The policy provides that an employee may present grievances to his supervisor, and if not appropriately addressed by his supervisor, to his department head. (Id. at P 25.) If the grievance is not resolved by the department head, the employee may present his complaint directly to the City Manager. (Id.) Thus, plaintiff cannot show that he was subjected to racial harassment as a result of an express policy of the City, because the City's express policy forbid, and put in place specific procedures to remedy, such harassment.

Neither can plaintiff show that he was subjected to harassment as a result of an "established custom" of condoning or authorizing racial harassment. As discussed, in order to [*31] establish a "custom," plaintiff must present evidence of a "widespread practice that . . . is so permanent and well-settled as to constitute a custom or usage' with the force of law." Griffin, 261 F.3d at 1308 (citing Brown, 923 F.2d 1474 at 1481.) The Eleventh Circuit has further defined the term "custom" to include "deeply imbedded traditional ways of carrying out policy." (Fundiller v. Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).

Viewing the evidence in the light most favorable to plaintiff, the most the Court can glean from the record is that officers in the Decatur police department frequently commented on plaintiff's ethnicity and religious customs, and that a general atmosphere of teasing among officers prevailed within the department. See PSMF [46] at PP 1-17; Hyath Dep. at 163, 241-42.) This is insufficient to establish that the City had a widespread practice of condoning racial harassment. Compare, Griffin, 261 F.3d at 1308-1309.

Indeed, all of the evidence in the record is to the contrary. Plaintiff concedes [*32] that when he complained about the alleged harassment to Assistant Chief Junger, Junger seemed concerned about his complaint and immediately arranged a meeting with plaintiff and other City officials. (DSMF [33] at PP 28-30.) Following this meeting, Director of Public Safety White appointed Lieutenant Hipple to investigate plaintiff's allegations. (Id. at P 36.) Within the next three days, Hipple interviewed plaintiff and several other officers in the department, including the officers that allegedly made offensive comments to plaintiff. (Id. at PP 37-39.) During the investigation, City Manager Merriss personally communicated to plaintiff that the City took his allegations seriously and was making every effort to address his complaint. (Id. at P 42.) At the conclusion of Hipple's investigation, the City disciplined and formally reprimanded the officers involved in the alleged harassment. (Id. at P 45.) The City's reaction to plaintiff's complaint belies any allegation of an "established custom" of condoning racial harassment. Compare, Griffin, 261 F.3d at 1308 (finding that sexual harassment was an on-going, accepted practice where the city commission, [*33] the mayor, and other high ranking city officials knew of, ignored, and tolerated blatant and pervasive sexual harassment).

Finally, there is no evidence that the racial harassment was committed or condoned by a City official with "final policymaking authority." A local government body can be held liable for the acts or decisions of "a municipal official with final policymaking authority in the area of the act or decision." Cuesta, 285 F.3d at 968. Plaintiff alleges that he was subject to a racially hostile work environment by various officers, including his co-worker defendant Hensel, his field training officer, defendant Karolyi, and his shift commander and direct supervisor, defendant Richards. (Pl.'s Mot. for Summ. J. [44] at 2-3; PSMF [46] at PP 1-17.) The only official who could arguably fall into the category of "final policymaker" is defendant Richards.

It is apparent from the record, however, that Richards does not qualify as an official with "final policymaking authority." "[F]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.'" Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003) [*34] (holding that County Administrator was not a "final policymaker" with respect to termination decisions). Pursuant to the City's express policy, Richards' decisions and actions with regard to any alleged harassment were subject to review by the department head and ultimately by the City Manager. (DSMF [33] at P 25.) In fact, as soon as plaintiff complained about Richards' conduct, the City investigated plaintiff's allegations and disciplined Richards with a formal reprimand. Id. (at P 45.) Clearly, then, Richards does not qualify as an official with "final policymaking authority" for purposes of imposing liability on the City under § 1983. See Quinn, 330 F.3d at 1326.

After a careful review of the record, the Court can find no evidence of any policy or custom of the City that could have resulted in a racially hostile work environment. Indeed, all of the evidence indicates, to the contrary, that the City had an express policy forbidding racial harassment and an established custom of enforcing that policy. Accordingly, the City is entitled to summary judgment on plaintiff's § 1983 claim for this additional reason.

Case 2:06-cv-00485-MHT-CSC    Document 34-9    Filed 03/16/2007    Page 10 of 16

Page 9
2006 U.S. Dist. LEXIS 21184, *

**III. Defendants Hensel, Karolyi,** [*35] **and Richards' Motions for Summary Judgment**

Plaintiff asserts similar hostile work environment claims against defendants Hensel, Karolyi, and Richards. (Compl. [1] at PP 6-8.) Specifically, plaintiff alleges that each defendant, by his individual actions, created a racially hostile work environment, thus depriving plaintiff of his constitutional right to equal protection. (Id.) Plaintiff seeks to hold each defendant personally liable under § 1983 in his individual and official capacity. n10 (Id.)

> n10 As with plaintiff's claims against the City, plaintiff's § 1981 claims against the individual defendants merge into his claims under § 1983. Accordingly, the Court will not separately consider plaintiff's § 1981 claims against the individual defendants. See Busby, 931 F.2d at 771, and Webster, 283 F.3d at 1256. See also, Hill v. Taconic Developmental Disabilities Servs. Office, 283 F.Supp. 2d 955, 957 (S.D.N.Y. 2003) (holding that state actors sued in their individual capacities must be sued under § 1983 for violations of rights guaranteed by § 1981).

[*36]

As to their official liability, the Eleventh Circuit has held that "when an officer is sued . . . in his or her official capacity, the suit is simply another way of pleading an action against . . . the city that the officer represents." Busby, 931 F.2d at 776. Consequently, it would be redundant to allow plaintiff to sue both the City and the officers in their official capacity. Id. The individual defendants are thus entitled to summary judgment on plaintiff's claims against them in their official capacity.

As to their individual liability, the individual defendants contend, like the City, that plaintiff has not presented evidence of sufficiently severe and pervasive harassment to establish a constitutional deprivation, which is necessary for liability under § 1983. The Court concluded in its discussion above that even plaintiff's cumulative allegations do not rise to the level of severe and pervasive harassment. Thus, plaintiff's allegations against each individual defendant, which are even less serious, necessarily fall short of the severe and pervasive standard. As plaintiff cannot establish that Hensel, Karolyi, or Richards deprived him of a constitutional [*37] right, the individual defendants are entitled to summary judgment on plaintiff's § 1983 claims.

Further, the Court finds that defendant Hensel was not acting "under color of state law" when he engaged in the alleged harassment, and for this additional reason is not liable to plaintiff under § 1983. In addition, the Court finds that defendant Richards is entitled to summary judgment on plaintiff's § 1983 claims on the alternative ground of qualified immunity. The Court addresses the allegations and the issues specific to each defendant below.

**A. Defendant Hensel**

Plaintiff alleges that Hensel, a fellow police officer: 1) referred to him by the nickname "Taliban" on one occasion; 2) stated during plaintiff's pepper spray training, "That's what you get for bombing us, you damn Taliban!"; and 3) asked plaintiff if he minded being called "Taliban" and, before plaintiff could respond, said "it doesn't matter, we're going to call you that anyway." (Pl.'s Resp. to Individual Def.'s Mots. for Summ. J. [47] at 29-30.) These statements do not constitute severe and pervasive harassment. Moreover, they were not made "under color of state law."

**1. Deprivation of a Constitutional** [*38] **Right**

As discussed, in order to hold defendant Hensel liable under § 1983, plaintiff must establish that Hensel: 1) deprived him of a constitutional right, 2) under color of state law. Edwards, 49 F.3d at 1522. To rise to the level of a constitutional deprivation, Hensel's actions must constitute "severe and pervasive" racial harassment. Busby, 931 F.2d at 777; Cross, 49 F.3d at 1508. It is well-settled that "mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not meet the severe and pervasive standard. Harris, 510 U.S. at 21. Thus, Hensel's three statements, though they may have offended plaintiff, do not constitute severe and pervasive racial harassment. (Id. See also, Edwards, 49 F.3d at 1521, and Smith, 978 F. Supp. at 1122. Accordingly, Hensel is entitled to summary judgment on plaintiff's claim under § 1983, because he did not deprive plaintiff of any constitutional right.

**2. Under Color of State Law**

In addition, in order to recover under § 1983, plaintiff must show that Hensel deprived plaintiff of a constitutional [*39] right "under color of state law." Edwards, 49 F.3d at 1522. The Eleventh Circuit has defined "acting under color of state law" to include "acting with power possessed by virtue of the defendant's employment with the state." Id. at 1523 (citing West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)). Applying this definition in the hostile work environment context, the court has held that co-workers without supervisory authority over a plaintiff are not "acting under color of law" when they engage in harassment. Id. This is because co-workers do not possess, and thus are not able to use, any supervisory authority to create a hostile work environment. Id. See also, Saunders v. Hunter, 980 F.Supp. 1236, 1242 (M.D. Fla. 1997) (finding that co-workers without supervisory authority over

Case 2:06-cv-00485-MHT-CSC  Document 34-9  Filed 03/16/2007  Page 11 of 16

Page 10
2006 U.S. Dist. LEXIS 21184, *

plaintiff were not acting under color of law when they created an allegedly hostile work environment); and *Redpath v. City of Overland Park*, 857 F.Supp. 1448, 1462 (D. Kan. 1994) (holding that co-workers were not liable for plaintiff's alleged sexual and racial harassment because they were not acting under color of state law). [*40]

Hensel was of higher rank than plaintiff, but did not supervise plaintiff or any other officers involved in plaintiff's alleged harassment. (Hensel Aff. [30] at P 5; PSMF [47] at P 7.) As Hensel had no supervisory authority over plaintiff, he was not acting "under color of state law" when he allegedly harassed plaintiff. Accordingly, and for this additional reason, Hensel is entitled to summary judgment on plaintiff's § 1983 claim against him in his individual capacity.

### B. Defendant Karolyi

Unlike Hensel, defendant Karolyi had some supervisory authority over plaintiff because he was plaintiff's field training officer ("FTO"). (Karolyi Aff. [31] at P 4.) As his FTO, Karolyi rode with plaintiff in the patrol car and made daily evaluations of plaintiff's performance and progress. (*Id.*) Thus, if Karolyi created a racially hostile work environment, he arguably acted "under color of state law" in doing so. *See Edwards, 49 F.3d at 1523*.

Karolyi's conduct, however, was even less severe than Hensel's, and clearly does not rise to the level of severe and pervasive harassment. Plaintiff alleges that Karolyi: 1) taunted him about what he could and could not [*41] eat; and 2) asked him whether women in traditional Muslim dress were, or looked like, plaintiff's "wife" or "mother." (Pl.'s Resp. to Individual Def.'s Mots. for Summ. J. [47] at 30; Hyath Dep. at 104, 107.) Plaintiff concedes that Karolyi never used any religious or racial slurs, and never referred to plaintiff by any derogatory name. (Karolyi Aff. [31] at P 5; Hyath Dep. at 108, 117.)

Assuming that plaintiff's allegations concerning Karolyi are true, Karolyi's conduct does not even approach severe and pervasive harassment, as that concept has been defined by the Supreme Court and the Eleventh Circuit. n11 *See Faragher*, 524 U.S. at 788 (reaffirming that "'simple teasing,' offhand comments, and isolated incidents" do not amount to severe and pervasive harassment) (citing *Oncale*, 523 U.S. at 81)), and *Gupta*, 212 F.3d at 585 (emphasizing that anti-discrimination laws do not operate as a "general civility code," and stating that merely "annoying or inappropriate" behavior does not constitute severe and pervasive harassment). As Karolyi's statements did not create a hostile work environment, he cannot be said to have deprived [*42] plaintiff of any constitutional right. Accordingly, Karolyi is entitled to summary judgment on plaintiff's § 1983 claim against him in his individual capacity.

> n11 The Court rejects plaintiff's argument that Hensel and Karolyi are responsible not only for their own actions, but also for the entire work environment, including the actions of officers who were not under their supervision. (Pl.'s Resp. to Individual Def.'s Mots. for Summ. J. [47] at 27.) The case plaintiff cites in support of this argument, *Hill v. Taconic Developmental Disabilities Servs. Office*, 283 F.Supp. 2d 955 (S.D.N.Y. 2003), deals with supervisor liability under § 1983. As neither Hensel nor Karolyi had any supervisory authority over the individuals in the police department who allegedly harassed plaintiff, *Hill* is inapplicable. Plaintiff cites, and the Court has found, no authority in support of holding Hensel and Karolyi liable under § 1983 for other individuals' actions that defendants had no authority either to direct or to curtail. *See Holloman v. Harland*, 370 F.3d 1252, 1263 (11th Cir. 2004) (explaining that an individual may be liable under § 1983 for "his own personal actions . . . or, under certain limited circumstances, for the actions of his subordinates"); and *Braddy*, 133 F.3d at 802 (outlining bases for supervisor liability under § 1983).

[*43]

### C. Defendant Richards

Plaintiff's allegations against defendant Richards are the most serious, both because of his supervisory position, and his level of participation in the alleged harassment. Richards was plaintiff's supervisor and shift commander. (Richards Aff. [29] at P 4.) In cases involving an alleged hostile work environment, the Eleventh Circuit has held that a supervisor may be individually liable if he: 1) condones; or 2) actively participates in the alleged harassment. *Braddy v. Florida Dep't of Labor*, 133 F.3d 797, 802 (11th Cir. 1998) (explaining bases for supervisor liability under § 1983). Assuming plaintiff's allegations are true, Richards did both. (PSMF [46] at PP 1-17.) He was aware that officers under his command referred to plaintiff as "Taliban" or "Al Queada" and made fun of Muslim dress and dietary restrictions, and took no action to correct the alleged verbal harassment. (*Id.* at PP 1-14.) He also actively participated in the harassment by creating and distributing an altered FBI poster depicting plaintiff as an Islamic terrorist. (*Id.* at PP 15-17.) Thus, Richards is potentially subject to supervisory liability under § [*44] 1983. *See Braddy*, 133 F.3d at 802.

Case 2:06-cv-00485-MHT-CSC    Document 34-9    Filed 03/16/2007    Page 12 of 16

Page 11
2006 U.S. Dist. LEXIS 21184, *

Of course, Richards is only liable to plaintiff if the alleged harassment was severe and pervasive, and thus deprived plaintiff of a constitutional right. The Court has concluded that plaintiff's allegations do not rise to the level of severe and pervasive harassment. Accordingly, Richards is entitled to summary judgment on plaintiff's *§ 1983* claim against him in his individual capacity. In addition, assuming Richards' conduct did result in a constitutional deprivation, he is entitled to summary judgment on the alternative ground of qualified immunity.

### 1. Discrimination or Deprivation of a Constitutional Right

As discussed above, the Court has concluded that plaintiff's cumulative allegations do not rise to the level of severe and pervasive harassment. This conclusion is based on the fact that most of the conduct consists of offensive statements, and the circumstances surrounding the statements do not indicate a climate "charged with racial hostility." *See Edwards, 49 F.3d at 1521.* In addition, plaintiff presents no evidence that the statements were made in an intimidating manner, were accompanied by a physical [*45] threat, or were otherwise severe. Indeed, plaintiff concedes that none of the officers involved, including Richards, expressed any ill-will towards him, and that the statements were made in a teasing, as opposed to a hostile or abusive manner. *See Oncale, 523 U.S. at 82* (instructing courts to consider the social context to distinguish between innocuous behavior and severe and pervasive harassment). Similarly, the incident involving the FBI poster, which apparently was intended as a joke, albeit in extremely poor taste, was not presented in a malicious manner, and was not particularly severe. *See* Richards Aff. [29] at P 15.) Finally, there is no evidence that the statements or the poster affected plaintiff's job performance. (Hyath Dep. at 176.) Applying the relevant factors, plaintiff's allegations are insufficiently severe and pervasive to establish a hostile work environment, and thus a constitutional deprivation.

As plaintiff cannot show that he suffered a constitutional deprivation, Richards is not liable to him under *§ 1983*. Accordingly, Richards is entitled to summary judgment on plaintiff's claims against him in his individual capacity.

### 2. Qualified [*46] Immunity

Even assuming that Richards' conduct rose to the level of severe and pervasive harassment, Richards is not liable if he can successfully claim a qualified immunity defense. A government official enjoys qualified immunity as to a *§ 1983* claim unless the constitutional right allegedly violated is "clearly established" at the time of the violation. Defendant Richards contends that he is entitled to qualified immunity because his conduct, including his failure to curtail his subordinates' offensive statements and his creation of the altered FBI poster, did not violate plaintiff's clearly established rights. The Court agrees.

The law concerning qualified immunity has been explored in many Eleventh Circuit cases. Qualified immunity confers complete protection upon government officials sued in their individual capacities unless their conduct " violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).* An official is entitled to qualified immunity if an objectively reasonable [*47] official in the same situation could have believed that his actions were lawful. *Id.* (citing *Anderson v. Creighton, 483 U.S. 635, 638-41, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).* In short, qualified immunity allows government officials to carry out their discretionary duties without fear of personal liability or harassing litigation and protects from suit, "all but the plainly incompetent or one who is knowingly violating the federal law." *Vinyard, 311 F.3d at 1346* (quoting *Lee (v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).*

To receive qualified immunity, a public official must first demonstrate that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Id.* Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.*

Contrary to plaintiff's argument, Richards was acting within his discretionary authority when he engaged in the alleged wrongful conduct. A government official acts within his discretionary authority when his actions "occur[] in the performance of the official's duties [*48] and within the scope of his authority." *Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1185 (11th Cir. 1994).* To determine whether an official is acting within his discretionary authority, the Court "look[s] to the general nature of the [official's] action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).*

In this case, most of plaintiff's allegations involve defendant Richards' failure to correct offensive statements directed towards plaintiff in the workplace. (PSMF [46] at PP 1-17.) Plaintiff also alleges that Richards, while on duty and during the course of a shift change, distributed an altered FBI poster to other officers in the roll call room. (*Id.* at PP 13-17.) All of Richards' alleged misconduct occurred at work, during work hours,

and in the course of performing legitimate job functions, including supervising and interacting with subordinate officers. (*See* PSMF [46] at PP 1-17.) Thus, Richards [*49] was acting within his discretionary authority when he engaged in the allegedly wrongful conduct. *Holloman, 370 F.3d at 1267* (stating that teacher was "undoubtedly engaged in a discretionary function" in chastising and punishing a student for refusing to say the pledge of allegiance because the teacher was responsible for maintaining classroom decorum). *See also, Jordan v. Doe, 38 F.3d 1559, 1565-66 (11th Cir. 1994)* (concluding that marshals were acting pursuant to their job duties and within the scope of their authority while transporting detainee from one facility to another).

Moreover, Richards did not violate plaintiff's clearly established rights by failing to curtail offensive statements within the department and creating the altered FBI poster. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272.* In *Hope v. Pelzer, 536 U.S. 730, 739-40, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)*, the Supreme Court indicated that this question boils down to whether the [*50] state of the law, at the time of the incident, gave "fair warning" to the official that his conduct was unlawful. The Eleventh Circuit has identified three ways by which a plaintiff can show that an official had "fair warning" that his act was unlawful. *See Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002).*

First, an official has fair warning if there is a federal statute or federal constitutional provision that is so specific as to clearly prohibit the conduct in question. Such a case is deemed an "obvious clarity" case. *Vinyard, 311 F.3d at 1350.* General principles of law are not specific enough to create an obvious clarity case, however. Thus, while the *Equal Protection Clause* has been held to prohibit racial discrimination, including severe and pervasive racial harassment, in public employment, this principle is far too broad to give a supervisor in Richards' position notice that his specific conduct was unlawful. *See Braddy, 133 F.3d at 801* (rejecting plaintiff's argument that supervisor was not entitled to qualified immunity because plaintiff had "a clearly established right to be free from sexual harassment and racial discrimination [*51] in the work place"). Whether harassment is sufficiently severe and pervasive to violate the *Equal Protection Clause* can only be determined after examining the specific facts of the situation. *Id.*

Second, a plaintiff can show fair warning to the official if there is case law that categorically prohibits the conduct in question. *Vinyard, 311 F.3d at 1351.* Plaintiff does not cite, and the Court has not found, any case law categorically prohibiting Richards' conduct in this case.

Third, a plaintiff can show fair warning if there is a case prohibiting the described conduct, involving facts that are not "fairly distinguishable" from the facts occurring in the plaintiff's case. *Vinyard, 311 F.3d at 1352.* Again, plaintiff does not cite cases finding severe and pervasive harassment on facts that are substantially similar to the facts of plaintiff's case. The closest case plaintiff cites is *Miller*. As discussed above, *Miller* is distinguishable because: 1) *Miller* involved intimidation, in addition to offensive statements; and 2) *Miller* involved continued verbal harassment over the plaintiff's objections. Thus, *Miller* would not provide [*52] fair warning to Richards that his conduct constituted severe and pervasive racial harassment.

At most, Richards' actions consisted of the following:

> 1) He was aware that officers under his command referred to plaintiff as "Taliban" and "Al Queada," and that they teased him about his dietary restrictions, but took no action to correct their behavior;
>
> 2) He was aware that defendant Hensel stated to plaintiff at pepper spray training, "That's what you get for bombing us, you damn Taliban," and that defendant Karolyi questioned plaintiff about women in traditional Muslim dress, but took no action to correct their behavior; and
>
> 3) He created, as a joke, an altered FBI poster depicting plaintiff as an Islamic terrorist.

(PSMF [46] at PP 1-17.) Although these actions certainly indicate very poor judgment, they do not "clearly and obviously" constitute severe and pervasive racial harassment. *Compare Braddy, 133 F.3d at 802-803* (denying qualified immunity to supervisor who engaged in behavior that clearly and obviously constituted severe and pervasive harassment, including, among other things, following plaintiff down the hall with a bull whip while stating, [*53] "this is my sexual fantasy for you").

Indeed, when dealing with allegations of unconstitutional conduct that involves only offensive speech, a rigorous application of the qualified immunity doctrine is particularly important. Given the different sensitivities that people bring to the work place, it is essential that a clear standard for offensiveness be met before an indi-

vidual governmental employee is, himself, held personally liable n12 for a comment that a fellow employee deems to be offensive.

> n12 Because of the applicability of § 1983, governmental employees who make allegedly offensive comments to fellow employees are treated far more harshly than their counterparts in the private sector. Specifically, when an individual in the private sector believes that he has been the butt of offensive ethnic comments by a fellow employee, that employee can sue only his employer, under Title VII, for permitting a hostile work environment to exist. The employee who made the offending remarks or the supervisor who tolerated these comments is never a defendant.
>
> A governmental employee who makes or tolerates offensive comments can, however, be named as a defendant in a case alleging a hostile environment claim, and this employee will be personally liable for any damages awarded in such a suit. This specter of potential financial ruin as a result of making or tolerating inappropriate comments is mitigated by the existence of the qualified immunity defense, which conditions liability on a clear showing of comments so severely and pervasively offensive that any reasonable employee would have understood that the repetition of these remarks operated to alter the terms and conditions of employment of the employee who was their target.

[*54]

In short, the Court concurs with plaintiff that the comments at issue were in very poor taste and that the defendants should have been more sensitive to the fact that the plaintiff, an individual whom they had just recently met, might be hurt, not amused, by the defendants' teasing. Nevertheless, for the reasons discussed above, defendant Richards is entitled to qualified immunity on plaintiff's § 1983 claim against him in his individual capacity.

## IV. Plaintiff's Motion for Partial Summary Judgment Against the City

In his motion for partial summary judgment, plaintiff argues that the City is collaterally estopped from relitigating the question whether plaintiff was subjected to a hostile work environment as a result of prior proceedings involving plaintiff's unemployment benefits. (Pl.'s Mot. for Summ. J. [44] at 4-5.) When plaintiff resigned from the police department, he applied for, and the Department of Labor initially granted, and then revoked, unemployment benefits. (Id.) The Department revoked plaintiff's benefits because it found that he voluntarily resigned "without good cause," disqualifying him from receiving benefits under O.C.G.A. § 34-8-194(1) [*55] . (Department of Labor Hearing Transcript and Decision ("Hearing Transcript") [72].) On appeal, the Department of Labor's Board of Review reinstated plaintiff's benefits, finding that plaintiff resigned for "good work-connected cause" as a result of his alleged verbal harassment. (Board of Review Order [58] at 3.) The Dekalb County Superior Court affirmed the Board's decision. (Pl.'s Mot. for Summ. J. [44] at Ex. A.) According to plaintiff, the Superior Court's decision precludes the City from arguing that plaintiff's harassment was not sufficiently severe and pervasive to create a hostile work environment, and thus a constitutional deprivation, under federal law. (Id. at 5.) The Court does not agree.

The doctrine of collateral estoppel, also known as issue preclusion, precludes relitigation of an issue previously litigated and adjudicated on the merits between the same parties. Simmons v. State, 276 Ga. 525, 527, 579 S.E. 2d 735, 737 (Ga. 2003); (Waldroup v. Greene County Hosp. Auth., 265 Ga. 864, 866-67, 463 S.E. 2d 5, 7 (Ga. 1995). Federal courts "give the same preclusive effect to state court judgments that those judgments would be given [*56] in the courts of the State from which the judgment emerged." (Kremer v. Chemical Constr. Corp., 456 U.S. 461, 465, 102 S. Ct. 1883, 72 L. Ed. 2d 262 (1982). Thus, the Court applies Georgia law to determine whether collateral estoppel bars the City's argument on the hostile work environment issue. Id.

Under Georgia law, collateral estoppel "precludes only those issues that were either actually litigated in a previous action or by necessity had to have been decided in order for the previous judgment to have been rendered." Shields v. Bellsouth Advertising & Publ'g Corp., 273 Ga. 774, 777, 545 S.E. 2d 898, 901 (Ga. 2001). In affirming the Board's decision, the Superior Court determined that, due to verbal harassment, plaintiff resigned from the police department for "good work-connected cause," and was thus eligible to collect unemployment benefits under O.C.G.A. § 34-8-194(1). (Board of Review Order [58]; Pl.'s Mot. for Summ. J. [44] at Ex. A.) The court did not determine whether the harassment was sufficiently severe and pervasive to result in a constitutional deprivation, as required for liability under § 1983. (Board of Review Order [58] at 3.) [*57] Neither was such a determination necessary to the court's conclusion, as the standard for granting unemployment benefits is lower than the standard applicable to a claim for damages under federal anti-discrimination statutes and parallel constitutional provisions. See O.C.G.A. § 34-8-194(1), and compare Gupta, 212 F.3d at 583 (explaining

severe and pervasive standard and noting that the severe and pervasive element "tests the mettle of most harassment claims"), and *Blair v. Poythress, 211 Ga. App. 674, 677, 440 S.E. 2d 261, 263 (1994)* (noting Georgia's "strong public policy favoring payment of unemployment benefits to persons unemployed through no fault of their own'") (citing *O.C.G.A. § 34-8-2*)). n13

> n13 Contrary to plaintiff's argument, *Shields* is inapplicable to this case. In *Shields*, the court held that Georgia's collateral estoppel rules barred plaintiff from asserting that he was fired in violation of the ADA as a result of his HIV positive status, because this assertion was inconsistent with the Superior Court's previous ruling, in an unemployment benefits determination, that plaintiff was terminated because he violated a work rule, and not because he was HIV positive. *Shields, 273 Ga. at 778, 545 S.E. 2d at 901*. In this case, the City's contention that plaintiff was not subjected to sufficiently severe and pervasive harassment to rise to the level of a constitutional deprivation is not inconsistent with the Superior Court's determination that plaintiff resigned for "good work-connected cause."

[*58]

Moreover, the Board did not consider the policy or custom requirement for holding the City liable under *§ 1983*. (See Board of Review Order [58] and Hearing Transcript [72].) Plaintiff was not required to show that he resigned as a result of a City custom or policy to prevail on his claim for unemployment compensation under *O.C.G.A. § 34-8-194(1)*. Instead, under Georgia's statutory scheme, the City's liability for unemployment compensation automatically followed the Board's finding that plaintiff resigned for "good work-connected cause." *See O.C.G.A. § 34-8-194(1)*. Holding the City liable on plaintiff's federal claims without requiring plaintiff to fulfill the policy or custom requirement, however, would be contrary to well-established principles governing municipal liability under *§ 1983*.

Although the Superior Court, in affirming the Board's decision, determined that plaintiff resigned for "good work-connected cause," the court did not consider, and it does not necessarily follow, that plaintiff was subjected to sufficiently severe and pervasive harassment to rise to the level of a constitutional deprivation. (Board [*59] of Review Order [58]; Hearing Transcript [72].) Neither did the court consider whether plaintiff's harassment resulted from a policy or custom of the City. (*Id.*) Thus, collateral estoppel does not apply to these issues, and the City is not precluded from arguing: 1) that the harassment in this case was not sufficiently severe and pervasive to result in a constitutional deprivation; or 2) that the City is not liable to plaintiff because the alleged harassment did not result from a custom or policy of the City.

Accordingly, plaintiff's motion for partial summary judgment should be **DENIED**.

### V. Plaintiff's State Law Claims

When a federal court has dismissed all of the federal claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over any remaining state law claims. *See McCulloch v. PNC Bank, Inc., 298 F.3d 1217, 1227 (11th Cir. 2002)* (citing *28 U.S.C. § 1367(c)(3)*). Indeed, the Supreme Court has directed lower federal courts to avoid, "needless decisions of state law," especially when federal claims are dismissed before trial. (*United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)*. [*60] Here, the Court has dismissed all of plaintiff's federal claims, and the remaining claims involve relatively complex decisions of state law. Accordingly, the Court **DISMISSES without prejudice** plaintiff's remaining state law claims.

### VI. Defendants' Motion for Sanctions

Defendant City of Decatur has filed a motion for sanctions to address plaintiff's alleged discovery violations. (Def.'s Mot. for Sanctions [40].) Specifically, the City contends that plaintiff has violated the Court's Order granting its motion to compel information from plaintiff concerning his employment history and income tax returns. (*Id.* at 2.) Plaintiff responds that he either has produced, or is still attempting to locate, the requested information. (Pl.'s Resp. to Def.'s Mot. for Sanctions [42].)

From the parties' submissions, it appears that plaintiff has not fully complied with his discovery obligations. However, all of the relief that the City requests, including orders barring certain evidence and designating certain facts as established, is now moot as a result of the Court's granting defendants' motions for summary judgment. (*See* Def.'s Mot. for Sanctions [40].) Accordingly, [*61] the Court **DENIES as moot** the City's Motion for Sanctions.

### VII. Defendant's Motion to Strike

Defendant City of Decatur also moves to strike certain exhibits submitted in support of plaintiff's motion for partial summary judgment, including the transcript of the Labor Department's hearing on plaintiff's application for unemployment benefits and the Superior Court's certified order granting plaintiff benefits. (Def.'s Mot. to Strike [69] at 3.) The City contends that plaintiff did not file these exhibits in a timely manner and, accordingly, that

the Court should not consider them in deciding the motions for summary judgment. (*Id.*)

Plaintiff has not responded to the City's motion to strike, and it appears that the exhibits were filed late. The Court expects all parties before it to comply with the deadlines set forth in the local rules and the Federal Rules of Evidence. However, in this case, the Court concludes that plaintiff's late submission has not prejudiced the City. Even after considering all of plaintiff's exhibits, the Court concludes that defendants are entitled to summary judgment on plaintiff's federal claims. Accordingly, the City's Motion to Strike [*62] is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant Richards' Motion for Summary Judgment [29], **GRANTS** defendant Hensel's Motion for Summary Judgment [30], **GRANTS** defendant Karolyi's Motion for Summary Judgment [31], **GRANTS** defendant City of Decatur's Motion for Summary Judgment [33], **DENIES** as moot defendant City of Decatur's Motion for Sanctions [40], **DENIES** plaintiff's Motion for Summary Judgment [44], and **DENIES** defendant City of Decatur's Motion to Strike [69].

The docket also indicates that three other miscellaneous motions remain pending. Plaintiff had filed a Motion to Extend Time to Respond to Motion for Summary Judgment [41], which this Court **GRANTED** ON June 27, 2005 [51]. Still pending is plaintiff's Motion for Leave to File His Statements of Undisputed Material Facts Out of Time [46], which the Court **GRANTS**, and defendant City of Decatur's Motion to Exceed Page Limitation [53], which the Court also **GRANTS**.

SO ORDERED, this 28 day of March, 2006.

JULIE E. CARNES

UNITED STATES DISTRICT JUDGE