# EXHIBIT 5

LEXSEE 2006 U.S. DIST. LEXIS 78093

**GABRIEL LEE, Plaintiff, v. REINHARDT MOTORS, INC., Defendant.**

**CIVIL ACTION NO. 2:05cv235-CSC**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

*2006 U.S. Dist. LEXIS 78093*

**October 25, 2006, Decided**

**COUNSEL:** [*1] For Gabriel Lee, Plaintiff: Gregory O'Dell Wiggins, Wiggins Childs Quinn & Pantazis, PC, Birmingham, AL. Joshua David Wilson, Wiggins Childs Quinn & Pantazis, LLC, Birmingham, AL.

For Reinhardt Motors, Inc., doing business as Reinhardt Toyota, Defendant: Charles Henry Clark, Jr., Christopher Stanley Rodgers, Jacob Warren Crawford, Huie Fernambucq Stewart LLP, Three Protective Center, Birmingham, AL.

**JUDGES:** CHARLES S. COODY, CHIEF UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** CHARLES S. COODY

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This is a *42 U.S.C. § 1981* action in which the plaintiff, Gabriel Lee ("Lee"), alleges that he was wrongfully terminated from his employment, retaliated against, and subjected to a hostile work environment because of his race. He also asserts state law claims of outrage and gross/negligent training, supervision and retention. Lee names as the sole defendant his former employer, Reinhardt Motors, Inc., ("Reinhardt"). He seeks compensatory and punitive damages, injunctive relief, and attorney fees.

The court has federal subject matter jurisdiction of the plaintiff's *42 U.S.C. § 1981* claims pursuant [*2] to *28 U.S.C. § 1331*. It has supplemental jurisdiction of the state law claims pursuant to *28 U.S.C. § 1367*. Pursuant to *28 U.S.C. § 636(c)(1)* and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

Now pending before the court is the defendant's motion for summary judgment and Lee's response in opposition to the motion. After careful review of the motion for summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials, the court concludes that the motion for summary judgment is due to be granted in part and denied in part.

### II. SUMMARY JUDGMENT STANDARD

Under *FED. R. CIV. P. 56(c)*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. [*3] n1 The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id. at 323*.

n1 In *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*, the court stated:

"[Where the nonmoving party will bear the burden of proof at trial on a dispositive issue...*Rule 56(e)*...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file,"

Case 2:06-cv-00485-MHT-CSC    Document 37-6    Filed 03/22/2007    Page 3 of 14

Page 2
2006 U.S. Dist. LEXIS 78093, *

designate "specific facts showing that there is a genuine issue for trial. . . .We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...*Rule 56(e)* permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in *Rule 56(c)* except the mere pleadings themselves. . . .

*Id. at 324.*

[*4]

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id. at 322-324.* If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993); see also FED. R. CIV. P. 56(e).* ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could [*5] return a verdict for the nonmoving party." *Id. at 248.* The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson, 477 U.S. at 257.* If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); Harris v. Ostrout, 65 F.3d 912 (11th Cir. 1995).*

However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson, 477*

*U.S. at 255; Molina v. Merritt & Furman Ins. Agency, 207 F.3d 1351, 1356 (11th Cir. 2000).* After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue [*6] of material fact and the moving party is entitled to judgment as a matter of law *FED. R. CIV. P. 56(c).* With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

**III. FACTS n2**

n2 On a motion for summary judgment the court must construe the facts in the light most favorable to the non-movant, the plaintiff in this case. *See, e.g. Brown v. Crawford, 906 F.2d 667 (11th Cir. 1990).*

Reinhardt Motors, Inc. is automobile dealership in Montgomery, Alabama. The dealership was founded by Jim Reinhardt's father and Mike Reinhardt's grandfather. n3 (Mike's Dep. at 9). Jim Reinhardt is Mike Reinhardt's father. Mike is employed by Reinhardt and is at the dealership every day. n4 (*Id.* at 14).

n3 For simplicity's sake, the court will refer to Mike and Jim Reinhardt by their first names and the defendant corporation as Reinhardt.

n4 It is unclear from the submissions what Jim Reinhardt's present connection is to the dealership.

[*7]

Gabriel Lee first met Jim and Mike in 2000 when they traveled together with others to Indiana to participate in "Carpenters for Christ." n5 (Pl's Dep. at 40 & 47; Mike's Dep. at 15). Sometime thereafter, Lee encountered Jim at the Kilby Correctional Facility where Lee was incarcerated on a robbery conviction, and Jim was ministering for Frazier Memorial Church. (Pl's Dep. at 48). At that time, Jim told Lee to "come see him" when Lee was released from prison. (*Id.* at 49).

n5 "Carpenters for Christ" is an annual trip sponsored by a local church to build a church or school for a community in need. (Pl's Dep. at 46).

After he was released, Lee went to Reinhardt seeking full-time employment. (*Id.* at 49). According to Lee, Mike was busy so Lee spoke to managers Cindy Dunkerson and Brian Chad. (*Id.*). After Dunkerson and

2006 U.S. Dist. LEXIS 78093, *

Chad told Lee they did not have a job for him, Lee spoke to Mike, and Mike told Dunkerson to "consider [Lee] for employment." n6 (Id at 25.). Lee was hired as a porter n7 and began [*8] work on June 7, 2003. (Def's Ex. 5 at 2).

> n6 Although Mike does not recall the sequence of events, he does remember speaking to both Lee and Dunkerson about employment for Lee. (Mike's Dep. at 21).

> n7 As a porter, Lee was responsible for greeting customers to the service department and retrieving their vehicles after the vehicles had been serviced.

Within three months, Lee began having problems with another employee, Jake Jacobs. (Id. at 65). When Lee told Jacobs that there were customers waiting for the courtesy shuttle, n8 Jacobs cursed at Lee and said "You let me run my job, and you run yours." (Id.) Lee reported Jacob's intemperate remarks to Dunkerson who told Lee that Jacobs was a just "grumpy old man" and that Lee should overlook the incident. (Id. at 66). Later, Jacobs commented on Lee's clothes calling them ugly; told Lee to "get your black ass back to your post;" called him a "dummy;" and told him that he had "a bad case of no ass at all." n9 (Id. at 83-86).

> n8 Jacobs was the courtesy shuttle driver for the service department while Lee was a porter in the same department.

[*9]

> n9 Lee does not dispute the accuracy of this remark. However, he took offense because, according to Lee, it was not funny. (Pl's Dep. at 86).

A couple of months later, two other employees, Gary Skinner and Shannon Speaks, began engaging in juvenile behavior around Lee. For example, Skinner and Speaks would open Lee's lunch, smell his food and comment on his sandwiches. (Id. at 70). In addition, Speaks would pass gas when he walked by Lee's desk or wet his finger and stick it in Lee's ear. n10 (Id. at 70 & 72).

> n10 This activity is commonly referred to as giving someone a "wet willie."

A month later, at about six months of employment, Jacobs backed a golf cart into Lee's desk trapping Lee behind the desk. (Id. at 90-92). After Jacobs backed up for the third time, Lee told Jacobs to stop and he did. (Id. at 92). Lee was not bruised or cut and he did not have to seek medical treatment. (Id.). According [*10] to Lee, "[i]t wasn't nothing serious." (Id.). After Lee told Jacobs to stop, Jacobs never ran the cart into Lee's desk again. (Id.).

One afternoon, a co-worker Audra Henley called Lee a "stupid mother-fucker." (Id. at 94). When Lee reported the comment to Dunkerson, she told him that Audra was "cranky" because she "was going through a relation with her husband." (Id. at 95). Henley never said anything like this to Lee again during his tenure at Reinhardt. (Id.)

The next month, for no apparent reason, Jacobs spit on Lee's desk. (Pl's Dep. at 64, 99 & 103). Lee immediately reported Jacobs which resulted in Jacobs being reprimanded and forced to apologize to Lee. Jacobs was also instructed to stay away from Lee's desk. (Id. at 108). Nonetheless, Jacobs would smoke by Lee's desk and flick his ashes onto the desk. (Id. at 109-10).

Two months after the spitting incident, general manager Clifford Wilcutt drew a racially offensive picture and made a racially offensive comment to Lee. n11 Sometime in mid-May, a meeting was held with Dunkerson, Wilcutt and two other managers at which time Lee told Dunkerson about the picture. (Id. at 136-37). At that point, [*11] Wilcutt stopped the meeting, told everyone to leave the office and said "Give [me] a few days to get something on Gabriel." (Id. at 137).

> n11 The picture was a circle with two triangles facing in towards the center of the circle with the triangles having two dots depicting eyes--clearly intending to depict Ku Klux Klan members. When Wilcutt drew the picture, he said to Lee "this is the last thing a black man seen when he was falling down the well." (Pl's Dep. at 115).

Lee was terminated from his employment on June 7, 2004. (Def's Ex. 5 at 2). He filed this lawsuit on March 11, 2005, alleging claims of retaliation, race-based termination and a racially hostile work environment in violation of 42 U.S.C. § 1981.

## IV. *42 U.S.C. § 1981* CLAIM

This action is brought pursuant to *42 U.S.C. § 1981. Section 1981* prohibits intentional discrimination on the basis of race in the making and enforcing of contracts, including private employment [*12] contracts. *See Fer-*

*rill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999). Section 1981* provides as follows.

(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

*42 U.S.C. § 1981.* Thus, *section 1981* provides a cause of action for race-based employment discrimination including wrongful termination, retaliation and a racially hostile work environment.

The same prima facie elements are required to prove a *42 U.S.C. § 1981* [*13] discrimination claim as are required to prove a Title VII discrimination claim. n12 *Patterson v. McLean Credit Union, 491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989); Brown v. American Honda Motor Co., Inc., 939 F.2d 946 (11th Cir. 1991).* Lee's claims are governed by the familiar tripartite framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).* In an employment discrimination case, Lee bears the ultimate burden of proving that the defendant intentionally discriminated against him. *Burdine, 450 U.S. at 253.* This Circuit has consistently held that federal courts, in resolving discrimination claims, do not review the accuracy of an employer's decision to terminate a plaintiff's employment. *See e.g., Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1324 n.16 (11th Cir. 1998) (citing Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984).*

n12 Title VII provides that it "shall be an unlawful employment practice for an employer . .

. to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." *42 U.S.C. § 2000e-2(a)(1).* Furthermore, "[w]here *Section 1981* is used as a parallel remedy for race discrimination which violates the *equal protection clause of the Fourteenth Amendment,* the elements of such a claim are the same as the elements of a Title VII action." *See Hanley v. Sports Auth., 143 F. Supp.2d 1351, 1358 (S.D. Fla. 2000) (citing Turnes v. AmSouth, Bank N.A., 36 F.3d 1057, 1060 (11th Cir. 1994)).*

[*14]

To be successful, Lee must first prove, by a preponderance of the evidence, a prima facie case of discrimination. *Burdine, 450 U.S. at 252-53.* If Lee establishes a prima facie case, Reinhardt then has the burden of producing "some legitimate, non-discriminatory reason" for the challenged employment action. *See McDonnell Douglas, 411 U.S. at 802.* If Reinhardt satisfies this burden, Lee must then prove, by a preponderance of the evidence, that the articulated reasons were mere pretext for intentional discrimination. *Burdine, 450 U.S. at 256.* In the summary judgment context, the plaintiff need only present evidence from which a trier of fact could conclude the defendant intentionally discriminated against him.

To defeat the defendant's motion for summary judgment, Lee must first establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell-Douglas, supra;* or (3) presenting statistical proof. *Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)* [*15] . n13

n13 Lee has not presented any statistical evidence to support a claim of intentional discrimination.

**1. Direct Evidence of Discrimination**

Under the law of this circuit, a plaintiff who presents direct evidence of discriminatory discharge is not required to rely on the *McDonnell Douglas* presumption to establish a prima facie Title VII case. *Miles v. M.N.C. Corp., 750 F.2d 867, 875 (11th Cir. 1985); Lee v. Russell County Bd. of Educ., 684 F.2d 769, 774 (11th Cir. 1982).*

2006 U.S. Dist. LEXIS 78093, *

Direct evidence of employment discrimination "must indicate that the complained-of employment decision was *motivated* by the decision-maker's [discriminatory animus]. As a result, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]" will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358-59 (11th Cir. 1999).* The Eleventh Circuit has severely limited the type of language constituting direct evidence of discrimination. [*16] *See, e.g., Evans v. McClain of Ga., Inc., 131 F.3d 957, 962 (11th Cir. 1997); Burrell v. Board of Trustees, 125 F.3d 1390, 1393-94 n.7 (11th Cir. 1997); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990).* This Circuit holds that a plaintiff presents direct evidence of discrimination where "actions or statements of an employer reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641-42 (11th Cir. 1998); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997).*

Lee contends that Wilcutt's racially offensive drawing, coupled with his explanation of the drawing, constitutes direct evidence of racially discriminatory animus. That racially derogatory or demeaning symbols or comments have no place in the workplace or anywhere else is beyond dispute. While Wilcutt's drawing or explanation are not professional or appropriate in a business setting, neither are they direct evidence of discrimination because the evidence [*17] does not suggest that the drawing or explanation statements were made in connection with Wilcutt's assessment of Lee's employment or made contemporaneously with Reinhardt's decision to fire him. Wilcutt's offensive conduct occurred three to four months before the decision to terminate Lee was made. *See Johnson v. Nicholson, 2005 U.S. App. LEXIS 26338, 2005 WL 3199278 (11th Cir. 2005).*

"[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] . . . constitute direct evidence of discrimination." *[Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1105 (11th Cir. 2001)]* (citation and internal marks omitted). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id.* (citation and internal marks omitted).

*Riley v. Birmingham Bd. of Educ., 154 Fed. Appx. 114, 116, 2005 WL 2981869, *2 (11th Cir. 2005).*

It is undisputed that the drawing was part and parcel of a tasteless joke being told by Wilcutt. It is also undisputed that this was a single isolated incident. Stray, racially offense remarks in the workplace [*18] and "statements by decisionmakers unrelated to the decisional process itself" are not direct evidence of discrimination. *See EEOC v. Alton Packaging Corp., 901 F.2d 920, 923 (11th Cir. 1990). See also Tomczyk v. Jocks & Jills Rests., LLC, 2006 U.S. App. LEXIS 20375, 2006 WL 2271255, *5-6 (11th Cir. 2006); Evans, 131 F.3d at 962; Burrell, 125 F.3d at 1393-94 fn.7-8.* Consequently, the court concludes that Lee has not produced direct evidence of racial discrimination related to his termination. Because Lee has not presented direct evidence or statistical evidence of discrimination, the court proceeds to evaluate Lee's circumstantial evidence of racial discrimination under the four-part *McDonnell Douglas* test.

## 2. Circumstantial Evidence of Discrimination

Because direct evidence of discrimination can be difficult to produce, the Supreme Court in *McDonnell Douglas* created a framework for analyzing a plaintiff's circumstantial evidence of discrimination. *See Nix, 738 F.2d at 1184* (noting that the *McDonnell Douglas* framework is a valuable tool for analyzing disparate treatment cases).

First, the [*19] plaintiff asserts that his termination was racially motivated. To establish a prima facie case of discriminatory discharge, the plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for the job from which he was discharged; (3) that he was discharged; and (4) that his former position was filled by a non-class member. *See Jones v. Gerwens, 874 F.2d 1534 (11th Cir. 1989); Cf., Evans, 131 F.3d at 964; Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995).* It is undisputed that Lee is African-American; he was qualified for the job from which he was terminated; and that he was terminated. In addition, it is undisputed that Lee was replaced by a white female, a non-class member. Consequently, the court concludes that the plaintiff has established prima facie cases of discrimination.

Because Lee has established a prima facie case of discriminatory discharge, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for Lee's termination. *McDonnell Douglas, 411 U.S. at 802-804.* Reinhardt offers several reasons why it allegedly terminated Lee, [*20] including failing to disclose his prior felony conviction on his employment application and excessive absenteeism and tardiness. The Eleventh Circuit holds that "[t]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by

discriminatory animus." *Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997)*. Consequently, Reinhardt has offered legitimate, non-discriminatory reasons for terminating Lee.

At this juncture, to survive the motion for summary judgment, Lee must present evidence creating a genuine issue of material fact on the issue of pretext. Lee can create a jury question by demonstrating that Reinhardt's legitimate, nondiscriminatory reasons should not be believed or by showing that in light of all the evidence, discriminatory reasons more likely motivated Reinhardt's decision. *See Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996)*. In evaluating a plaintiff's evidence of pretext, the court is not required to agree with the employer's proffered reasons for discharge. [*21] Instead, the crucial question is whether the employer was motivated by a racially discriminatory bias. *See e.g., Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998)* (citing *Combs, 106 F.3d at 1538*).

Lee asserts that Reinhardt's reasons for terminating him were pretextual because the reasons given have been inconsistent and contradictory, changing significantly over time. Lee also argues that Reinhardt's reasons for firing him should not be believed because the reasons offered have changed depending on the forum and the manager asserting the reason. Lee can create a jury question by demonstrating that Reinhardt's legitimate, non-discriminatory reasons should not be believed or by showing that in light of all the evidence, discriminatory reasons more likely motivated the employment decision. *See Mayfield, 101 F.3d at 1376*. Lee can also demonstrate pretext by presenting evidence that Reinhardt's decisionmakers "did not honestly believe" or that "no reasonable person in the exercise of impartial judgment" could have believed the facts upon which they relied to support their decision. *Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265-66 (11th Cir. 2002)* [*22] .

After Lee was terminated, he applied for unemployment benefits. (Pl's Ex. 7 in Opp. to Mot. for Summ. J.) The Department of Industrial Relations records demonstrate that Lee was told by Dunkerson that he was being terminated because "the company no longer needed [him.]" (*Id.* at p. 2) He was also told that he "was let go for unsatisfactory work." (*Id.* at 4). Wilcutt offered his explanation to the Department of Industrial Relations during an interview on June 17, 2004.

> The employee worked in the service dept. and greeted customers when they came in. I was not personally involved. Not really one final incident, just unacceptable work, I have no idea how his work was unac-

ceptable. LDW 060104. We just let him go. No ideas about warnings or suspensions or no idea if he got handbook at date of hire. No idea what the incident was that caused his separation. Overall just unsatisfactory work.

(*Id.*)

The Department of Industrial Relations awarded Lee unemployment compensation benefits.

> The claimant was discharged for alleged unsatisfactory work. However, employer has failed to provide a specific final incident to substantiate the allegation [*23] and claimant states he was performing the job to best of his ability. There has been no disregard of the employer's interests. This does not constitute misconduct committed in connection with work.

(*Id.* at 9).

During his deposition Wilcutt testified that when sometime in early 2004, perhaps March, a day or so after the spitting incident, he discovered that Lee had a previous criminal conviction as a result of a conversation with Jim Reinhardt. (Wilcutt Dep. at 113-14).

> A: And we told [Jim] yes, [Lee] was working in service as a porter. And he said that I saw that man in prison a short while back. . . . And he said that gentleman was in prison so and so date. And -- can't be. And he said yes, it was. I saw him up there. So I went and pulled his application and it stated that he had never had any problems. So I got my boss telling me he was in jail and I got an application that said he wasn't. So I went to Elmore County -- I live in Wetumpka and I just stopped by there and I pulled his record. And I found out that yes, in fact, he had been incarcerated for robbery. And --
>
> Q: When was this?
>
> A: That was -- we had two or three things going on at the same [*24] time and I can't give you the exact date. All that sort of dove-tailed in together. The absentee-

2006 U.S. Dist. LEXIS 78093, *

ism, [Cindy] wanting to dismiss him would have been just prior to the spitting incident, so whatever the time that was. When was that, March or something?

(*Id.* at 114-15).

In addition, contrary to what Wilcutt allegedly told the Department of Industrial Relations, in deposition, Wilcutt testified that he was involved in the decision to terminate Lee for failing to disclose his criminal conviction and for the way he was performing his job.

Q: Did it [the conviction] help your decision to fire him that you found that out?

A: It was half the equation, yes, sir.

Q: It was half the equation?

A: Right.

Q: Half being that he had lied on his application, and the other half his --

A: His job -- the way he was performing his duties.

. . .

Q: And then let's go to the final decision to terminate Gabriel. Tell me, was there a meeting held or --

A: There was. When I gained the information that I had myself and the other parties that -- Linda, Mike, Cindy, and myself, when we found that he had not been truthful on his application -- and quite [*25] frankly to me, the severity of the charges and the position that he was in, that the -- role that he played at the dealership, he was taking responsibility for people's cars with personal items in them with -- that, you know, who knows what they leave in the car, and he had just gotten out from being incarcerated for theft. And, you know, that -- it was just -- it was enough to sway my opinion to agree with Cindy that we would terminate Gabriel Lee.

(*Id.* at 123-125). However, Wilcutt admitted that there have been other employees at Reinhardt with criminal records, and in fact, Reinhardt participates in the work

release program with the Department of Corrections. (*Id.* at 40). Finally, in his affidavit submitted in support of the motion for summary judgment, Wilcutt asserted that Lee was terminated for "excessive amount of time away from his job" and for failing to disclose the robbery conviction. (Def's Ex. 3 in Supp. of Mot. for Summ. J.)

As his direct supervisor, Cindy Dunkerson n14 testified that she hired Lee after Mike brought him to her office. (Dunkerson Dep. at 16). She further testified that within six months, she thought about terminating Lee and by eight [*26] months, she wanted to terminate him. (*Id.* at 34-35). She testified that she didn't fire him because "Gabriel was having a lot of personal crises [a]nd . . . you try factor in what's going on in that person's life before you dismiss them that may have a factor in their job performance and give them the benefit of the doubt." (*Id.* at 35). Dunkerson testified that she finally had to terminate Lee for "[c]onstantly not being at work." (*Id.* at 39).

n14 Dunkerson has since married and has taken her husband's name Mitchell. However, for the sake of clarity and consistency, the court will continue to refer to her as Dunkerson.

Dunkerson testified that she and Wilcutt made the decision to fire Lee because Dunkerson needed to hire someone who would be at work every day. (*Id.* at 58). However, in direct contrast to Wilcutt's testimony, Dunkerson testified that she was not aware of Lee's criminal conviction; not aware that Lee had lied on his application; and didn't learn of the conviction until two months [*27] prior to her deposition in this case. She was adamant that neither his conviction nor lying on his application were the reasons he was fired. (*Id.* at 57-58).

In her affidavit submitted to the EEOC in opposition to Lee's charge of discrimination, Dunkerson admits that Lee was given a raise "[b]ecause he had been a good employee," but in the same breath decided to fire him because "his job performance [] was not up to the standards required at Reinhardt Motors." (Pl's Ex. 7 in Opp. to Mot. for Summ. J.). According to Dunkerson, Lee's job performance did not begin to suffer until after the spitting incident with Jacobs. (*Id.*)

In contrast to Lee's testimony that both Mike and Jim Reinhardt knew about his conviction prior to his employment, Mike Reinhardt denied knowing about his conviction until after Lee had been hired. (Mike's Dep. at 22). Mike Reinhardt further denied being in meetings to discuss terminating Lee and believed that Dunkerson "had pretty much decided much earlier that things weren't working out." (*Id.* at 42). According to Mike

Reinhardt, Lee was terminated for "his poor attendance." (*Id.* at 44).

Finally, in response to requests for admissions, Reinhardt [*28] admitted that Lee was never given any written warnings concerning his job performance or excessive tardiness or absenteeism. In addition, Reinhardt admitted that Lee was never disciplined for absenteeism or tardiness prior to lodging a discrimination complaint. Finally, Reinhardt admitted that when he was terminated, Lee was "advised that his services were no longer needed." (Pl's Ex. 17 in Opp. to Mot. for Summ. J.)

In contrast to the evidence offered by Reinhardt, Lee testified that both Jim and Mike Reinhardt knew about his criminal history and encouraged him to apply for a job at Reinhardt anyway. According to Lee, Mike Reinhardt told him "not to worry" about his record. (Pl's Dep. at 54). According to Lee, he was terminated within two weeks of complaining to Dunkerson and others about what he perceived to be discriminatory treatment by Reinhardt. In particular, Lee testified that when he told Dunkerson about Wilcutt's drawing and explanation, Wilcutt "stopped the meeting. Told everyone to get out of the office. . . . [and] said . . . I have something on Gabriel. Give me a few days." (Pl's Dep. at 137). Shortly thereafter, Lee was terminated.

In order to show pretext, [*29] the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).* "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994)* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).* In evaluating a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence. [*30] " *Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)* (internal citations omitted).

*Jackson v. State of Ala., State Tenure Comm., 405 F.3d 1276, 1289 (11th Cir. 2005).* At the summary judgment stage, it is not necessary for Lee to prove that Reinhardt's articulated reasons for terminating him are false; it is sufficient that a reasonable fact finder could conclude that Reinhardt's reasons should not be believed. The foregoing factual discussion reflects numerous inconsistencies in the explanation for Lee's termination. This would provide a basis for a factfinder to reject the defendant's proffered reason for termination. While that rejection does not compel judgment for the plaintiff, *Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 146 (2000),* a trier of fact may infer discrimination from the falsity of an employer's explanation along with the elements of a prima facie case. *Id.* at 147. Consequently, the court concludes that genuine issues of material fact exists about whether Reinhardt's reasons for terminating Lee should not be believed, were pretext for terminating Lee or that discriminatory [*31] reasons more likely motivated Reinhardt's decision. For these reasons, Reinhardt's motion for summary judgment regarding Lee's termination is due to be denied

### 3. Disparate Treatment Claim

To the extent that Lee suggests that he was treated differently than other employees because other employees were not terminated for absenteeism, he is entitled to no relief on this claim. In order to survive summary judgment, "in addition to being a member of a protected class, [Lee] must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and the disciplinary measures enforced against him were more severe than those engaged in similar misconduct." *Jones, 874 F.2d at 1540. See also, Jones v. Bessemer Carraway, 137 F.3d 1306, 1311 n.6, modified by, 151 F.3d 1321(11th Cir. 1998) ; Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir. 1998); Holifield, 115 F.3d at 1561.* The question of whether the plaintiff is similarly situated with non-minority employees is crucial. *See Marshall v. Western Grain Co., Inc., 838 F.2d 1165, 1168 (11th Cir. 1988)* [*32] (citing *Kendall v. Block, 821 F.2d 1142 (5th Cir. 1987)* (holding that Caucasian employees with a different grade level were not similarly situated with the plaintiff)). It is Lee's burden to prove that a similarly situated person not in the protected class received dissimilar treatment. *See e.g., Holifield, 115 F.3d at 1565.*

Although Lee argues in brief that Jake Jacobs and Audra Henley missed more work than he did, he presents no evidence which would be admissible regarding this issue. *FED. R. CIV. P. 56(e)*. Counsel's argument is not evidence and thus, is insufficient to create a genuine issue of material fact defeating summary judgment. The burden is on the plaintiff to show a similarity between his conduct and that of other employees who were treated differently. *Id.* After careful review, the court concludes that Lee has failed to establish that he was similarly situated to any other employee. Thus, the court concludes that Lee has failed to establish a prima facie case of disparate treatment.

## V. Retaliation Claim

The plaintiff asserts a separate claim of retaliation pursuant [*33] to *§ 1981*. He alleges that he was terminated in retaliation for complaining of racial discrimination. The plaintiff may pursue a retaliation claim under *§ 1981*. *See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1409-13 (11th Cir. 1998)*. In order to establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) he participated in protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events. *Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)*. The causal connection requirement must be construed broadly. *See generally EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993)* ("a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated"). Once the plaintiff makes out a prima facie case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1196 (11th Cir. 1997)* [*34] . If the defendant offers a legitimate reason for the adverse employment action, the presumption of retaliation disappears. *Id.* The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. *Olmsted, 141 F.3d at 1460*.

Reinhardt argues that Lee cannot establish a *prima facie* case of retaliation because he was terminated before he filed a charge with the EEOC. The court disagrees and quickly disposes of Reinhardt's participation claim.

Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment

practice by this subchapter." *42 U.S.C. § 2000e-3(a)*. And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.*

*EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). See also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999)* [*35] .

The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC." *Total Sys., 221 F.3d at 1174*. However, Lee does not make a participation clause argument, and protected expressions are not limited to EEOC complaints.

Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment. *See, e.g., Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)* ("[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [Barnes], who informally voice complaints to their superiors or who use their employers' internal grievance procedures.")

*Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501 (11th Cir. 2000)*.

Lee contends that his termination was in retaliation for reporting and complaining about discrimination and harassment in general, and Wilcutt's racially offensive drawing in particular. According to Lee, he complained to Dunkerson, [*36] Wilcutt and Linda Wilson in May, all before he was terminated. He further alleges he was fired two weeks later, after Wilcutt said "give me a few days -- I have something on Gabriel." It is undisputed that Lee suffered an adverse employment action when he was terminated. The defendants also do not deny that Lee complained to management about what he perceived to be discrimination and harassment or that he was fired two weeks later. "[A] temporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation." *Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227,*

*1232 (11th Cir. 2006).* Consequently, the court concludes that Lee has established a prima facie case of retaliation.

At this juncture, the burden shifts to Reinhardt to rebut the presumption of retaliation by offering legitimate reasons for Lee's termination. *See Raney, supra.* Reinhardt, however, does not seek summary judgment on Lee's retaliation claim on any basis other than the participation clause. Consequently, the defendant's motion for summary judgment on Lee's retaliation claim is due to be denied.

### VI. Racially [*37] Hostile Work Environment

In support of his hostile work environment claim, Lee points to the following conduct of Jacobs to assert that these incidents demonstrate racial animus:

> . Spitting on his desk
> . Running his golf cart into his desk
> . Smoking by and flicking ashes on his desk
> . Cursing and telling him "You let me run my job, and you run yours."
> . Calling him a dummy
> . Saying "Get your black ass back to your post."
> . Telling him he had a "bad case of no ass at all."

Lee also complains that Speaks and Skinner would examine his food and comment on it; that Speaks would pass gas when he walked by Lee's desk or would put his finger in Lee's ear; and that Audra Henley called him a "stupid motherfucker." Finally, Lee contends that the racially offensive drawing and explanation by Wilcutt support his racial harassment claim.

While racially derogatory or demeaning comments are abhorrent, the law clearly "prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Blevins v. Heilig-Meyers Corp., 52 F. Supp.2d 1337 (M.D. Ala. 1998)* (citing *Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997)) [*38] aff'd by 184 F.3d 825 (11th Cir. 1999).* See also *Carr v. Allison Gas Turbine Div., General Motors Corp., 32 F.3d 1007, 1010 (7th Cir. 1994)* ("Workers, like other people, often are foulmouthed and . . . employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace.").

In this case, Lee complains about sporadic and stray statements or incidents by several different people that occurred during his year of employment at Reinhardt. At best, Lee complains of isolated incidents in which an offensive utterance was made over a twelve month period, none of which were physically threatening. n15 This is not a situation in which racial slurs and racially offensive material were so "commonplace, overt and denigrating" that a reasonable jury could conclude that "they created an atmosphere charged with racial hostility." *Edwards, 49 F.3d at 1521-22; EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990).* The evidence presented by Lee does not rise to this level.

> n15 Although Lee argues that the golf cart incident rose to the level of physical violence, his own testimony regarding that event belies his position.

[*39]

Perhaps more importantly, however, Lee presents no evidence that the actions or statements of Jacobs, Skinner, Speaks, or Henley were racially motivated, could be construed as racially offensive, or made because of Lee's race. Undoubtedly, the drawing and explanation by Wilcutt was racially offensive; however, this single incident does not rise to the level of a racially hostile work environment. Consequently, the court is compelled to conclude, as a matter of law, that none of the complained about incidents constitute a per se racially hostile work environment.

The plaintiff argues, however, that these incidents, coupled with the "physical violence" of the golf cart incident and the offensiveness of the spitting and drawing incidents, amalgamated into a racially hostile work environment. Under the law of this circuit, a plaintiff establishes a prima facie case of racially hostile work environment harassment claim by showing: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was based on his race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment [*40] and create a discriminatory abusive working environment; and (5) a basis for holding the defendant liable. *See generally Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).*

A plaintiff must establish that the harassment is sufficiently severe or pervasive "to ensure that courts and juries do not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment'" and to ensure that the courts are not creating a "general civility code." *Gupta, 212 F.3d at 583.* To be successful, "a plaintiff must establish not only that [he] subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." *Gupta, 212 F.3d at*

2006 U.S. Dist. LEXIS 78093, *

*583.* Finally, "[t]o constitute an actionable hostile environment, conduct must be objectively sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (quoting *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986))*. [*41] It is the fourth element -- conduct sufficiently severe or pervasive to alter the conditions of employment -- "that tests the mettle of most . . . harassment claims." *Gupta, 212 F.3d at 583.* The court examines the conduct in combination, not isolation, to determine, under the totality of the circumstances, "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza, 195 F.3d at 1246* (citations omitted). *See also Johnson, supra.* This court considers four factors in determining whether the harassment objectively altered the terms or conditions of a plaintiff's employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *See Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)* (citing *Harris, 510 U.S. at 23).*

Viewing the evidence in the light most favorable to the plaintiff, the [*42] court concludes that Lee has not established a prima-facie hostile work environment claim because the record contains no evidence that the conduct that he was subjected to was sufficiently severe or pervasive to affect a term or condition of his employment and create a discriminatorily abusive work environment. Lee complains primarily about statements made by Jacobs during the year that he worked in the service department at Reinhardt. The statements about which he complains were made by Jacobs, a non-decision-making co-worker. The plaintiff presents no evidence, other than these statements coupled with his termination, that he was subjected to racially hostile conduct. In fact, in his brief, Lee "disputes that his job performance suffered and Defendant has presented no evidence that his job performance suffered." (Pl's Br. in Opp. to Mot. for Summ. J. at 41).

Applying the *Harris* factors to the totality of these events, the court concludes that the plaintiff has failed to establish a genuine issue of material fact regarding whether the conduct at issue was objectively sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatory [*43] abusive working environment. Even if the court assumed that these incidents were sufficiently severe to satisfy the second element of Lee's prima facie case, the infrequency of the conduct militates against a finding that the

incidents during the year period were sufficiently pervasive to alter his work environment. The plaintiff has presented no evidence that he was hindered in his ability to do his job as a result of these incidents. Spread over a period of a year, the incidents are not at all frequent. n16

> n16 Even if the plaintiff was able show frequent conduct, "the frequency . . . does not compensate for the absence of the other factors." *Mendoza, 195 F.3d at 1248.*

The plaintiff argues that because he was subsequently terminated, the totality of the circumstances clearly demonstrates that he was subjected to a racially hostile work environment. The problem with the plaintiff's argument is, however, that if the court accepts it, then every claim of racially discriminatory termination also [*44] becomes a hostile work environment claim. This is not the law of this circuit and such a conclusion would markedly weaken the severity requirements of present law. Under the standards applied in this circuit, the incidents about which the plaintiff complains fall under the rubric of offensive conduct which does not rise to the level of a racially hostile work environment. *See e.g., Harris, 510 U.S. at 22* (holding that "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently implicate Title VII."). Accordingly, the court concludes that the plaintiff has failed to establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and create a discriminatory abusive working environment.

Finally, the court concludes that, with the exception of the obviously racially derogatory drawing and related comment, Lee has failed to demonstrate that the other actions or statements about which he complains were based on race. To survive the defendant's properly supported motion for summary judgment, the plaintiff must come forward with some evidence in support of his claim that the [*45] conduct was based on his race. Lee has not provided the court with any evidence from which the court could conclude that the behavior of Jacobs, Skinner, Speaks or Henley was racially motivated. Neither the single episode involving Wilcutt nor the plaintiff's status as an African-American employee converts the other non-African-American employees' offensive or derogatory comments or actions, regardless of context, into racially motivated comments or actions. The mere fact that Lee is African-American is insufficient to demonstrate that the conduct about which he complains is racially motivated. "Regardless of the factual context, our analysis focuses only on whether the complaining employee was targeted because of his or her [race]." *Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345*

2006 U.S. Dist. LEXIS 78093, *

*(11th Cir. 2000)*. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[tion] . . . because of . . . [race]." *See generally Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* (discussing Title VII prohibition against sex discrimination). The court concludes that Lee has failed to present [*46] any evidence that his treatment was racially motivated and thus, has failed to create a genuine issue of material fact about a necessary prong of the analytical paradigm is fatal to his racially hostile work environment claim.

> Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal . . . The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality. What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.

*EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1319 (10th Cir. 1992)*. While the law prohibits discrimination, it is not a shield against harsh treatment at the work place. *See McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986)*.

In sum, under the standards applied in this circuit, these incidents about which Lee complains fall under the rubric of mere offensive conduct which is does not rise to the level of a racially hostile [*47] work environment. Consequently, the court concludes that the plaintiff has failed to establish that a genuine issue of material facts exists regarding his claim of hostile work environment and the defendant is entitled to summary judgment on Lee's racially hostile work environment claim.

### D. STATE LAW CLAIMS

**A. Tort of Outrage Claim.** n17 The plaintiff alleges that the conduct he endured at Reinhardt was sufficiently egregious to constitute the tort of outrage. The Alabama Supreme Court first recognized the tort of outrage, or intentional infliction of emotional distress, in *American Road Service Co. v. Inmon, 394 So. 2d 361 (Ala. 1981)*.

> In *Inmon*, the Court held that to present a jury question the plaintiff must present sufficient evidence that the defendant's

conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

*Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1043 (Ala. 1993)*. The Alabama Supreme Court has declined to impose liability against an employer except in the most egregious cases. [*48] *Id., at 1044*.

> n17 In Alabama, the torts of outrage, outrageous conduct, and intentional infliction of emotional distress are the same cause of action. *Stewart v. Matthews Indus., Inc., 644 So. 2d 915, 918 (Ala. 1994)*.

To establish a claim of the tort of outrage, the plaintiff must demonstrate that "(1) the defendant[] either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from the[] conduct; (2) that the defendant[]'s conduct was extreme and outrageous; and (3) that the defendant[]'s conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Callens v. Jefferson County Nursing Home, 769 So. 2d 273, 281 (Ala. 2000)* (citing *Inmon, 394 So. 2d at 365*).

The plaintiff has not come forward with sufficient evidence to survive summary judgment because the plaintiff has failed to present evidence on each element of his claim. Specifically, [*49] the plaintiff failed to present any evidence that he suffered extreme emotional distress as a result of the alleged racial harassment sufficient to survive summary judgment. n18 Accordingly, the defendants' motion for summary judgment is due to be granted on this claim.

> n18 During his deposition, Lee conceded that he had not been seen by a psychiatrist or psychologist for any mental problems and the only illnesses or injuries he suffered since his termination was the flu and strep throat. (Pl's Dep. at 181-82).

**B. Negligent/Gross Training, Supervision and Retention.** The final claim the plaintiff asserts against Reinhardt is for the negligent training, supervision and retention of "its managers, supervisors and human resource personnel." (Compl. at 13). The elements of negligent supervision in Alabama are described in *Lane v. Central Bank of Ala., N.A., 425 So. 2d 1098 (Ala. 1983)*:

"'In the master and servant relationship, the master is held responsible for his servant's incompetency [*50] when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon it being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence.' "*Id., at 1100.*"

*Collins v. Wilkerson, 679 So. 2d 1100, 1103 (Ala. Civ. App. 1996)*. Negligent retention liability is distinct from respondent superior liability for negligent acts of employees acting within the line and scope of their employment. A claim for negligent retention is brought against the employer for its own act(s) of negligence. *Cf Connes v. Molalla Transp. Sys. Inc.,, 831 P. 2d 1316, 1320 (Colo. 1992)* (noting that the principal of liability supporting a negligent hiring claim is not based on the rule of agency but on the law of torts.)

The Alabama Supreme Court has held that an employer "must use due care to avoid the . . . retention of an employee whom [the employer] knows or should [*51] know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." *Brown v. Vanity Fair Mills, Inc., 291 Ala. 80, 277 So. 2d 893, 895 (Ala. 1973)*. To recover for negligent retention in Alabama, "a plaintiff must show breach of the employer's . . . duty and that such breach proximately caused the plaintiff's injury." *Patterson v. Augat Wiring Sys., Inc., 944 F.Supp. 1509, 1529 (M.D. Ala. 1996)*. Reinhardt, as Lee's employer, had a duty to the plaintiff, an invitee on Reinhardt's premises, "not to unreasonably retain unworthy employees." *Id. (citing Lawson v. Williams, 514 So. 2d 882, 883 (Ala. 1987)*.

Lee's cause of action for negligent supervision is based on the premise that the Reinhardt is liable for continuing to employ "incompetent" employees and his cause of action for negligent retention is premised on Reinhardt's retention of "unworthy" employees. (Pl's Br. in Opp. to Mot. for Summ. J. at 44). Nowhere in his complaint or in his opposition to summary judgment does Lee identify those managers, supervisors or employees he contends were negligently supervised or retained. In his [*52] brief, Lee mentions two employees. "Rather than address Plaintiff's concerns they terminated him despite the fact that the behavior of Jake Jacobs and Cliff Wilcutt, two white employees, amounted to much worse conduct." (*Id.*). This is simply insufficient to preclude summary judgment on this claim. The plaintiff alleges no facts in support of this claim and his brief contains only a general cursory discussion of the law. It is not the court's responsibility to seek out facts in support of the plaintiff's position; rather, the burden is on the parties to formulate arguments and present facts in support of their positions. *See generally Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)*. Thus, the plaintiff has not demonstrated that Reinhardt negligently retained or supervised unworthy employees. Accordingly, the court concludes that the plaintiff has not produced sufficient evidence to survive summary judgment on this claim.

## IX. CONCLUSION

For the reasons as stated, it is

ORDERED as follows:

1. That the defendant's motion for summary judgment on the plaintiff's racially hostile work environment harassment [*53] claim be and is hereby GRANTED and this claim be and is hereby DISMISSED with prejudice.

2. That the defendant's motion for summary judgment on the plaintiff's racially discriminatory termination and retaliation claims be and is hereby DENIED.

3. That the defendant's motion for summary judgment on the plaintiff's outrage claim be and is hereby GRANTED and that this claim be and is hereby DISMISSED with prejudice.

4. That the defendant's motion for summary judgment on the plaintiff's claim of gross/negligent supervision, training and retention be and is hereby GRANTED and these claims be and are hereby DISMISSED with prejudice.

Done this 25th day of October, 2006.

/s/Charles S. Coody

CHARLES S. COODY

CHIEF UNITED STATES MAGISTRATE JUDGE