MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 166

1    Q    Called who?

2    A    Asset Protection.

3    Q    Okay.

4    A    And then they got in touch --

5    Q    But you didn't go to Jerry Culpepper --

6    A    Jerry was out of town.

7    Q    Okay.  Go on.

8    A    And Jerry came back in town.  They told
9    him to get down to the store.

10   Q    When you called Asset -- you personally
11   called Asset Protection?

12   A    Uh-huh.

13   Q    Is that like loss prevention?

14   A    Yeah.

15   Q    What did you say when you called them?

16   A    I told them that Mike had put us on some
17   pictures in the store, and some clowns and fake
18   money, and he said that he would get in touch
19   with Jerry and Jerry would get back -- be back
20   in town so they -- Jerry said they told him to
21   come back immediately.

22   Q    All right.  Now, is that all you said
23   when you talked to somebody in the Asset

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 167

1     Protection?

2     A       I had called Human Resources, also.

3     Q       You called Human Resources, also?

4     A.      Yes, I did.

5     Q       On the same day?

6     A       Yes.

7     Q       What day was this?

8     A       That date, the 30th.

9     Q       Who did you speak with in Human

10    Resources?

11    A       I tried to speak to -- oh, I spoke

12    with -- I can't think of the man's name.  I

13    don't remember his name.

14    Q       Okay.  Do you remember the name of the

15    person you spoke to in Asset Protection?

16    A       Yes.  It was a man.  He left -- I don't

17    know his name.  I don't remember his name.

18    Q       All right.  What did you say when you

19    spoke to someone in Human Resources?

20    A       I don't know if it was Mark or --

21    Q       What did you say when you spoke to

22    somebody in Human Resources?

23    A       I told him he had put pictures of me and

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 174

1    A       He was really mad.

2    Q       Did he think they were unprofessional?

3    A       Yes.

4    Q       All right.  And then what happened next?

5    A       I was -- the next day, he called me in

6    the office.  They -- he had talked to the DM.

7    Q       Who was that?

8    A       Jim.  I don't know his last name.

9    Q       Jim?  And by DM, you mean the District

10   Manager?

11   A       Yes.

12   Q       Okay; all right.  And then what happened?

13   So the next day you --

14   A       I was called in the office.

15   Q       Jerry Culpepper called you in the office?

16   A       Yes.

17   Q       And the District Manager was there?

18   A       Yes.  Billy and him was in the office

19   then.  The District Manager talked to me that

20   day, also.

21   Q       Who's Billy?

22   A       Pridget.

23   Q       Okay.  So Jerry and Billy Pridget?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 175

1    A       Was in this office.

2    Q       And then what happened in the office?

3    A       He said what they --

4    Q       Did they apologize?

5    A       Yes.  They apologized to me, and they

6    said they would get Mike in to apologize, and

7    they said they wrote him up.

8    Q       Uh-huh.

9    A       And said, "This won't happen again."  And

10   he asked me did I want his apology.  I told him

11   I didn't want Mike's apology.

12   Q       Okay.  So they said it wouldn't happen

13   again, and they apologized?

14   A       They did; they did.

15   Q       That's what I'm asking.

16   A       Uh-huh.

17   Q       Okay.  And did you -- do you remember

18   anything else you said about the pictures at

19   that point?

20   A       Nothing else.

21   Q       Okay.  And these pictures hadn't been up

22   or anything; they had already been taken down at

23   this point?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 178

1    would call me in the office to write a statement
2    or something, write something down.  They didn't
3    volunteer anything like that.  They said they
4    was handling it, management did.
5    Q       Yeah.  All right.  So again my question
6    was, you didn't write down any complaint in
7    writing, did you?
8    A       No.
9    Q       Okay.  Are you aware that Big Lots
10   determined Mike Williams had violated company
11   policy, specifically the Standards of Conduct,
12   by making the pictures?
13   A       Yes.
14   Q       Are you aware that Mike Williams was
15   disciplined after the pictures -- or about the
16   pictures, rather, on April 5th, 2005?
17   A       I don't know.
18   Q       All right.
19   A       I don't know.  He was still employed.  I
20   don't know.  I don't know what they did to him.
21   Q       You don't know whether he was
22   disciplined?
23   A       No, I don't know.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 179

1    Q       You have no reason to disagree with that?

2    A       I don't know.

3    Q       But you said Jerry Culpepper told you he

4    was going to?

5    A       Yes.  So I don't know whether he did or

6    not.

7    Q       And you're aware that Williams'

8    employment with Big Lots ended shortly

9    thereafter, correct?

10   A       He was looking for a job before.

11   Q       My question was, you're aware that

12   Williams' employment with Big Lots ended shortly

13   after this incident, correct?

14   A       Yes.

15   Q       And are you aware that Williams'

16   separation from Big Lots was effective April

17   11th, 2005?

18   A       No.

19   Q       Do you have any reason to disagree with

20   that date?

21   A       No.

22   Q       And isn't it true that as soon as Big

23   Lots learned about the pictures, it investigated

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 180

1    the incident?

2    A       Yes.

3    Q       And isn't it true that after Big Lots'

4    timely investigation and its discipline of

5    Williams, there were no more such pictures?

6    A       Yes.

7    Q       And don't you agree that Big Lots

8    corrected any problems with Mike Williams and

9    these pictures by disciplining him?

10   A       No; no.

11   Q       There were no more pictures after --

12   A       There were no more pictures, but --

13   Q       All right.  So this stopped the pictures,

14   correct?

15   A       That stopped the pictures.

16   Q       So the actions that Big Lots took towards

17   Mike Williams ended the pictures about which

18   you're complaining about, correct?

19   A       Yes.

20   Q       So Big Lots took effective action,

21   correct?

22   A       Yes.

23   Q       And you were pleased with the way Big

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 182

1    Q      But after Big Lots found out and did its

2    investigations and investigated and disciplined

3    him, there were no more pictures, correct?

4    A      Right.

5    Q      All right.  So that problem with Mike

6    Williams was corrected by what Big Lots did,

7    correct?

8    A      Yes.

9    Q      Okay.  You personally would have liked to

10   have seen him fired, right?

11   A      Yes.

12   Q      But that's just your personal opinion?

13   A      Yes.

14   Q      And you're not personally familiar with

15   the circumstances surrounding his separation

16   from Big Lots, are you?

17   A      No.

18   Q      Are you aware that Mike Williams first

19   became employed by Big Lots at Store Number 818

20   on December 20th, 2004?

21   A      I don't know the date.

22   Q      Okay.  So you testified that this EEOC

23   charge was based on these pictures that Mike

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 183

1    Williams made; those that we just testified

2    about, right?

3    A       Yes.

4    Q       And also some other incidents; is that

5    right?

6    A       Yes.

7    Q       In addition to those pictures, correct?

8    A       Yes.

9    Q       And these other incidents or comments

10   that you're referring to, those are the ones

11   that you specifically identified in the second

12   charge you filed with the EEOC; is that right?

13   A       Yes.

14   Q       Okay.  So the last paragraph -- let's

15   look back at -- the last paragraph of Exhibit A

16   to your EEOC charge states, "That management at

17   Big Lots 818, furthermore during the last 180

18   days has made many comments and statements of a

19   racially and sexually harassing nature."  There

20   you're referring to other comments that you

21   specifically identified in your second EEOC

22   charge; is that right?

23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 184

2    REPORTER'S NOTE:  (At this point, instrument was
3    marked for identification by the Reporter as
4    Defendant's Exhibit Number 24, after which, the
5    deposition continued, as follows:)

7    Q      (continued by Mr. Smith)  Okay.  You've
8    just been handed a document that's been marked
9    as Exhibit 24, which is a Dismissal and Notice
10   of Rights from the EEOC; is that right?
11   A      Yes.
12   Q      And is this a copy of the Dismissal and
13   Notice of Rights you received from the EEOC with
14   respect to your EEOC charge number
15   130-2005-05216?
16   A      Yes.
17   Q      And you produced a copy with your
18   discovery responses, didn't you?
19   A      Yes.
20   Q      And the document indicates it was mailed
21   on June 29th, 2005; is that right?
22   A      Yes.
23   Q      And you received the document on or about

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 185

1    that date, correct?

2    A       Yes.

3    Q       And the box that's checked that states,

4    "The facts alleged in the charge fail to state a

5    claim under any of the statutes enforced by the

6    EEOC;" is that right?

7    A       Yes.

8    Q       And under "Notice of Rights, I guess the

9    last sentence of the first paragraph states,

10   "Your lawsuit must be filed within ninety days

11   of receipt of this Notice;" is that correct?

12   A       Yes.

13

14   REPORTER'S NOTE:  (At this point, instrument was

15   marked for identification by the Reporter as

16   Defendant's Exhibit Number 25, after which, the

17   deposition continued, as follows:)

18

19   Q       (continued by Mr. Smith)  You've just

20   been handed a letter to you from the EEOC, which

21   has been marked as Exhibit 25.  Do you recognize

22   this letter?

23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 186

1    Q      This is a letter to you dated 6/29/05

2    from Allen Gosa, G-O-S-A, with the EEOC,

3    correct?

4    A      Yes.

5    Q      And you produced a copy in response to

6    Big Lots' request for production, correct?

7    A      Yes.

8    Q      In it the EEOC states that your charge

9    has been dismissed.  From the facts presented,

10   the EEOC did not conclude that the photographs

11   and illustrations constitute a racially or

12   sexually hostile work environment; is that

13   correct?

14   A      Yes.

15   Q      And the last paragraph states that,

16   "Should you decide to pursue the claim, you must

17   do so within ninety days from the date you

18   receive the Dismissal and Notice of Rights;" is

19   that correct?

20   A      Yes.

21   Q      And in the second paragraph, Mr. Gosa

22   states that the EEOC concluded that the

23   photographs and illustrations you presented as

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 191

1    A       No.

2    Q       But then you went on and you returned to

3    work and performed your work duties at that

4    point, right?

5    A       I did that, and then I called -- made

6    those calls.

7    Q       Okay.  Well, that wasn't the same day,

8    was it?  You testified that you made the calls

9    the next day.

10   A       No, I made those calls that afternoon on

11   those pictures.

12   Q       Okay.  The pictures were on two different

13   days you testified.

14   A       I made the call on 1/30; the one on 1/30.

15   That's when I made --

16   Q       3/30.

17   A       Well, 3/30.

18   Q       I was asking you about 3/29?

19   A       Oh, no, I didn't call on that one.

20   Q       Okay.  And after you saw the picture on

21   3/29, you went on back to work, correct?

22   A       Yes.

23   Q       Okay.  And then on 3/30, after you saw

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 192

1    the pictures that Linda Sankey showed you, you

2    then went on back to work, correct, and

3    performed your job?

4    A      And made a call.

5    Q      At some point later?

6    A      Yes.

7    Q      Okay.  But you performed your work duties

8    on both of these days?

9    A      Yes.

10   Q      You were at work and working those days,

11   correct?

12   A      Yes.

13   Q      And performed all your job duties those

14   days?

15   A      Yes.

16

17   REPORTER'S NOTE:  (At this point, instrument was

18   marked for identification by the Reporter as

19   Defendant's Exhibit Number 26, after which, the

20   deposition continued, as follows:)

21

22   Q      (continued by Mr. Smith)  Ms. Croskey,

23   you've just been handed what has been marked as

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 193

1    Exhibit 26.  Do you recognize this document?

2    A       Yes.

3    Q       And this is a copy of the second charge

4    of discrimination you filed against Big Lots

5    with the EEOC; is that correct?

6    A       Yes.

7    Q       And you also attached a copy of this

8    charge as an exhibit to your Complaint in your

9    interrogatory responses, correct?

10   A       Yes.

11   Q       And this is charge number 130200506801,

12   correct?

13   A       Yes.

14   Q       And you filed it with the EEOC on

15   September 16th, 2005, correct?

16   A       September 12th.

17   Q       That's when you signed it, but it was

18   filed on the 16th; is that correct?

19   A       Oh, yeah.

20   Q       16th of September, correct?

21   A       Yeah.

22   Q       Did someone prepare this for you?

23   A       Gary Atchison.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 194

1   Q       Did you review the charge before it was

2   submitted to the EEOC?

3   A       Yes.

4   Q       And is this your signature at the bottom

5   of the page?

6   A       Yes.

7   Q       And you signed the charge on September

8   12th, 2005?

9   A       Yes.

10  Q       And you understood this was sworn

11  testimony, correct?

12  A       Yes.

13  Q       Is everything in the charge truthful and

14  accurate?

15  A       Yes.

16  Q       Okay.  And you filed a second EEOC

17  charge, because the EEOC had dismissed the first

18  charge; is that right?

19  A       Yes, to go along with this -- with the

20  pictures.

21  Q       Right.  But the EEOC had dismissed your

22  first charge, right?

23  A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 195

1    Q     And that's why you filed this second

2    charge, correct?

3    A       This one and the pictures.  I redid it

4    with the pictures.

5    Q     And the reason you did that is because

6    the EEOC had dismissed the first charge,

7    correct?

8    A       Yes.

9    Q     And this charge is also based on alleged

10   conduct that took place between March 28th

11   through March 30th of 2005; is that correct?

12   A       Yes.

13   Q     And this second charge -- this second

14   EEOC charge is based on the same allegations of

15   harassment and discrimination included in your

16   first EEOC charge, correct?

17   A       Yes.

18   Q     In other words, the same incidents that

19   you're complaining about in the second EEOC

20   charge are the ones that you based your first

21   EEOC charge on; is that correct?

22   A       Yes.

23   Q     And this charge also alleges race and sex

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 196

1    harassment, correct?

2    A        Yes.

3    Q        And under cause of discrimination, you

4    checked race and sex; isn't that correct?

5    A        Yes.

6    Q        And attached to the EEOC charge is

7    Exhibit A to the charge; is that right?

8    A        Yes.

9    Q        And Exhibit A contains all the

10   allegations on which you base this EEOC charge,

11   correct?

12   A        Yes.

13   Q        And are these pages attached as an

14   exhibit the only documents and information you

15   recall providing to the EEOC in support of your

16   second EEOC charge?

17   A        Yes.

18   Q        And did you draft Exhibit A?

19   A        What did you say now?

20   Q        Did you draft Exhibit A?

21   A        Did I draft --

22   Q        Did you prepared it?

23   A        No.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 197

1    Q      Who did?

2    A      Gary Atchison.

3    Q      And in this charge you also complain

4    about the same Mike Williams' pictures you

5    complained about in your first EEOC charge,

6    right?

7    A      Yes.

8    Q      And this conduct by Williams occurred

9    between March 28th and March 30th, 2005; is that

10   correct?

11   A      Yes.

12   Q      And you testified that Mike Williams was

13   an associate store manager, correct?

14   A      Yes.

15   Q      And Jerry Culpepper was the store manager

16   at that time, and he was your direct supervisor,

17   correct?

18   A      Yes.

19   Q      And in Exhibit A, you allege that Mike

20   Williams made a comment about a metal screw on

21   or about March 14th, 2005; is that correct?

22   A      Yes.

23   Q      And this incident occurred before you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 198

1   filed your first EEOC charge on June 23rd, 2005,

2   correct?

3   A       Yes.

4   Q       And this is one of the incidents in which

5   you based your June 23rd EEOC charge, correct?

6   A       Yes.

7   Q       All right.  Tell me what you can recall

8   about Mike Williams' statement about the metal

9   screw.

10  A       I was working on the toy wall, and he was

11  coming across the back, and he called me, and I

12  was still hanging stuff, and I turned.  When I

13  did -- he called my name again, and then when I

14  turned around, he asked me did I want to screw,

15  and I said, "No, I don't need no screw over here

16  on this wall."  And he's like, "Do you want a

17  screw?"  And then I caught on to what he was

18  saying, and then he laughed.  I said, "Oh,

19  you're asking me do I want to screw?"  So that's

20  when I walked up to the front, went to Jerry

21  Culpepper --

22  Q       Hold on.  Is there anything else about

23  what he said, that you can recall, Mike

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 200

1    Q    Okay.

2    A    There's no screws that go on a peg wall.

3    Q    Okay.  And that's all that you can recall

4    about what he said or you said?

5    A    Yes.

6    Q    Were there any other employees around at

7    the time?

8    A    No, I was on the back wall by myself.

9    Q    So there were no witnesses?

10   A    No.

11   Q    So you said Williams said, quote, do you

12   want a screw, end quote?

13   A    Yes.

14   Q    While holding a metal screw?

15   A    Yes.

16   Q    Do you have any personal knowledge as to

17   why Williams made this alleged statement?

18   A    I don't know.

19   Q    Do you think he was simply trying to be

20   funny?

21   A    No.  I was standing up on something

22   like --

23   Q    I'm asking you -- my question was, do you

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 201

1    think he was trying to be funny?

2    A      No.

3    Q      You don't know, though?

4    A      I don't know.

5    Q      You don't know whether he was trying to

6    be funny?

7    A      I don't know.

8    Q      And he was holding a metal screw?

9    A      Yeah.

10   Q      And you said he laughed?

11   A      Yeah.

12   Q      Did you know whether this was part of his

13   sense of humor?

14   A      No, it wasn't.

15   Q      I'm asking whether you know whether it

16   was part of his sense of humor.  I'm not asking

17   whether you thought it was funny.  I'm asking

18   whether you know whether it was part of his

19   sense of humor.

20   A      He don't have a sense of humor.  I mean,

21   he asked me do I want a screw.

22   Q      Okay.  Listen to my question.  Do you

23   know whether that was part of his sense of

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 205

1    A     Yes.

2    Q     Just your personal opinion?

3    A     Yes.

4    Q     All right.

5    A     I know when my husband wants something, I

6    know.  So he was asking me in that kind of way,

7    and that hurts.

8    Q     You don't have any personal knowledge as

9    to why Williams made the comment, do you?

10   A     No.

11   Q     Williams didn't make any reference to

12   your race or sex when he made that comment, did

13   he?

14   A     I don't know.

15   Q     You don't know?

16   A     No.

17   Q     You don't recall?

18   A     My sex, he did.

19   Q     I'm asking whether he made any reference

20   to your race or sex?

21   A     No.

22   Q     Do you know whether Williams ever made

23   the same comment to white employees?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 206

1    A       No.

2    Q       You don't know?  Go ahead.

3    A       No.

4    Q       Do you know whether he ever made the same
5    comment to male employees?

6    A       No.

7    Q       You don't think that comment had anything
8    to do with your race, do you?

9    A       No.

10   Q       Do you think his comment had anything to
11   do with your sex?

12   A       Yes.

13   Q       And why?

14   A       He was looking at me asking me did I want
15   a screw.

16   Q       Do you want a screw.  And he was holding
17   a metal screw, correct?

18   A       Yes.

19   Q       Okay.  Is there any other reason you
20   think that might have had something to do with
21   your sex?

22   A       Yes.

23   Q       What?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 210

1    Q        Do you understand what I'm saying?

2    A        Yes.

3    Q        Just listen to my questions.

4    A        Uh-huh.

5    Q        So the reason you believe this comment

6    had something to do with your sex is because you

7    personally are equating the term "screw" with

8    the term "sex;" is that right?

9    A        Yes.

10   Q        But again, you don't know whether he was

11   just trying to be funny, do you?

12   A        He was looking serious.

13   Q        Do you know whether he was just trying to

14   be funny?

15   A        No.

16   Q        Okay.  So then you just walked away; is

17   that right?

18   A        Yes.

19   Q        And then what did you do?

20   A        Went to the service desk where Jerry was.

21   Q        And is that Jerry Culpepper, the store

22   manager?

23   A        Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 211

1    Q       Okay.  And what did you tell Jerry?

2    A       I told Jerry I needed to talk to him.

3    Q       Okay.

4    A       And he came up to the -- to the

5    service -- he came closer to me, and I told him

6    what Mike said.

7    Q       So you repeated the comment about "do you

8    want a screw" that Mike Williams had said to

9    you?

10   A       Yes.

11   Q       And you said that to Jerry?

12   A       Yes.

13   Q       Did you say anything else to Jerry?

14   A       He said he was coming to the back.

15   Q       All right.  Did you say anything else to

16   Jerry?

17   A       No; no.

18   Q       So all you did was repeat what Mike

19   Williams had said to you?

20   A       Yes; yes.

21   Q       Okay.  And then Jerry Culpepper said he

22   was going to come to the back; is that right?

23   A       He's going to come -- yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 212

1    Q      And that's where you were working?

2    A      Yes, I was.

3    Q      Okay.  And then what happened?

4    A      We was in the center of the aisle, and I

5    was talking to Jerry, and then Mike came over to

6    the conversation, and then --

7    Q      All right.  So Jerry came back to talk to

8    you, as he said he would, correct?

9    A      Yes.  And then Mike came over in the

10   conversation, and then he got on another --

11   Q      Did you say anything else to Jerry at

12   that point?

13   A      No.

14   Q      Jerry had just walked back there?

15   A      Yes.

16   Q      Okay.  And then what happened?

17   A      And he came over to the conver -- came

18   over there and --

19   Q      Mike Williams did?

20   A      Yes.

21   Q      And then what happened?

22   A      He started talking about Jerry Beads.

23   Q      Who did?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 213

1    A       Not even talking about what -- he just

2    started talking --

3    Q       Who started talking about Jerry Beads?

4    A       Mike.

5    Q       Okay.  As far as you know at that point,

6    Mike didn't know why Jerry Culpepper was back

7    there, right?

8    A       No.

9    Q       He didn't know, correct?

10   A       No.  I don't think he knew.

11   Q       Okay.

12   A       He saw me walking up there, so he just --

13   Q       But he didn't know why Jerry Culpepper

14   was back there, right?

15   A       No.

16   Q       And presumably Jerry Culpepper had gone

17   back there to talk to Mike Williams about

18   anything he had said to you --

19   A       Yes.

20   Q       -- that made you feel uncomfortable,

21   correct?

22   A       Yes.

23   Q       So this was the same date, on or about

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 214

1    March 14th, 2005, correct?

2    A       Yes.

3    Q       In the same few minutes?

4    A       Yes.

5    Q       Just a few minutes after the comment

6    regarding the metal screw, correct?

7    A       Yes.

8    Q       And so this comment about the beads also

9    allegedly occurred prior to you filing the first

10   EEOC charge on June 23rd, 2005, correct?

11   A       That was right when he came back to

12   the -- came to the back, correct.

13   Q        It happened before you filed your first

14   charge, correct?

15   A       It was the same day all that happened,

16   yes.

17   Q       So they were -- both of these incidents

18   occurred before you filed the first EEOC charge?

19   A       Yes; yes.

20   Q       And this was also one of the incidents in

21   which you based your June 23rd EEOC charge,

22   correct?

23   A       Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 215

1    Q      Okay.  So Jerry has come back there

2    presumably to talk to Mike about the comment

3    that you had told Jerry about, correct?

4    A      Uh-huh.

5    Q      And Jerry has not yet said anything, and

6    Mike comes over --

7    A      Yes.

8    Q      -- correct?  And then what happened?

9    A      He started talking about Jerry Beads.

10   Q      Okay.  And this is Mike?

11   A      Yes.

12   Q      Now, tell me what he said --

13   A      He said --

14   Q      -- as best you can recall.

15   A      I was standing there with Jerry, and he

16   said, "You want some Jerry Beads?  And Jerry

17   said --

18   Q      Hold on.  I only asked you to tell me

19   what Mike said.

20   A      "Jerry Beads."

21   Q      Offering, "Do you want some Jerry Beads?"

22   A      Yes.

23   Q      All right.  So that's everything that

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 220

1    A      No.

2    Q      And the reason you think it's connected

3    to the Jerry Springer show is because you watch

4    that show; is that right?

5    A      Yes.

6    Q      And Williams did not reference your race

7    or sex when he made the comment, did he?

8    A      What do you mean by sex?

9    Q      Your gender.

10   A      What do you mean by -- explain gender to

11   me, what you're saying about gender.

12   Q      Well, he didn't mention your race or sex,

13   did he?

14   A      What do you mean by sex and gender?

15   Explain it to me.

16   Q      I don't know how to explain that any more

17   clearly.

18   A      No.

19   Q      So the answer to my question is no, he

20   did not reference your race or sex when he made

21   the comment; is that correct?

22   A      No.

23   Q      Is that correct?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 221

1    A       Yes.

2    Q       Do you know if Mike Williams had ever

3    seen the Jerry Springer show?

4    A       He said he did.

5    Q       When?

6    A       When he was explaining to Jerry what they

7    were.

8    Q       Well, that's not what you -- you've not

9    said anything about him saying that he watched

10   the Jerry Springer show.

11   A       He said it.  I said it.  Every time I got

12   ready to say it, you said, "No."  He said it to

13   Jerry; he explained to Jerry what is Jerry

14   Beads, because Jerry didn't know what it was.

15   Q       Yes.  But you've still not said that he

16   said he had ever seen the Jerry Springer show.

17   A       Oh, he said he had seen it.

18   Q       What did he say exactly?

19   A       He said he seen when the ladies show

20   their breasts.  He said that to Jerry.

21   Q       That's all he said?

22   A       And I walked off, because --

23   Q       And that's all he said?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 223

1    this was, correct?

2    A       No.

3    Q       Is that right?

4    A       He didn't know what it was.

5    Q       He didn't know what it was.  Do you know

6    whether Williams knew whether you had ever

7    watched the Jerry Springer show or knew what

8    Jerry Beads were?

9    A       No.

10   Q       And you don't know why Williams made this

11   comment, do you?

12   A       No.

13   Q       He could have been joking, correct?

14   A       I don't know.

15   Q       Do you know whether Williams ever made

16   the statement to white employees?

17   A       No.

18   Q       Do you know whether Williams ever made

19   this statement to male employees?

20   A       No.

21   Q       You don't think this comment had anything

22   to do with your race, do you?

23   A       No.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 224

1    Q    Do you think this comment had something

2    to do with your sex?

3    A    Yes.

4    Q    And why do you think that?

5    A    Because I'm a woman, and he wanted to see

6    beads.  He was telling Jerry what Jerry Beads

7    are.

8    Q    Is it just your personal belief or

9    speculation that it had something to do with

10   your sex?

11   A    Personal belief.

12   Q    After Mike allegedly told Jerry what

13   Jerry Beads were, you said you just walked away?

14   A    Yes, I left while he was standing there

15   talking to him, because he wasn't even talking

16   to him about what he said to me.  So I just

17   walked off while they were talking about Jerry

18   Beads.

19   Q    So when he explained what Jerry Beads

20   were, he wasn't talking to you, was he?

21   A    He asked me did I want any Jerry Beads.

22   Q    Okay.  But after that, when he explained

23   what they were, he was talking to Jerry

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 225

1    Culpepper?

2    A        No.  He was the talking to Jerry

3    Culpepper.

4    Q        Not you?

5    A        No.

6    Q        And at that point, you just walked away?

7    A        Yeah, mad.

8    Q        But you didn't say anything else to them

9    about it?

10   A        No.

11   Q        All right.  So you never complained about

12   the Jerry Beads statement?

13   A        No.  I told my lawyer and he told me to

14   just note all this.

15   Q        But you never complained to anyone at Big

16   Lots, right?

17   A        I should have done it, but no.

18   Q        So the answer is, no, you didn't complain

19   to anyone at Big Lots?

20   A        No.

21   Q        Okay.  And Jerry Culpepper continued to

22   talk to Mike Williams; is that correct?

23   A        Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 226

1  Q     Do you know what he -- you weren't part

2  of that conversation, were you?

3  A     No.

4  Q     And so you don't know what he said to

5  him; what Jerry Culpepper said to Mike Williams,

6  do you?

7  A     No.

8  Q     You don't know whether he said that was

9  inappropriate statements, do you?

10  A     No.

11  Q     You don't know whether he reprimanded

12  Mike Williams, do you?

13  A     No.

14  Q     But Mike Williams thereafter never made

15  similar comments to you, did he?

16  A     No.

17  Q     So if Jerry Culpepper had talked to him

18  about these comments and asked him not to make

19  such comments in the future, that would have

20  worked, correct?

21  A     Yes.

22  Q     Because after this incident, you didn't

23  have any more comments like that from Mike

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 227

1    Williams, correct; is that right?

2    A       I stayed away from him.

3    Q       Okay.  But my question was, after this

4    incident --

5    A       No.

6    Q       -- there were no further --

7    A       No, I ain't talked to him.

8    Q       Okay.  After this incident, there were

9    not any similar incidents with Mike, were there?

10   A       No.

11   Q       All right.  And you also alleged that

12   Mike Williams made a comment about another

13   woman's butt in early March of 2005; is that

14   correct?

15   A       Yes.

16   Q       And this comment likely pre-dated the

17   comment about the metal screw and the comment

18   about the Jerry Beads, correct?

19   A       Yes.

20   Q       And if this incident occurred in March

21   2005 as you testified, it occurred before you

22   filed your first EEOC charge on June 23rd, 2005,

23   correct?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 228

1    A      Yes.

2    Q      And this was one of the incidents in

3    which you based your June 23rd EEOC charge,

4    correct?

5    A      Yes.

6    Q      All right.  Tell me what you recall about

7    Williams' comment.

8    A      About what?

9    Q      About his comment.

10   A      To whom?

11   Q      About the other woman.

12   A      She was in the -- I had seasonal wall at

13   Big Lots.  I used to do the seasonal, and she

14   was over in the lawn and garden part, and she

15   was bending over getting some pots, and he

16   watched that woman, and he said those words

17   about her butt, he had never seen a white woman

18   with a big butt.  He watched that lady all the

19   way through the store.  That's when I started

20   really noticing him, really looking at him.

21   Q      Okay.  Is that all that you can recall

22   about the incident?

23   A      Yeah.  He looked at her; he watched her.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 229

1    He came out and watched her all the way up the

2    hall.  Even when she paid and went out to the

3    car.  I just watched him.

4    Q       Were there any witnesses?

5    A       I don't know.  I was looking at him.

6    Q       Okay.  And who was the woman to whom he

7    was referring; a customer?

8    A       A customer.

9    Q       And you overheard him make that statement

10   while he was standing near you?

11   A       Yes.

12   Q       Williams was not referring to you, was

13   he?

14   A       No.

15   Q       And he was not referring to your anatomy,

16   was he?

17   A       No.

18   Q       And because he wasn't referring to you

19   personally, you weren't personally affected by

20   this alleged comment, were you?

21   A       None other than him -- realizing that

22   he's really a weirdo.

23   Q       Okay.  My question was, because Williams

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 230

1    was not referring to you personally, you really

2    weren't personally affected by the alleged

3    comment, were you?

4    A       No.

5    Q       Do you have personal knowledge as to why

6    Williams made this alleged statement?

7    A       No.

8    Q       Do you know whether he was just trying to

9    be funny?

10   A       No.

11   Q       And Williams didn't make any reference to

12   your race or sex when he made this comment, did

13   he?

14   A       No.

15   Q       And this comment had nothing to do with

16   your race, did it?

17   A       No.

18   Q       And this comment had nothing to do with

19   your sex, did it?

20   A       No.

21   Q       And you didn't complain to anyone about

22   this incident, did you?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 231

1    Q    All right.  And these three comments that
2    you alleged were made by Mike Williams, these
3    were all isolated incidents, correct?
4    A    It didn't do no good with Jerry being --
5    Q    What I'm asking is, these were all
6    isolated incidents, right?
7    A    Yeah.  Me and him was the only ones
8    working on one side of the store.
9    Q    And you've told me about the three
10   comments you allege Mike Williams made, that you
11   raised in your EEOC charge, correct?
12   A    Yes.
13   Q    Okay.  Did you allege that in mid May
14   2005 Billy Pridgen once stated something about
15   sugar?
16   A    Yes.
17   Q    And that was in mid May 2005?
18   A    Yes.
19   Q    And this incident also occurred before
20   you filed your first EEOC charge on June 23rd,
21   2005, correct?
22   A    Yes.
23   Q    And this was one of the incidents in

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 232

1    which you based your June 23rd EEOC charge,

2    correct?

3    A      Yes.

4    Q      Okay.  Tell me what you can recall about

5    Pridgen's alleged comment.

6    A      I was at the time getting ready to clock

7    out.  Deborah and Linda had already clocked out.

8    They came in early, so they clocked out five

9    minutes before I did; five minutes early.  And I

10   was there at the time clock waiting for the time

11   to get straight up.  Billy came down the

12   hallway, and I was up against the wall, and he

13   put his arms --

14   Q      You were up against the wall waiting for

15   the time clock?

16   A      Yes; yes.

17   Q      You were just waiting for the time to

18   leave?

19   A      Waiting for the time to get up; that one

20   more minute to get up there.

21   Q      Okay.

22   A      He came down the hallway, and put his

23   arms around me like that (indicating).  And I

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 233

1    told him to move, and he was trying to kiss me.

2    Q       You mean like he put his arms on the

3    wall?

4    A       Yes.

5    Q       When you say "put it around," you mean he

6    put his arm on the wall?

7    A       Yes, around me.

8    Q       But on the wall?

9    A       On the wall.

10   Q       But not on you personally?

11   A       Not on me personally, but his body was on

12   me, because he's a big person.

13   Q       All right.

14   A       His body touched my body.

15   Q       Because of his weight?

16   A       Yes.

17   Q       But you don't know that he was

18   intentionally meaning to touch you with his

19   body?

20   A       He was trying to kiss me with his face.

21   He had his arms around me.  I was on the wall,

22   and I'm telling him to move --

23   Q       Hold on a minute.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 234

1    A    He was doing like that (indicating).

2    Q    Okay.  He didn't kiss you, did he?

3    A    No, because I was telling him to move.

4    Q    So he didn't kiss you?

5    A    But he was kissing at my face.

6    Q    And his arms were on the wall?

7    A    Yes.

8    Q    Not on you, correct?

9    A    Yes.  His body was touching mine.

10   Q    All right.

11   A    If my husband had came around that

12   corner --

13   Q    We're not talking about your husband

14   right now.  I'm talking about this incident.

15   Your husband was present?

16   A    He was picking me up.

17   Q    Okay.  Have you told me everything you

18   can remember about that incident?

19   A    Yes.

20   Q    Were there any witnesses?

21   A    No.

22   Q    What time of day was it?

23   A    3:00.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 235

1    Q    And you were near the time clock?

2    A    Yes.

3    Q    Just waiting for time to clock out?

4    A    Yes.

5    Q    And what was Pridgen doing back there?

6    A    He was coming down the hallway.

7    Q    Do you know why?

8    A    No.  The office is right there.  I guess
9    he was going in the office.

10   Q    Going toward the office, and you just
11   happened to be there?

12   A    Yes.

13   Q    And this incident, how long would you say
14   it lasted, a couple of seconds?

15   A    Yes.

16   Q    And then what happened, he just moved
17   away and you clocked out and went home?

18   A    Yes, because I was trying to get out from
19   under him.

20   Q    I'm sorry?

21   A    I was trying to get out from down there.

22   Q    Okay.  So then he just moved?

23   A    After I pushed him and went on out of the

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 238

1    A      Yes.

2    Q      Okay.  And you said he didn't actually

3    kiss you; is that right?

4    A      No.

5    Q      That is right?

6    A      He didn't kiss me.

7    Q      Okay.  Do you have any personal knowledge

8    as to why Pridgen made this alleged statement or

9    acted in this way?

10   A      No.

11   Q      Do you think he was just trying to be

12   funny?

13   A      No.

14   Q      Do you think it's possible?

15   A      Yes.

16   Q      Do you think it's possible he was just

17   teasing around with you?

18   A      No.

19   Q      I'm saying, do you think it's possible?

20   A      He was doing it.  Yes, he was trying to

21   kiss me.

22   Q      Okay.  Do you think he was just teasing?

23   A      He wasn't teasing.  No, he wasn't

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 240

1    A       I don't know.

2    Q       You don't know?

3    A       I don't know about his humor.

4    Q       So you don't know?

5    A       Not about his humor.

6    Q       Okay.  And you don't have any personal

7    knowledge as to why Pridgen made the comment or

8    acted this way, or what he actually meant by it,

9    do you?

10   A       No.

11   Q       And Pridgen didn't actually make any

12   reference to your race or sex during this

13   incident, did he?

14   A       No.

15   Q       You don't think this conduct had anything

16   to do with your race, do you?

17   A       I don't know.  Maybe he wanted to kiss a

18   black woman.  I don't know.

19   Q       But you don't know?

20   A       I don't know.

21   Q       All right.  You just don't know why he

22   did that?

23   A       No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 241

1    Q      Do you know whether Pridgen ever made the
2    same comment or acted in the same manner with
3    white employees or male employees?
4    A      No.
5    Q      And you didn't complain to anyone about
6    this, did you?
7    A      No.  My lawyer.
8    Q      Okay.  But no one at Big Lots?
9    A      No.  And my husband.
10   Q      Okay.  But no one at Big Lots?
11   A      No.
12   Q      You also allege that in late May 2005
13   Billy Pridgen rubbed against you; is that
14   correct?
15   A      Yes.
16   Q      And this incident also occurred before
17   you filed your first EEOC charge on June 23rd,
18   2005, correct?
19   A      Yes.
20   Q      And this was also one of the incidents in
21   which you based your June 23rd EEOC charge,
22   correct?
23   A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 242

1    Q      All right.  Tell me what you recall about

2    the incident.

3    A      We was unloading a truck one day.  It was

4    on a Tuesday or Thursday.  He was on the same

5    side that I was, and the boxes was coming down,

6    some heavy boxes, and he was like, "I'll get

7    these right here."  And that's when I was

8    standing right there.  The conveyer belt is

9    right here (indicating).  I was standing right

10   here, and he was like moving like --

11   Q      Okay.  Now, you're going to have to

12   verbalize what you're talking about, because the

13   Court Reporter can't -- even though I may be

14   able to see what you're showing me, he can't get

15   it on the record.  Okay?  So tell me again.  You

16   were --

17   A      On the conveyer belt that the

18   merchandise --

19   Q      So the merchandise comes down on a

20   conveyer belt?

21   A      Uh-huh.

22   Q      Okay.

23   A      And Billy wanted to get around me.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 243

1    Q      To get some boxes off the conveyer belt?

2    A      And I was trying to move for him to get

3    the boxes.

4    Q      Okay.

5    A      He's just going to come right past me and

6    rub his body up against me.

7    Q      Okay; all right.  And so the both of you

8    were next to the conveyor belt at this point?

9    A      My face was -- and our butts was behind.

10   That's what he rubbed against.

11   Q      I'm sorry.  Now, what was?

12   A      My butt is where he came --

13   Q      You were facing forward towards the

14   conveyor belt?

15   A      Yes.

16   Q      And he was walking around behind you to

17   get boxes off the conveyor belt; is that right?

18   A      Yes.

19   Q      Okay.  And in doing so, he rubbed against

20   you?

21   A      Rubbing against me holding my -- like

22   this (indicating), and that's when I moved with

23   his body touching me on my --

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 244

1    Q    His body touched you as he went around

2    you to get boxes off the conveyor belt?

3    A    Yes, holding my -- holding me, but I was

4    trying to move and let him by.  He could have

5    said, "Excuse me."  I would have let him by.

6    Q    Okay.  Now, what did you just say?

7    A    I was letting him -- I was trying to let

8    him get by.

9    Q    That is a tight space there, isn't it?

10   A    Yeah.

11   Q    All right.  So you were trying to move a

12   little out of the way, and he was trying to get

13   around you to get the boxes off the conveyor

14   belt, and in so doing, he rubbed against the

15   back of you; is that correct?

16   A    Yeah.  Like I'm standing here with his

17   hands right here trying to get -- holding me,

18   but wasn't moving fast.  He was trying to --

19   Q    What do you mean holding you?  What are

20   you talking about now?

21   A    If I'm standing --

22   Q    Did he put his hands on you?

23   A    Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 245

1    Q       While he was trying to get by you?

2    A       Yes.  And he wasn't moving fast.  He was

3    moving slow.

4    Q       In your opinion?

5    A       Yeah.

6    Q       All right.

7    A       His body was touching my behind.

8    Q       Okay.  While he was trying to get around

9    you?

10   A       Yes.

11   Q       Do you know why -- he put his hand on

12   your shoulder, did you say?

13   A       I don't know.

14   Q       Did he or did he not?

15   A       He did.  I don't know why he did it,

16   but --

17   Q       You don't know why he did it.  Do you

18   know if he was trying to like just kind of let

19   you know he was trying to get around you?

20   A       He didn't have to let me know.  I was

21   trying to move.

22   Q       Do you know if he was trying to move you

23   a little bit?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 246

1    A      No.  He wasn't moving me.  He was moving

2    slow --

3    Q      Do you know why he did it?  You said no?

4    A      Yes.  He was trying to rub my butt.

5    That's what he was doing.

6    Q      Okay.  I'm asking you what you know --

7    A      Yes.

8    Q      -- based on your personal knowledge, not

9    what you speculate about.

10   A      Okay.

11   Q      All right?  You don't know why he touched

12   your shoulders as he was walking by, do you?

13   A      No.

14   Q      All right.  But you said that he's a

15   large person?

16   A      Yes.

17   Q      And do you know how much he weighs?

18   A      No.

19   Q      How much did you weigh at the time?

20   A      The same size I am now.

21   Q      What size is that?

22   A      246.

23   Q      And you don't know how much he weighed?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 247

1    A       No.

2    Q       Do you know how -- was there a wall

3    behind -- you know, kind of a conveyor belt, and

4    then a space, and then a wall?

5    A       There's a wall right there.

6    Q       Okay.  Do you know how much space there

7    was; how many feet between the wall and the

8    conveyor belt?

9    A       A lot of it.

10   Q       Do you know how many?

11   A       It was enough for me to move out of his

12   way; to let me move instead of trying to rub

13   into me to let him get by.  He could have let me

14   move.  I was moving.

15   Q       So in answer to my question, you don't

16   know how many feet, do you?

17   A       No.

18   Q       Now, have you told me everything you

19   remember about that incident?

20   A       Yes.

21   Q       Okay.  Were there any witnesses to that?

22   A       They was all at the end.  I don't know if

23   they seen him --

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 248

1    Q        Do you know if there were any witnesses?

2    A        No.

3    Q        What time of day was that?

4    A        It was in the morning.

5    Q        And you were both working on unloading

6    boxes from the conveyor belt, right?

7    A        Yes.

8    Q        And when I say "both," I mean you and

9    Billy Pridgen, right?

10   A        Uh-huh.

11   Q        And did this incident take place over the

12   course of a few seconds?

13   A        Yes.

14   Q        And then following this incident, you

15   continued on with your job -- your work duties?

16   A        Yes.

17   Q        Do you have personal knowledge as to

18   whether Pridgen's conduct was accidental rather

19   than intentional?

20   A        Intentional.

21   Q        I'm talking about personal knowledge.

22   A        This is my personal knowledge.

23   Q        Your personal opinion?

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 249

1    A       Yes.

2    Q       Do you know whether he was trying to be

3    funny or teasing you?

4    A       No.

5    Q       Do you know whether he thought it was an

6    accidental situation?

7    A       No, because when he -- when he was trying

8    to get by, he said something -- I said -- he

9    said, "I'm going to fall on top of you."  And he

10   said, "If you fall backwards, I'm going to fall

11   on top of you."  I was trying to move away from

12   him.  He said, "If you fall backwards, I'm going

13   to fall on top of you."

14   Q       Well, that doesn't even make any sense.

15   A       Fall on top of me?

16   Q       When you fall backwards?

17   A       Yeah, he's going to fall on top of me.

18   Q       All right.  Anything else?

19   A       That was it.

20   Q       You don't know what he meant by that?

21   A       No.

22   Q       Okay.  So again I was asking you, you

23   don't know whether he thought that incident was

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 250

1    accidental, do you?

2    A       No.

3    Q       And Pridgen didn't make any reference to

4    your race or sex when he bumped into you, did

5    he?

6    A       What do you mean?

7    Q       He didn't make any reference to your race

8    or sex when he bumped into you, did he?

9    A       No.

10   Q       And you don't know whether this incident

11   had anything to do with your race, do you?

12   A       No.

13   Q       And you don't know whether it had

14   anything to do with your sex, do you?

15   A       No.

16   Q       Do you know whether Pridgen ever acted in

17   the same manner with white employees or male

18   employees?

19   A       No.

20   Q       And you didn't complain regarding this

21   incident to anyone at Big Lots, did you?

22   A       My lawyer.

23   Q       Okay.  Listen to my question, please.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 251

1    A        No.

2    Q        You didn't complain to anyone at Big

3    Lots, did you?

4    A        No.

5    Q        Was there another incident involving

6    Billy Pridgen in which you based your EEOC

7    charge?

8    A        Yes.

9    Q        And was this an incident that allegedly

10   occurred in mid June 2005?

11   A        Yes.

12   Q        And this incident also occurred before

13   you filed your first EEOC charge on June 23rd,

14   2005, correct?

15   A        Yes.

16   Q        And this is one of the incidents in which

17   you based your June 23rd EEOC charge, correct?

18   A        Yes.

19   Q        Okay.  If you would, tell me what you

20   recall about the incident.

21   A        This was another one with the truck, and

22   we was taking our fifteen minute break, and he

23   sent Deborah Mitchell up to the front to get

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 252

1    some sodas for everybody.  So I was sitting on a

2    box that was up against the wall, and --

3    Q      Let me stop you just for a second.  Now,

4    is that something that he would sometimes do,

5    was to offer to buy drinks for folks when they

6    were working unloading the truck?

7    A      They write them off.  They write the

8    drinks off for the people that are unloading the

9    truck.

10    Q      That's kind of a perk of working there,

11    right?

12    A      Uh-huh.

13    Q      So that's a nice thing that they do?

14    A      Yes.  Since it wasn't but us ladies back

15    there unloading, he tried to give us something

16    to have that was cold.

17    Q      To be nice?

18    A      Yes.

19    Q      Okay.  So go on.  I'm sorry.

20    A      And I was on the box in the corner, and I

21    was -- to tell you the truth, I really had dozed

22    off, because I really was tired, and I was up on

23    the box waiting, you know, for Deborah to get

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 253

1    back with the drinks on my fifteen minutes.

2    Then I felt somebody blowing their breath in a

3    circular motion in my face, and that's when I

4    looked up.  I said, "Billy, what are you doing?"

5    I pushed him back off of me.  "What are you

6    doing?"  "That's the way my wife likes it when I

7    wake her up in the morning.  She likes me to

8    blow my breath in her face."  And then Deborah

9    came, and I said, "Deborah, why didn't you wake

10   me up?  Billy is over here blowing his breath in

11   my face."  She said, "I didn't know he was over

12   there doing that."

13   Q      Okay.  Is that all you recall?

14   A      That was it.  He was over me like this

15   blowing his breath in my face in a circular

16   motion (indicating).

17   Q      Trying to wake you up?

18   A      Yeah.

19   Q      All right.

20   A      I don't know what he was doing, but I

21   know he ain't got to blow his breath in my face.

22   Q      But you were asleep; you had dozed off?

23   A      Yeah.  I wasn't asleep.  I was relaxing

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 255

1    A       Uh-huh.

2    Q       -- in the back area?

3    A       We didn't go in the break room.  We just

4    stayed back there and took our fifteen minutes.

5    Q       I see what you're saying.  So you were

6    getting a break at the time?

7    A       Yes.

8    Q       And Pridgen had been working with you at

9    the time?

10   A       Yes.

11   Q       And did this take -- this incident take

12   place over the course of a few seconds, as well?

13   A       Yes.

14   Q       And then following this incident, I

15   assume your break was over and you just returned

16   to work; is that right?

17   A       Yes.  We also have cameras.  We had

18   cameras in the store.

19   Q       You had cameras in the store?

20   A       Yes.

21   Q       Okay.  Why are you telling me that?

22   A       Because those dates, the camera was on in

23   the hallway, and the camera was on in the back

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 257

1    to how long any film or video coverage is

2    maintained?

3    A       No.

4    Q       Do you know whether the cameras are even,

5    in fact, actually recording or saving the

6    pictures, unless someone has, you know, pushed a

7    button or done something else to make them

8    operate like in the case of a theft or

9    something?

10   A       No.

11   Q       Okay.  You don't have any personal

12   knowledge as to why Pridgen acted this way?

13   A       No.

14   Q       Or what he meant by it, do you?

15   A       No.

16   Q       He didn't actually make any reference to

17   your race or sex during this incident?

18   A       No.

19   Q       Do you know whether Pridgen ever acted in

20   the same manner with white employees?

21   A       No.  It was all blacks over there.

22   Q       Well, I'm asking, you don't know whether

23   he ever acted in the same manner with white

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 258

1    employees, do you?

2    A      No, I don't.

3    Q      You don't know whether he ever acted in

4    the same manner with male employees, do you?

5    A      No.

6    Q      You don't know whether this had anything

7    to do with your race?

8    A      No.

9    Q      You don't know whether it had anything to

10   do with your sex?

11   A      No.

12   Q      And you didn't complain to anyone --

13   A      No.

14   Q      -- at Big Lots?

15   A      Not at Big Lots.

16   Q      You worked with Billy Pridgen throughout

17   your employment at Big Lots, didn't you?

18   A      Yes.

19   Q      And the three incidents you allege

20   regarding Pridgen are isolated incidents, aren't

21   they?

22   A      Except for the cameras.  There's four.

23   Q      Okay.  And we've already covered the

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 260

1     mean by isolated.

2     A     Okay.

3     Q     You understand what I mean now?

4     A     Uh-huh.

5     Q     So these incidents that you allege

6     regarding Pridgen are isolated incidents; isn't

7     that correct?

8     A     Yes.

9     Q     And the incident involving Pridgen that

10    you've just testified about, those were

11    unrelated to the incidents you testified about

12    with respect to Mike Williams, correct?

13    A     Yes.

14    Q     In other words, they didn't have anything

15    to do with each other, did they?

16    A     No.

17    Q     Are you aware that numerous former

18    employees of Store Number 818, who worked there

19    during your employment, have all denied

20    witnessing any racial or sexual harassment at

21    Store Number 818?

22    A     No.

23    Q     And you've told me now about all the

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 261

1    conduct in which you base your second EEOC

2    charge, correct?

3    A        What?

4    Q        You've told me about all the conduct in

5    which you based your second EEOC charge,

6    correct?

7    A        Yes.

8

9    REPORTER'S NOTE:  (At this point, instrument was

10   marked for identification by the Reporter as

11   Defendant's Exhibit Number 27, after which, the

12   deposition continued, as follows:)

13

14   Q        (continued by Mr. Smith)  Ms. Croskey, do

15   you recognize what has been marked as Exhibit

16   27?

17   A        Yes.

18   Q        And this is a copy of the Dismissal and

19   Notice of Rights you received from the EEOC with

20   respect to your second EEOC charge, charge

21   number 130200506801, correct?

22   A        Yes.

23   Q        And you attached this document to your

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 262

1    Complaint as an exhibit, and also produced a

2    copy in response to Big Lots' interrogatories,

3    didn't you?

4    A        Yes.

5    Q        And the document indicates it was mailed

6    on May 5th, 2006, correct?

7    A        Yes.

8    Q        And according to your Complaint, you

9    received the document on May 5th, 2006, correct?

10    A        Yes.

11    Q        And the box that's checked states that,

12    "Based on the EEOC's investigation, it is unable

13    to conclude that the information obtained

14    establishes a violation of the statutes;" is

15    that correct?

16    A        Yes.

17    Q        And you only filed the two EEOC charges,

18    the two we've discussed today, correct?

19    A        Yes.

20    Q        And you never revised or amended these

21    two EEOC charges, did you?

22    A        No.

23    Q        And the alleged conduct on which you

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 263

1   based your two EEOC charges was alleged race and

2   sex harassment, correct?

3   A      Yes.

4   Q      And we've discussed all the incidents on

5   which you based your EEOC charges, correct?

6   A      Yes.

7   Q      And you've told me about any complaints

8   you made regarding any alleged misconduct at Big

9   Lots, correct?

10  A      Yes.

11  Q      Your employment with Big Lots ended

12  effective December 24th, 2005; is that correct?

13  A      Yes.

14  Q      And you were terminated because Store

15  Number 818 where you worked was closed

16  permanently, correct?

17  A      Yes.

18  Q      And you're aware that all hourly

19  employees at Store Number 818 were terminated

20  because the store closed, aren't you?

21  A      Yes.

22  Q      And this was over twenty individuals who

23  were terminated because the store was closed,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 264

1    correct?

2    A      Yes.

3    Q      And do you recall signing an Action

4    Request Form acknowledging that your termination

5    was because Store Number 818 was closing?

6    A      Yes.

7    Q      And your termination resulting from the

8    store closing is not part of your claims in this

9    lawsuit; isn't that correct?

10   A      Yes.

11   Q      And you're not claiming your termination

12   from Big Lots was because of your race or sex,

13   are you?

14   A      No.

15   Q      And you don't have any personal knowledge

16   as to who made the decision to close Store

17   Number 818, do you?

18   A      No.

19   Q      And you don't have any personal knowledge

20   as to who made the decision to terminate your

21   employment effective December 24th, 2005, do

22   you?

23   A      No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 265

1  Q      And you're not aware of any hourly store

2  employees who were transferred to another Big

3  Lots' location when Store Number 818 closed, are

4  you?

5  A      No.

6  Q      Okay.  So again, your claims in this

7  lawsuit have nothing to do with your

8  termination, do they?

9  A      No.

10  Q      And your claims in this lawsuit don't

11  have anything to do with not being transferred

12  to another Big Lots store, do they?

13  A      No.

14  Q      All right.  According to your Complaint,

15  which we have marked previously as Exhibit 22,

16  and according to paragraph 4 of that Complaint

17  on page 1, the acts you're complaining of in

18  this lawsuit are hostile environment based on

19  your race and/or sex; is that correct?

20  A      Yes.

21  Q      And these are the only claims you're

22  alleging in this lawsuit, correct?

23  A      Yes.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 266

1    Q      And according to paragraph 8, the alleged

2    discrimination occurred on or about March 28th

3    through the 30th, 2005; is that correct?

4    A      Yes.

5    Q      Are your claims in this lawsuit based on

6    the pictures of employees made by Mike Williams

7    that we've discussed previously?

8    A      Yes.

9    Q      And for clarification, you're not

10   alleging retaliation in this lawsuit, are you?

11   A      No.

12   Q      And no one ever told you you were being

13   terminated because of your race or sex, did

14   they?

15   A      No.

16   Q      And no one ever told you you were being

17   terminated because of any complaints you had

18   made or anything like that, did they?

19   A      No.

20   Q      Have we now discussed all the facts that

21   support the claims you've made in this lawsuit?

22   A      Yes.

23   Q      And you're not aware of any other facts

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 286

1    you to be transfused, two units of packed RBCs

2    for the chest pain; is that correct?

3    A        Yeah.

4    Q        "So with the patient clinically improved

5    after the transfusion, I" -- meaning the

6    doctor -- "decided to discharge her home;" is

7    that correct?

8    A        Yes.

9    Q        And then you were discharged to home in

10   good condition, correct?

11   A        Yes.

12   Q        So again, you don't know what the medical

13   cause was for this visit, do you?

14   A        No.

15   Q        You don't know whether it had anything to

16   do with Big Lots, do you?

17   A        No.

18   Q        Okay.  So I'm going to ask you again, can

19   you identify any treatment by any doctors or

20   healthcare providers for any medical or

21   psychiatric condition allegedly caused by Big

22   Lots?

23   A        No.

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 288

1    Q       And that had nothing to do with Big Lots,

2    did it?

3    A       No.

4    Q       And also in March 2002, you were treated

5    at the same hospital due to your face, lips and

6    tongue swelling, and then it was determined that

7    that was probably an allergic reaction to food

8    or drink, as well, correct?

9    A       Correct.

10   Q       Okay.  And so again, you can't identify

11   any medical treatment that you have received

12   resulting from the alleged harassment or hostile

13   work environment at Big Lots, can you?

14   A       No.

15   Q       Will you look back at Exhibit 22 for me?

16   Actually, that's not the right one.  How about

17   Exhibit 2?  Interrogatory Number 8, which is in

18   Exhibit 1, just asks you to state the name and

19   dosage of any medications that have been

20   prescribed to you in the last ten years; and for

21   each medication, to provide the name and address

22   of the medical provider who provided such

23   medication, the reason such medication was

e7b850c2-8e7d-4d11-8864-13990c2bb0e7

## Equal Employment Opportunity                    Last update: August 2005

No person shall be discriminated against in employment because of race, color, religion, sex, sexual orientation, age, national origin, mental or physical disability or marital status.

This policy applies to all terms and conditions of employment including, but not limited to hiring, training, promotion, transfer, demotion, compensation, benefits, and termination.

The Executive Vice President is responsible for formulating, implementing, coordinating, and monitoring all efforts in the area of equal employment opportunity.

Each manager is responsible for initiating and administering this policy within his/her store/department.

Every associate is expected to adhere to the guidelines set forth in this policy in both practice and spirit.

Any formal or informal allegation that this policy has been violated should be referred immediately to Human Resources.

## Employing Persons with Disabilities

Qualified individuals with disabilities are to be treated in a nondiscriminatory manner in the pre-employment process and in all terms, conditions, and privileges of employment.

All medical-related information is to be maintained in a confidential manner in separate, confidential files.

Applicants and associates with disabilities are to be provided reasonable accommodation, except where making an accommodation would create an undue hardship on the Company.

All requests for reasonable accommodation from qualified applicants and associates with disabilities are to be referred to the appropriate Human Resources manager. The Company will make a good faith effort to assist individuals seeking accommodations.

In determining the feasibility of the requested accommodation, the Company will consider the preference of the individual to be accommodated and, if there are two or more effective accommodations, will choose the least expensive or most practical accommodation that will provide equal opportunity for the applicant or associate.

Accommodation is generally initiated by a request from an applicant or associate. Situations may arise where an associate, who is known to have a disability, may be having difficulty performing the essential functions of his/her job and therefore, may need accommodation. The associate's supervisor should discuss the matter with the appropriate Human Resources manager. The Human Resources manager will advise the associate's supervisor on how to initiate a discussion with the associate.

Violations of this policy may result in disciplinary action, up to and including termination of employment. (See Confidential Information, Harrassment-Free Environment, Open Door)

DEFENDANT'S
EXHIBIT

9

**Harassment-Free Environment**                    **Last update: August 2005**

Big Lots strictly prohibits harassment and/or discrimination based on race, color, religion, sex, sexual preference, age, national origin, mental or physical disability or marital status.

Each supervisor or manager is responsible for maintaining a work environment that is free of harassment both sexual and otherwise. This includes communication of this policy to all associates and assuring that they are not subjected to insulting, degrading or exploitative behavior as defined above.

Big Lots also strictly prohibits sexual harassment. Sexual harassment includes any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when:

- Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment.
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

Likewise, all associates are responsible for adhering to these guidelines and are prohibited from engaging in discriminatory or harassing behavior. Any associate who believes he/she has been the subject of harassment is responsible for promptly reporting the alleged act to Human Resources or his/her immediate supervisor.

All reports of harassment will be promptly investigated under the direction of Human Resources. All investigations of alleged harassment will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved. Any associate who is found to have engaged in discriminatory or harassing conduct will be subject to appropriate disciplinary action, up to and including termination. Likewise retaliation against anyone reporting acts of harassment will not be tolerated.

This policy is intended to be in compliance with all Federal laws, specifically Title VII of the Civil Rights Act of 1964, and all State and Local laws dealing with unlawful discrimination and/or harassment. (See Equal Employment Opportunity, Open Door, Standards of Conduct)

DEFENDANT'S
EXHIBIT

10

**Open Door**                          **Last update: August 2005**

Big Lots believes in dealing directly with all associates and further believes that all associates have a right to express their opinions, concerns, and to ask any questions they may have relating to their job or the Company. Any associate with a question or problem is entitled to use the Open Door Policy and may contact anyone in the organization.

Take the question or concern to your immediate supervisor or manager.

OR

If you have a question and do not wish to discuss the matter with your direct manager or supervisor, go to the next level manager.

OR

If you have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department:

- <u>Store Associates</u>: Contact the Regional Human Resources Manager.
- <u>Distribution Associates</u>: Contact the Distribution and Transportation Services Human Resources Manager.
- <u>General Office Associates</u>: Contact the General Office Human Resources Manager.

Associates wishing to make anonymous complaints or ask a question may call the Get Real Hotline at 1-866-834-REAL (1-866-834-7325).

All members of management are expected to maintain the integrity and communicate the spirit of the Open Door Policy.

Any attempt to thwart or retaliate against an associate for exercising his/her Open Door rights will be considered a serious violation of Company policy and may result in disciplinary action, up to and including termination of employment. (See <u>Harrassment-Free Environment</u>, <u>No Solicitation</u>, <u>Standards of Conduct</u>, <u>Union-Free Environment</u>)



DEFENDANT'S
EXHIBIT

11

**Standards of Conduct**                    **Last update: August 2005**

Associates are expected to conduct themselves in a way that is conducive to an ethical business environment. Violations of company policy, public policy, or local, state, and federal laws will not be tolerated. Conduct is expected to reflect our Company's values at all times.

The following behaviors are unacceptable deviations from the Company Standards of Conduct:

- Violation of the Harassment-Free Environment Policy.
- Physical assault or attempted assault on another associate or customer.
- Engaging in conversation, gestures or behaviors that are considered lewd, offensive, abusive, and profane or threatening to associates and/or customers.
- Inappropriate fraternization, including having an intimate relationship with another associate whom you supervise, either directly or indirectly, or over whom you exert some influence or control by nature of your responsibility.
- Violation of the Drug-Free Workplace Policy, including but not limited to consuming intoxicating beverages or use of illegal drugs during scheduled work time; or reporting to work under the influence of intoxicating beverages or illegal drugs.
- Smoking in a company facility or company vehicle and/or use of chewing tobacco or similar products (See Smoke Free Policy).
- Conduct which results in a substantial risk of harm to a customer or another associate, or damage to Company property.
- Possession of weapons, including but not limited to, knives, firearms, explosives, or other instruments that may cause harm to others, intoxicating beverages, or illegal drugs on Company property, including parking lots, or while conducting Company business.
- Conviction of a criminal offense for a crime against the Company or related to the type of responsibilities performed for the Company.
- Dishonest activities such as, theft, selling merchandise at a price lower than that which is marked on the goods without authorization, consumption or use of merchandise that has not been previously purchased by the associate or approved by management.
- Violation of minor labor laws for those associates under eighteen (18) years of age. *NOTE: Associates less than eighteen (18) years of age are not permitted to load, unload or otherwise operate the cardboard baler. These associates are also not permitted to operate any type of power equipment. (See Employment of Minors Policy).*
- Violation of the No Solicitation Policy.
- Unauthorized use of Company property, facilities or resources (See Information Security and Electronic Communications Policy).
- Unauthorized divulgence of personnel records or Company business (See Confidential Information Policy).
- Insubordination by refusing to complete work as assigned by a manager. In the event of conflicting instructions, the associate should follow the directions of the manager-on-duty and later request clarification.
- Unsatisfactory work performance including disregard of established safety practices and rules.
- Failure to cooperate with Company investigations or inspections.
- Excessive absenteeism or tardiness (See Attendance Policy).
- Working before or after scheduled time without specific authorization from management.
- Job abandonment, which includes two (2) consecutive days absence from scheduled work without calling into management (See Call-in Procedure Policy) or walking off the job without notifying management. These occurrences are

DEFENDANT'S EXHIBIT

12

considered voluntary terminations (See Termination of Employment Policy).

- Falsification of documents or records including but not limited to, employment application, expense reports, price change documents, timecards, permitting another associate to clock in or out for you, production reports, payroll management documents, etc.

- Misuse of the associate discount privilege by permitting someone not eligible to purchase items with the associate discount or by returning merchandise for a full refund when purchased with the associate discount (See Associate Discount Policy).

- Associates are not permitted to hold or hide merchandise for purchase at a later time. Associates may not purchase merchandise unless it is available for sale to the general public.

- The writing of bad checks to the Company.

- The following violations are store specific:

  O Any violation of established shopping regulations including processing unauthorized markdowns and/or ringing sales or handling any other transaction (i.e., returns, cashing checks, etc.) of your own or any immediate relative.

  O Improper use of "paid outs".

  O Cashing checks.

  O Use or unauthorized removal of store funds, or other Company resources, for personal use.

  O Unexplained single incident variance of $50 or greater where till integrity has been maintained.

  O Single till variance of $5 or more, and/or variances of $15 or more in a 30-day period.

  O Failure of store associates to perform established procedures, including but not limited to, the following:

    ■ Completing daily bank deposits.

    ■ Securing funds properly.

    ■ Maintaining accountability for all funds transactions.

    ■ Conducting "cash pickups" when cash totals in excess of $1500 in drop box and till.

    ■ Ensuring that Register operator "till drops" are made when cash exceeds $100 of paper currency in till.

    ■ Ensuring all doors are locked and alarms set as required.

    ■ Ensuring all safety exits are accessible.

    ■ Securing safe, as required including maintaining confidential safe combination.

    ■ Maintaining key control.

    ■ Ensuring that store security cameras are operating daily and tapes maintained as required.

    ■ Allowing only authorized associates in controlled areas (i.e., stock room, cash office, etc.).

  O Violation of any other Company rules/regulations or any other action/activity that is deemed to be detrimental to the orderly operation of our Company.

Associates are expected to comply with this Policy and report violations immediately. In all of the above instances, the severity of an individual violation may warrant immediate termination. However, only those persons with the approval to terminate can make this determination (See Termination of Employment Policy).